Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2        FOR THE CENTRAL DISTRICT OF ILLINOIS
 3                  PEORIA DIVISION
 4
 5
 6   FLOYD K. HAYES,
 7           Plaintiff,
 8      vs.                       No. 04 CV 1062
 9   DONALD N. SNYDER, JESSE
     MONTGOMERY, MARK A.
10   PIERSON, WANDA L. BASS,
     WILLIAM M. HAMBY, MD., PhD.,
11   each in their individual
     capacities only,
12
              Defendants.
13
14
15
16      THE DEPOSITION of WILLIAM M. HAMBY, M.D.,
17   called as a witness pursuant to notice and
18   pursuant to the provisions of the Federal Rules
19   of Civil Procedure pertaining to the taking of
20   depositions, taken before SUE A. PHELPS, CSR,
21   State of Illinois, at 1 Old State Capitol
22   Plaza, Springfield, Illinois, on the 6th day of
23   June, 2006, commencing at 12:30 p.m.
```

EXHIBIT 2

```
 1    APPEARANCES:
 2    MR. JONATHAN A. BACKMAN
      Law Office of Jonathan A. Backman
 3    117 North Center Street
      Bloomington, Illinois   61701-5001
 4    (309) 820-7420
              appeared on behalf of the Plaintiff;
 5
      MS. KELLY R. CHOATE
 6    MS. ELLEN BRUCE
      Office of the Attorney General
 7    500 S. Second Street
      Springfield, Illinois   62706
 8    (217) 782-9026
              appeared on behalf of the Defendants
 9            Donald N. Snyder, Jesse Montgomery, Mark
              A. Pierson, and Wanda L. Bass;
10
      MS. THERESA POWELL
11    Heyl, Royster, Voelker & Allen
      1 North Old State Capitol Plaza, Suite 575
12    Springfield, Illinois   62702
      (217) 522-8822
13            appeared on behalf of the Defendant
              William M. Hamby, M.D., PhD.
14
15    Also Present:  Ms. Eileen Backman
16
17
18
19
20
21
22
23
```

```
 1
                        * * * * * * *
 2
 3                    I N D E X
 4   DEPONENT                          PAGE NUMBER
 5   William M. Hamby, M.D.
 6   Examination by Mr. Backman        4, 125
     Examination by Ms. Choate         111
 7   Examination by Ms. Powell         112
 8
 9
                     E X H I B I T S
10
     NUMBER                    MARKED FOR IDENTIFICATION
11
     Exhibit P                         16
12   Exhibit Q                         16
     Exhibit R                         17
13   Exhibit S                         21
     Exhibit T                         22
14   Exhibit U                         32
     Exhibit V                         34
15   Exhibit W                         38
     Exhibit X                         40
16   Exhibit Y                         40
     Exhibit Z                         44
17   Exhibit AA                        91
     Exhibit BB                        97
18   Exhibit CC                        99
     Exhibit DD                        109
19
     All exhibits attached.
20
21
22
23
```

Page 4

```
 1              WILLIAM M. HAMBY, M.D.,
 2   being first duly sworn, deposes and says as
 3   follows, in answer to:
 4                  EXAMINATION BY
 5                   MR. BACKMAN
 6   Q.  Mr. Hamby -- Dr. Hamby.  I'm sorry.  Would you
 7       state your name and spell it for the record?
 8   A.  William, W-i-l-l-i-a-m, M., Hamby, H-a-m -- as
 9       in Mary -- b -- as in boy -- y.
10   Q.  And you understand that you're here today in a
11       deposition in case number 04 CV 1062, Floyd
12       Hayes versus Donald Snyder and various other
13       people including yourself?
14   A.  Yes, I do.
15   Q.  In the room today we have myself and Eileen
16       Backman, my assistant and wife, your attorney
17       Kelly Choate and -- I'm sorry -- Theresa Powell
18       is your attorney, Kelly Choate and Ellen Bruce
19       and -- the one I only just recently met is the
20       one whose name I remember -- and the court
21       reporter and yourself and nobody else.
22       Correct?
23   A.  Yes.
```

1   Q.   Okay.  And have you ever been deposed before?
2   A.   Yes.
3   Q.   How many times roughly?
4   A.   Six.
5   Q.   Okay.  You understand that -- Well, let me
6        start out by saying I'm not trying to trick you
7        in the questions I'm going to be asking and if
8        you feel that you don't understand a question,
9        you can ask me to clarify it or if you want to
10       break to clarify something with your attorney,
11       that's fine with me.  Okay?
12  A.   Okay.
13  Q.   You understand that because of the nature of
14       depositions, particularly ones where there's no
15       videographer, you'll have to answer with a
16       verbal response, yes, no, or something else.
17  A.   Yes.
18  Q.   But nods of the head and otherwise won't be
19       captured accurately.
20  A.   Yes.
21  Q.   The other thing -- general rule that frequently
22       gets violated by both the attorney and the
23       witness is one of us expecting that we know

```
 1        what the other one's saying so we kind of step
 2        on each other's words.
 3             That's really difficult for the court
 4        reporter and even worse can result in your
 5        answering a question before I finished it and
 6        therefore the answer being inaccurate or not
 7        conveying the message you wanted to so we'll
 8        try to avoid that.  Okay?
 9   A.   Okay.
10   Q.   Lastly, and I kind of mentioned this, if you
11        want a break at any time whether to talk to
12        your attorney or for any other reason, please
13        just let me know and I'll be happy to take one.
14   A.   Okay.
15   Q.   Where do you live now?
16   A.   At the moment?  35 Herring Drive,
17        H-e-r-r-i-n-g, in Murphysboro, Illinois, 62966.
18   Q.   And how old are you?
19   A.   I'm sorry?
20   Q.   How old are you?
21   A.   How old am I?
22   Q.   Age.
23   A.   Seventy-six.
```

1   Q.  What was your date and place of birth?
2   A.  East St. Louis, Illinois.  4-10-30.
3   Q.  Where did you live before you lived in
4       Murphysboro?
5   A.  In Indian Head Park, Illinois.
6   Q.  How long have you been where you are now in
7       Murphysboro?
8   A.  Going on eleven years.
9   Q.  That would include everything that happened in
10      this case.  Okay.  Do you live alone or do you
11      live with someone?
12  A.  Right at the moment I am living with my son and
13      daughter-in-law.
14  Q.  Are you married?
15  A.  I was.
16  Q.  Divorced or deceased?
17  A.  Deceased.
18  Q.  Sorry.  Have you ingested in the past 24 hours
19      any alcohol or other substance that could
20      affect your ability to understand my questions
21      and to give honest answers to them?
22  A.  No.
23  Q.  How long have you been a medical doctor?

```
 1   A.  Since 1960.  1959 actually.
 2   Q.  Now what specialties do you have as a doctor?
 3   A.  I am an internal medicine specialist with a
 4       subspecialty in nephrology.
 5   Q.  What is neph -- I'm sorry.
 6   A.  Nephrology?
 7   Q.  I didn't mean to interrupt.
 8   A.  Kidney disease.
 9   Q.  Did I interrupt you?  Was there something else
10       you were going to say about --
11   A.  I was just going to tell you that I had a Ph.D.
12       in physiology to go with my M.D.
13   Q.  When did you get your Ph.D.?
14   A.  1968.
15   Q.  When did you get your specialty or
16       certification as a -- in nephrology?
17   A.  I was grandfathered into nephrology in -- I
18       don't remember what year.
19   Q.  Was it more than ten years ago?
20   A.  Yes.
21   Q.  Where did you go to medical school?
22   A.  University of Illinois, Chicago.
23   Q.  What type of degree did you get when you
```

```
 1        graduated?  Is there a specific degree or is it
 2        M.D.?
 3   A.   It's M.D.
 4   Q.   Okay.  Where did you get your Ph.D.?
 5   A.   University of Illinois, Chicago.
 6   Q.   Any other educational information since you
 7        graduated from medical school that I should be
 8        aware of?
 9   A.   No.  Not really.
10   Q.   Are you practicing today?
11   A.   No.
12   Q.   When did you retire?
13   A.   19 -- That's not true.  2004.  I'm sorry.
14   Q.   That's okay.  Where were you working at the
15        time you retired?
16   A.   Big Muddy.
17   Q.   And that's a correctional facility?
18   A.   Correctional facility at Ina, Illinois.
19   Q.   Ina?
20   A.   Ina.
21   Q.   And you had been there I take it since you
22        left --
23   A.   Was there from 10-1.
```

1  Q.  '02?
2  A.  '02 to 9-17-04.
3  Q.  And you -- Immediately proceeding being at Big
4      Muddy you were at Hill Correctional Facility,
5      correct?
6  A.  Correct.
7  Q.  Did you refer to it as Hill Correctional
8      Facility or Hill Correctional Center or both?
9  A.  Both.
10 Q.  Is it okay with you if from time to time I
11     refer to it as HCF today?
12 A.  I won't -- won't recognize that.
13 Q.  You won't recognize that?
14 A.  I will ask you what that means.
15 Q.  Okay.  Did you have a -- What did you day to
16     day when you were working at Hill Correctional
17     Facility -- how did you refer to it?  As the
18     facility?
19 A.  No.  Just Hill.
20 Q.  Just Hill.  Fair enough.  And how long were you
21     at Hill?
22 A.  About a year.  I don't remember the exact date
23     that I got there but I left on 10-1-04.

1  Q.  10-1-02?
2  A.  10-1-02.  I'm sorry.
3  Q.  I know this goes back several years.  Where did
4      you work before Hill?
5  A.  At Farmington in Missouri.
6  Q.  Farmington, was that a correctional facility?
7  A.  Yes.
8  Q.  Okay.  Where -- What states are you licensed in
9      to practice?
10 A.  At the present time only in Illinois.
11 Q.  Were you in Missouri back then?
12 A.  Yes.  Licensed in Missouri and in Indiana.
13 Q.  What caused you to give up those licenses?
14 A.  Not going there to practice medicine.
15 Q.  So there wasn't any disciplinary issues?
16 A.  No.
17 Q.  How long -- When did you start working in
18     correctional facilities as a doctor?  Again,
19     not -- The exact date isn't important.  Just
20     that period in your career.
21 A.  1994.
22 Q.  Was that in Missouri or Illinois?
23 A.  That was in Illinois.

```
 1   Q.   Do you remember which facility that was at when
 2        you started?
 3   A.   Menard.
 4   Q.   Menard?
 5   A.   Menard.
 6   Q.   What caused you to go into medical practice in
 7        correctional facilities?
 8   A.   Why?  Because I wanted to retire and quit
 9        taking night call.
10   Q.   And what was it about working correctional
11        facilities that would enable you to do that?
12   A.   The regular hours.
13   Q.   Do you remember what position you were in when
14        you first started back in Menard in 1994?
15   A.   I was a medical director.
16   Q.   You came right in as a medical director?
17   A.   Yes, sir.
18   Q.   And then when you started in Hill did you start
19        there as medical director?
20   A.   Yes, sir.
21   Q.   Did you -- Strike that.  In Missouri likewise
22        at Farmington?
23   A.   Yes.
```

1  Q.  So you were generally familiar I take it then when you started at Hill with the roles and responsibilities of a medical director?
4  A.  Yes, sir.
5  Q.  And when we say medical director, that's medical director of the health facility of the specific correctional center?
8  A.  Yes.
9  Q.  Okay.
10 A.  Only of that specific correctional center.
11 Q.  Okay. Who's your -- well, let me limit it to -- Strike that. Oh, okay.
          We've talked for a moment about your leaving -- We spoke a moment ago about your leaving Hill and transferring to Big Muddy. What caused that decision? Why that transfer?
17 A.  My wife was ill and I wanted to be closer to home.
19 Q.  Had you been living at home when you were working at Hill, or did you live --
21 A.  I was living at home on the weekends and driving up on Monday and driving home on Friday.

1   Q.  How had you come to work at Hill?
2   A.  I don't understand the question.
3   Q.  Okay. I'm sorry. What caused the transfer
4       from Farmington to Hill?
5   A.  Again, an effort to get back to Illinois.
6   Q.  Were you living with your wife when you were
7       working in Farmington?
8   A.  Yes.
9   Q.  Were you living here or in Missouri?
10  A.  In Missouri.
11  Q.  Okay. Did you own the home that you
12      subsequently came to -- Strike that.
13          At the time that you worked in Farmington
14      did you own the home that you lived in when you
15      came to live at Hill?
16  A.  I think the question you're asking me is did I
17      own the home in Missouri?
18  Q.  No. I'm sorry. Did you own the home in
19      Illinois at the time that you were working in
20      Missouri?
21  A.  Yes.
22  Q.  And who was living there at the time?
23  A.  My son and daughter.

1   Q.   Okay.  Were you disciplined -- Did you receive
2        any discipline for problems with medical issues
3        at Farmington?
4   A.   No.
5   Q.   Do you recall whether you did -- did so at
6        Menard?
7   A.   No.
8   Q.   You don't recall or you didn't?
9   A.   No, I've never been disciplined.
10  Q.   Fair enough.  Thank you.  Okay.  I'm going to
11       talk now about your position as medical
12       director at Hill.  Okay?  So the next series of
13       questions, unless I state otherwise, is going
14       to be directed just to the period of time that
15       you were a medical director at Hill.  Okay?
16  A.   Okay.
17  Q.   What were your responsibilities as medical
18       director?
19  A.   The responsibilities of a medical director, the
20       administrative responsibilities of the unit,
21       and the medical practice that goes on within
22       the unit including the nursing practices.
23  Q.   I'm going to show you a document I'm going to