1       mark as Exhibit P.

2                       (Whereupon Deposition

3                       Exhibit P was marked for

4                       identification.)

5       BY MR. BACKMAN:

6    Q. Some documents have previously been marked in

7       this case so I'm starting with P.  Ask you to

8       take a look at it and let me know whether you

9       are -- ask you if you recognize that document.

10   A. This is the DOC medical director guidelines.

11   Q. And these applied to you at the time that you

12      were medical director at Hill?

13   A. Yes.

14   Q. I'll mark another document as Exhibit 2 -- I'm

15      actually going to mark this document for

16      identification even though it's the complaint

17      in this case.  Not 2.  Strike that.  Q.

18                      (Whereupon Deposition

19                      Exhibit Q was marked for

20                      identification.)

21      BY MR. BACKMAN:

22   Q. You can take a look at it but then I'll direct

23      your attention to page 2, paragraph 8.  And now

1        I'm going to turn you to another document which

2        I'm going to mark as Q.

3              MS. BACKMAN:   R.

4                    (Whereupon Deposition

5                    Exhibit R was marked for

6                    identification.)

7    BY MR. BACKMAN:

8  Q.  And this is -- I believe it's your answer to

9        the complaint in this case.  And ask you

10       likewise to turn to -- if I described it --

11       Strike that.  If I described incorrectly -- Let

12       me take a look at the complaint.

13             Paragraph 8 in the complaint is actually

14       on a carryover paragraph from two to three, and

15       now I'm going to ask you to look at Paragraph 8

16       on page 2 in the answer.

17             The problem is the answer doesn't have the

18       question -- doesn't have the allegation above

19       it, so I'm trying to get you to look at the

20       allegation and then at the answer just to ask

21       you a couple questions.  All right.

22             Doctor, if you'd just take a look with me

23       at the complaint, Paragraph 8.  It says

1      Dr. Hamby, license number 36037075, is a

2      citizen of the state of Illinois.  At all times

3      relevant to this complaint occurring after

4      July, 2001, he was the medical director at HCF

5      charged with the duty and responsibility of

6      administering and operating the medical unit at

7      HCF.

8   A.  What is HCF?

9   Q.  Hill.

10  A.  Does it say in here that HCF is Hill?

11  Q.  Yes, it does.

12  A.  Where does it say that?

13  Q.  If you go to Paragraph 6 on page 2.  You'll see

14      that in the second sentence it says at all

15      times relevant to this complaint, he was the

16      warden -- he meaning Pierson -- was the warden

17      of Hill Correctional Center in Knox County,

18      Illinois.

19  A.  Do the quotations have any meaning?

20  Q.  The quotation marks are used --

21  A.  Since they're not on these two over here, does

22      that have any meaning?

23  Q.  The quotation marks are the mechanism for

1      letting the court and other lawyers know that

2      I'm defining a term.

3  A.  So that the absence of them has no meaning on

4      page 3?

5  Q.  No.  In fact, it's been defined as HCF so now

6      HCF is Hill.  Okay.  But that was a fair

7      question.

8  A.  Yes.  That's fine.

9  Q.  So I read what the question was -- the

10     allegation was in Paragraph 8.  Now I want you

11     to just turn and look to the answer to that in

12     the answer to Paragraph 8.

13     Let me read you what I -- You'll want to

14     read the whole thing, but I'm particularly

15     interested in the third sentence of it which

16     reads defendant -- defendant meaning you --

17     denies that Paragraph 8 accurately sets forth a

18     duty owed by Dr. Hamby with respect to the

19     healthcare unit at Hill Correctional Facility.

20     I'm going to ask you if you understand

21     what it is you're denying about my allegation

22     in Paragraph 8 that he was the medical director

23     charged with the duty and responsibility of

1    administering and operating the medical unit?

2        MS. POWELL:  I'm going to object to that

3    question and to him answering because duty is a

4    question of law, not a question of fact.  And I

5    denied that as that Paragraph 8 does not

6    accurately set forth the duty, if any, owed by

7    Dr. Hamby.

8        He cannot give testimony about what the

9    legal duty is.  If you want to ask him a

10   specific question about what his understanding

11   of what his job was, I think you've already

12   done that, but as far as what you've alleged in

13   the complaint legally, that's a question of law

14   for the court to determine.

15       MR. BACKMAN:  Okay.  That's fine.  You

16   don't have to answer it.

17   BY MR. BACKMAN:

18   Q.  Were you at Hill -- Would it be accurate to say

19       you were responsible for administering and

20       operating the medical unit at Hill?

21   A.  I'm sorry?

22   Q.  Well, you see in the complaint where I've

23       alleged on the second page -- on page 3 the

1       carryover paragraph.  I've alleged that you

2       were charged with the duty and responsibility.

3            I'm asking you whether you were in fact

4       charged with the responsibility of

5       administering and operating the medical unit at

6       Hill.  Is that a fair characterization of

7       what --

8    A.  After July 20, '01?

9    Q.  Yes.

10   A.  To the time I left Hill?  Yes.

11   Q.  Okay.  Fair enough.  Thanks for clarifying.

12       Let's take a look at a document I'm going to

13       mark as S.

14                   (Whereupon Deposition

15                    Exhibit S was marked for

16                    identification.)

17   BY MR. BACKMAN:

18   Q.  If you'll take a look at this.  This appears to

19       be an administrative directive from the

20       Illinois Department of Corrections that went

21       into effect on September 1st, 2002.  Let me

22       first just ask you if you recognize that.

23   A.  Recognize it as what?

Page 22

1    Q.   Recognize it as something you've seen before.

2    A.   I don't recall.

3    Q.   Okay.

4         MS. POWELL:  I just for the record want to

5         object to the reference to Exhibit S as it says

6         it's effective September 1st of 2002 which

7         would have been approximately three weeks after

8         Dr. Hamby left Hill Correctional Center.

9         MR. BACKMAN:  Yes, that's true, but

10        just -- Just for the record he did, however, go

11        to Big Muddy and this would presume to apply

12        there, and really what I was going to ask was

13        whether there were any significant changes from

14        what he was operating under at Hill but since

15        he doesn't recognize it, fine.

16        MS. POWELL:  Same objection.

17        MR. BACKMAN:  I'll mark a document as

18        Exhibit T.

19                    (Whereupon Deposition

20                     Exhibit T was marked for

21                     identification.)

22   BY MR. BACKMAN:

23   Q.   Ask you the same question.  Whether you

1    recognize this administrative directive as

2    something you've seen before.

3        MS. POWELL:  Same objection with respect

4    to Exhibit T as it states that it is effective

5    9-1 of 2002.

6        MR. BACKMAN:  But you'll still let him

7    answer?

8        MS. POWELL:  You can ask the question,

9    sure, but I'm still objecting to its relevance.

10        MR. BACKMAN:  I did ask the question.

11    BY MR. BACKMAN:

12  Q.  Do you recognize the document as something

13    you've seen before?

14  A.  I have no recall of having seen this, no.

15  Q.  Okay.  Now, Doctor, when you were the medical

16    director at Hill and again I'm going to be

17    talking about that time period now, what did

18    you understand your obligations to be or the

19    unit's obligations to be relative to patients

20    who were in pain?

21        MS. POWELL:  I object to the form of the

22    question.

23        THE WITNESS:  I don't understand the

Page 24

1      question.

2      BY MR. BACKMAN:

3  Q.  Let me ask you first.  Were you an employee of

4      DOC while you were working at Hill?

5  A.  No.

6  Q.  Who were you an employee of?

7  A.  By Wexford.

8  Q.  And Wexford was what?

9  A.  A healthcare HMO caring for patients in the

10     prison system.

11 Q.  Did they care for all prisons?  That is were

12     they the HMO for all of the prisons within

13     Illinois during that time period or just --

14     just Hill?

15     MS. POWELL:  I object to the form of the

16     question.

17     THE WITNESS:  I don't know the answer to

18     the question.

19     BY MR. BACKMAN:

20 Q.  Okay.  Were they -- were they -- Did you remain

21     with Wexford when you transferred to Big Muddy?

22 A.  Yes.

23 Q.  Were you -- I take it you weren't with Wexford

1       however when you were at Farmington in

2       Missouri?

3   A.  No.

4   Q.  So you were paid actually by Wexford?

5   A.  Yes.

6   Q.  Now your title medical director, was that a

7       title -- were you medical -- Were you the

8       Department of Correction's medical director or

9       were you considered the Wexford medical

10      director?

11  A.  I don't know the answer to the question.

12  Q.  Okay.

13  A.  I was considered the medical director so that

14      my assumption was I was the medical director

15      for both.

16  Q.  Okay.  And would there -- Were there any

17      healthcare providers at Hill during this time

18      period other than Wexford?

19          What I mean to say is was there more than

20      one HMO providing services there or was it just

21      Wexford was responsible for the healthcare at

22      this facility?

23          MS. POWELL:  I object to the form of the

1     question.  You referred to Wexford as an HMO

2     but I don't really think they're technically an

3     HMO.

4          MR. BACKMAN:  I think that's what your

5     client said but we'll go ahead.  That's fine.

6     It was just a technical objection.

7     BY MR. BACKMAN:

8  Q.  You can answer my -- my subsequent question

9     which is do you know of any other healthcare

10    providers that were providing services at the

11    facility?

12 A.  I do not know of any other.

13 Q.  During this time period when you were medical

14    director at Hill how many -- roughly how many

15    doctors -- what range of number of doctors

16    would see patients at the -- at the Hill

17    facility?

18 A.  On any given day?

19 Q.  No.  The total number that you had working

20    under you.

21 A.  I think there were three other part-time

22    physicians that were working at Hill at the

23    time.

Page 27

1  Q.  Did they come and go or were there three

2      basically sturdy ones, stable ones?

3  A.  They came and went.  They were the same ones,

4      but they weren't there on a regular schedule.

5  Q.  I see.  And one was Dr. Shute, correct?

6  A.  I -- Actually I don't recall except that I know

7      that he signed the records so I know he was

8      there.

9  Q.  But what is it that you don't recall?  You

10     don't recall actually seeing him?

11 A.  I don't recall actually interacting with him.

12 Q.  Is there any doctor there during this time

13     period that you do recall at Hill?

14 A.  No, sir.

15 Q.  How much interaction would you have with the

16     other doctors on the -- during the course of

17     any particular day?

18 A.  Basically depended upon them.  If they wanted

19     to see me, they saw me and if I wanted to see

20     them, I saw them.  Otherwise we saw patients.

21 Q.  And you saw patients along with the other

22     doctors?

23 A.  I saw patients alongside of them as well as

1    with them.

2  Q.  What was your responsibility relative to any

3      particular examination, and what I mean by that

4      is if let's say Dr. Shute as an example saw a

5      patient, made progress notes, made -- wrote a

6      prescription.

7          Would that -- Could that be determinative

8      of the prescription or would you in every case

9      like that review the progress notes before a

10     prescription was written or some other action

11     were taken?

12         MS. POWELL:  I'm going to object to the

13     form of the question.  It's compound.

14         THE WITNESS:  It would depend upon the

15     case that he was seeing.  If he wrote a

16     prescription, the prescription would be

17     followed.  If he filled out papers properly for

18     a referral, a referral would be made.

19         If he did not fill out papers properly

20     for a referral and those papers were sent to

21     me, I would send them back to him for proper

22     filling -- filling in of the blanks that he had

23     not filled in.  If he did not fill out the

1    papers, nothing would happen.

2    BY MR. BACKMAN:

3  Q.  I see.  So with respect to any particular

4      referral or any particular prescription then

5      are you saying that he would -- the

6      prescription or the referral would not require

7      your approval?

8  A.  The prescription would not require my approval.

9      The referral may or may not have required my

10     approval.

11 Q.  Understood.  If you needed to make a referral,

12     to whom would patients be referred?  Outside

13     physicians?

14     MS. POWELL:  Object to the form of the

15     question.  It's vague and I don't know what

16     you're talking about.

17     MR. BACKMAN:  That's not anywhere in the

18     rules.  I don't know what you're talking about

19     objection?  I'll rephrase.

20     MS. POWELL:  It's a vague question.  How

21     can he understand to whom would it be

22     referraled?  What type of referral are we

23     talking about?

1       BY MR. BACKMAN:

2   Q.  When you spoke about as -- We were talking

3       about the term referrals a minute or two ago,

4       about the example of if Dr. Shute made a

5       referral whether it would need your approval or

6       not.

7           In the context of such a referral would

8       that referral be a referral to a doctor within

9       Hill, or were you referring to referrals that

10      would be the doctors outside the facility?

11  A.  If a referral was made to a doctor within Hill,

12      it needed no approval.

13  Q.  And now were there different -- Strike that.

14      Of the doctors you mentioned, three or so, that

15      were working at the same time as you at Hill,

16      were they all internal medicine doctors or did

17      they have other specialties?

18  A.  Well, I don't know but they were not

19      sub-specialists.  I think one of them was a

20      surgeon.  I don't really know.  I don't really

21      remember.

22  Q.  Fair enough.  More specifically to this case

23      was there anybody within Wexford at Hill who