E-FILED
Thursday, 31 August, 2006  03:52:14 PM
Clerk, U.S. District Court, ILCD

Page 31

1        provided urology services for urology consults?

2    A.  At the facility?  No, sir.

3    Q.  So to go to a urologist, that would require an

4        outside referral?

5    A.  To go to a urologist?

6    Q.  To send a patient to an outside -- Strike that.

7    A.  Would require a referral, yes.

8    Q.  Now when you -- When you went to an outside

9        healthcare provider, was that someone within

10       the Wexford system or would that be somebody

11       outside of it?  How did Wexford work relative

12       to the prison in that regard?

13   A.  Wexford would approach physicians in the

14       community to see if they would be willing to

15       see inmates.  Many physicians in the community

16       were not willing to see inmates in their

17       offices.

18           They would seek out physicians who were

19       specialists who would see the inmates in their

20       offices and/or in the hospitals and those were

21       the physicians that we would utilize.

22   Q.  Okay.  Did specialists ever come to the prison

23       to see a patient there, an inmate there?

1    A.    The specialists come to some prisons but none

2          came to Hill.

3    Q.    I'm going to show you a document that we're

4          going to mark as U.

5                         (Whereupon Deposition

6                          Exhibit U was marked for

7                          identification.)

8    BY MR. BACKMAN:

9    Q.    And you can take a look at it.

10         MR. BACKMAN:  I'm going to ask counsel

11   whether they will stipulate after reviewing it

12   that these are Floyd Hayes' medical records.

13         MS. POWELL:  I don't know that I can

14   stipulate to them as we sit here today.  I have

15   to look through everything that I have and

16   obviously these are records that relate to care

17   and treatment before Dr. Hamby was there.  So

18   without looking at everything I have I can't

19   stipulate as I sit here today.  It might be

20   something we can agree to later.

21         MS. CHOATE:  I agree.  Without being able

22   to look at what I have, they appear to be

23   records from the Department of Corrections but

1    I don't know that they're his for sure.  I

2    don't know.

3        MS. POWELL:  They're obviously not

4    complete because they don't have any of the

5    orders attached to them and they don't have any

6    of the lab results.  They don't have the MARs.

7        MR. BACKMAN:   Let me --

8        MS. POWELL:  And I don't know what they

9    say because they're written by people that are

10   not my client.

11       MR. BACKMAN:  That's for sure, but I'm

12   only looking for a stipulation as to -- and I'm

13   not asking that it needs to be today but to

14   clarify, what I'll be looking for in the next

15   couple of days is a stipulation that these are

16   in fact -- these are in fact records from Floyd

17   Hayes' medical record file at the prison and

18   they are marked -- your set should have the

19   Bates numbers which are marked -- I think it's

20   D00024 through 77.

21       MS. POWELL:  I can stipulate that they

22   appear to be records maintained by the

23   Department of Corrections from 4-29 of 1998

Page 34

1       through sometime -- it looks like 8-14 of '02,

2       but I can't stipulate to their content nor can

3       I stipulate to their completeness nor can I

4       stipulate as to whether or not who it was that

5       wrote them.

6              MR. BACKMAN:  Sure.

7              MS. POWELL:  Just that the records that

8       you've given me that are Bates stamped 24

9       through --

10             MR. BACKMAN:  77.

11             MS. POWELL:  -- 77 appear to be records

12      from the Department of Corrections.

13             MS. CHOATE:  Same.

14             MR. BACKMAN:  That's fine.

15      BY MR. BACKMAN:

16   Q.  Now that we did that.  Before we get to these

17      actual records which I'll be asking you several

18      questions about in a little while, let me

19      review a few documents first.  I'm going to

20      mark a document as Exhibit V.

21                     (Whereupon Deposition

22                      Exhibit V was marked for

23                      identification.)

1        BY MR. BACKMAN:

2    Q.   I'll ask you if you recognize or recall having

3         seen that before.

4    A.   Yes, I've seen this before.

5    Q.   Do you recognize it to be what -- Hold on.

6         Strike that.

7             Do you recognize this document to be the

8         result of a sonogram that Floyd has had in --

9         prior to you joining Hill?

10   A.   I'm sorry?

11   Q.   Do you recognize this document to be the report

12        on a sonography of the scrota of Floyd Hayes

13        done on or about October 9, 2000?

14   A.   I recognize this as a copy of that report, yes.

15   Q.   Now in the first paragraph this report notes

16        that Floyd was not experiencing pain but -- but

17        that he had a lump in his right scrotum,

18        correct?

19            MS. POWELL:  I'm going to object to him

20        referring to what some other physician meant or

21        what Floyd may have or may not have said to

22        somebody else.  Obviously this was not

23        generated by Dr. Hamby nor was it presented to

1       Dr. Hamby.  It actually refers to another

2       physician at Hill.  It says what it says.

3            MR. BACKMAN:  Okay.

4       BY MR. BACKMAN:

5   Q.  Would you agree that what I just stated is what

6       the report --

7   A.  If you will restate what you stated, I will

8       tell you whether or not I agree with it.

9   Q.  Okay.  I'll restate it.  Would you agree with

10      me that this report indicates that -- that is

11      the first paragraph -- that Floyd was not

12      experiencing swelling or tenderness in the area

13      of his right scrotum but that he did have a

14      palpable lump there?

15  A.  This is a history, and the patient states that

16      he had a palpable lump in his right scrotum and

17      he had noted it for six weeks.  Denied a

18      history of trauma and there was no redness,

19      swelling or tenderness over the area.

20  Q.  Now in the impression at the bottom it

21      indicates that there is a cyst in the right

22      epididymal -- Can you pronounce that word?

23  A.  Epididymal.

1   Q.   The report indicates that it was -- that

2        Mr. Hayes did have a cyst in the right

3        epididymal head and that it could represent the

4        things indicated thereafter but that otherwise

5        it was a negative study.  Correct?

6   A.   Yes.

7   Q.   Now just based on your -- without specifically

8        asking you about what you did in response to

9        this -- because obviously this exhibit --

10            MR. BACKMAN:  What exhibit?

11            MS. BACKMAN:  V.

12       BY MR. BACKMAN:

13  Q.   This Exhibit V was -- came before you got

14       involved in this situation before you were even

15       at the facility, right?

16  A.   Yes.

17  Q.   But where it indicates that it could represent

18       something otherwise it was negative, what would

19       be your ordinary response or action, if any, to

20       a report such as this?

21            MS. POWELL:  I'm going to object to the

22       relevance of that question.  Doesn't matter

23       what he would or wouldn't have done.  He was

1    not treating him at that time.  He's not your

2    opinion witness.

3         THE WITNESS:  Based on a report such as

4    this you would ask to see the patient so that

5    you could put the patient together with the

6    report and then determine what you might do in

7    response to this report.

8    BY MR. BACKMAN:

9  Q.  Do you know what -- what the term complicated

10     epididymal cyst refers to?

11 A.  It's a cyst that has something in it instead of

12     fluid.

13 Q.  But the word complicated doesn't tell you what

14     that might be?

15 A.  The word complicated doesn't tell you what it

16     might be, no.

17 Q.  Okay.  Now I'm going to mark a document as

18     Exhibit W.

19               (Whereupon Deposition

20                Exhibit W was marked for

21                identification.)

22     BY MR. BACKMAN:

23 Q.  Ask you to take a read through it and I'll just

1       ask you a couple questions about it.  Do you

2       recall having seen this before?

3    A.  I signed this.

4                    (Whereupon a discussion was held

5                     off the record.)

6    BY MR. BACKMAN:

7    Q.  All right.  So looking at document W you did in

8       fact sign this.  You recognize that to be your

9       signature?

10   A.  Yes.

11   Q.  Okay.  Do you remember the circumstances under

12      which Mr. Hayes was sent for this radiology

13      consult?

14   A.  This was ordered by Dr. Shute.

15   Q.  But I'm asking you if you recall the

16      circumstances of it based on either your

17      involvement at the time or subsequently.

18   A.  I don't recall exactly why he ordered it.  I

19      could look at the records and tell you since I

20      have asked to see the chart.

21   Q.  We'll get to that.  Maybe that will refresh

22      your recollection.  I'm going to mark the next

23      document X.

```
 1                    (Whereupon Deposition
 2                    Exhibit X was marked for
 3                    identification.)
 4    BY MR. BACKMAN:
 5    Q.  Take a look through -- at this document.  Let
 6        me know if you recall receiving a copy of this
 7        or previously seeing this letter.  I can direct
 8        your attention particularly to the --
 9    A.  I've never seen this before or I have no recall
10        of seeing it before.
11    Q.  Okay.  Then I'll mark the next document as Y.
12                    (Whereupon Deposition
13                    Exhibit Y was marked for
14                    identification.)
15    BY MR. BACKMAN:
16    Q.  Before I actually show you Y let me ask.  This
17        letter that is marked as Exhibit X, it purports
18        to be at least a letter from Floyd Hayes to
19        Jesse Montgomery dated April 16th, 2002.
20            Do you know who -- what position -- Strike
21        that.  Did you know Mr. Jesse Montgomery as of
22        April 16th, 2002?
23    A.  No, I did not.
```

Page 41

```
 1   Q.   You did not know who he was?

 2   A.   No, sir.

 3   Q.   During your course as medical director at Hill

 4        would patients from time to time make

 5        complaints about their treatment?

 6   A.   Constantly.

 7   Q.   Okay.  And where would those complaints

 8        generally be directed or where were they

 9        supposed to be directed?

10   A.   Generally they were directed through the

11        grievance procedure which would eventually wind

12        up in the medical care -- medical unit after

13        they went through the grievance officer

14        on-site.

15   Q.   Okay.  And when you say they would wind up in

16        the medical unit, where would they wind up?

17   A.   They would wind up with the healthcare unit

18        administrator.

19   Q.   And who was that at the time?  Do you recall?

20   A.   It was either -- it was --

21   Q.   Would it have been a woman named

22        Lindorff-Mathes?

23   A.   Could have been.
```

Page 42

1   Q.   Lois?

2   A.   Lois.  It could have been Lois or the lady just

3        before her who was acting.

4   Q.   And then what would happen?  What as a matter

5        of general procedure would she do with that

6        grievance?

7   A.   The grievance officer would divide it into

8        complaints that were made against the

9        healthcare unit or someone else and send the

10       grievances to the various departments, and the

11       various departments' administrative personnel

12       would then respond to them.  Usually I was not

13       involved.

14  Q.   What would cause you to be involved?

15  A.   When the healthcare unit administrator wanted

16       my medical opinion about something.

17  Q.   The healthcare administrator, would she be a

18       doctor or usually not?

19  A.   No.  She -- Most of them were nurses but some

20       of them were just lay people.

21  Q.   Would they go back and review the files, or how

22       would they prepare their response over the

23       normal course?

1          MS. POWELL:  I'm going to object to

2     foundation as to whether or not he knows

3     specifically the duties or what the healthcare

4     unit administrator would do or not do.

5          MR. BACKMAN:  That's fine.

6          THE WITNESS:  I'm not going to tell you

7     what they would do unless they came to me

8     because I don't know how they would do it.

9     They might go to the dentist.  They might go to

10    a nurse.  They would do whatever they felt was

11    necessary to get the response that they needed.

12    BY MR. BACKMAN:

13  Q.  I understand.  Thank you.  Let me show you a

14    document that's been marked -- we just marked,

15    I haven't shown you yet -- as Exhibit Y.  I'm

16    going to ask you first if you've -- if you

17    recall ever seeing this particular email?

18  A.  This would have been someone in the warden's

19    office and I would not have known her.

20  Q.  When you say this would have been, the

21    Ms. Mary --

22  A.  Mary Lindley.

23  Q.  But you see it's to -- appears to be to a

```
 1        Ms. Lois Lindorff-Mathes.  Correct?

 2   A.   That's right.

 3   Q.   But you don't -- you don't recall Miss Mathes

 4        ever actually giving this to you?

 5   A.   This I would never have seen.

 6   Q.   Okay.  Let me then hand you the next document

 7        which we'll mark as Exhibit Z.

 8                      (Whereupon Deposition

 9                       Exhibit Z was marked for

10                       identification.)

11        BY MR. BACKMAN:

12   Q.   You may want to take -- Well, let me ask a

13        couple of questions first.  Take a look at it.

14        Let me know if you recognize it.  You don't

15        need to read the whole thing through.  I just

16        want to know if you recognize this to be a

17        letter that you directed to Whom it May Concern

18        at some point in May, 2002, regarding

19        Mr. Hayes.

20   A.   Yeah, I've signed it.

21   Q.   Okay.  Do you recall what it was that led to

22        your writing up this -- this letter?

23   A.   My guess is that -- and it is a guess because I
```

```
 1        don't remember -- that the healthcare unit
 2        administrator asked me to respond to his
 3        complaints and told me that there was a letter
 4        from somebody named Montgomery and that's
 5        basically all I would know.
 6   Q.   Roughly how many times during any month period
 7        would you write specific letters of this sort
 8        relative to inmates when there were complaints?
 9   A.   Very rarely.  I can't give you an estimate but
10        it would be very rare.
11   Q.   Do you recall what it was about this situation
12        that -- and if you want --
13             MR. BACKMAN:  In fact, why don't we take a
14        five-minute break and have him read through the
15        letter.  I could use a little break and then
16        I'm going to ask some more specific questions.
17             MS. POWELL:  What's the question that he's
18        looking for because I know he's already looked
19        through it before we ever started.
20             MR. BACKMAN:  Oh, okay.  Then maybe we
21        don't need to take the break yet.
22             MS. POWELL:  If you want a break, you can
23        have a break.  I don't care.
```