Page 46

1        MR. BACKMAN: My questions -- Well, let's
2    wait a couple minutes then. What was my last
3    question before I said why don't we take a
4    break?
5             (The requested portion of the
6              record was read back by the
7              Court Reporter.)
8    BY MR. BACKMAN:
9    Q. Do you recall what it was about Mr. Hayes'
10      situation that made this one of the unusual or
11      rare times that you would actually write a
12      letter of this sort?
13   A. Probably it was related to whoever Montgomery
14      was, and I have to tell you that it was
15      probably him and he would always get an answer.
16   Q. When you say he would always get an answer,
17      what do you mean by that?
18   A. I mean that an assistant deputy director for --
19      for a district if he wrote a letter to the
20      healthcare unit administrator would always get
21      a response from the healthcare unit
22      administrator, and if it was a medically
23      related question, I would answer that question

```
 1       and give her the response to that question and
 2       then she would respond to him.
 3   Q.  Do you recall whether in preparing this letter
 4       you would have looked at any of Mr. Hayes'
 5       grievances or his written complaints about what
 6       the alleged grievance involved, or would you
 7       just go back to the file or did you just go
 8       back to the file and write-up a letter based on
 9       what it said?
10   A.  I would not be privy to anything but the file
11       and this, and I would take my response from the
12       file in terms of what our medical unit had done
13       to and/or for the inmate.
14   Q.  So you wouldn't know then what it was that
15       Mr. Hayes was saying you had done wrong?
16           MS. POWELL:  Object to the
17       characterization that he's saying he did
18       anything wrong.
19           THE WITNESS:  We would not know what
20       Mr. Hayes had said to Mr. Montgomery.  We would
21       not know.  We would only know what
22       Mr. Montgomery had said to the healthcare unit
23       administrator and she or he would not
```

Page 48

1      necessarily tell me what I was responding to.
2      They would simply ask me for a summary of his
3      medical care to date.
4    BY MR. BACKMAN:
5  Q. Okay.  Understood.  Dr. Hamby, you refer to the
6      offender -- the term this offender or the
7      offender in this letter.
8          Was that typically the way that you would
9      refer to patients, the inmate patients that you
10     saw when you were writing up a memo of this
11     sort?
12 A. That would be a classical way to label them,
13     yes.
14 Q. Now if you'll look at -- starting in the middle
15     of the carryover paragraph, that is the second
16     paragraph on page 1 and review it through to
17     the end of the full paragraph on page 2.
18         My question is going to be whether you
19     would agree with me that it reports an ongoing
20     series of reports by Mr. Hayes of suffering
21     pain in his testicles?
22 A. If you will change ongoing to intermittent, I
23     will agree with you.

Page 49

1  Q.  Okay.  Can you explain why you would change --
2      make that change from ongoing to intermittent?
3  A.  Because there were times that he came in
4      stating that his epididymis was fine.
5  Q.  And is that reflected here in a way that I've
6      missed?  Could you point me to what sentence it
7      is that --
8  A.  It's in the first sentence.  The paragraph that
9      starts on page 2.
10 Q.  Do you know what the frequency and urgency
11     refers to?
12 A.  Refers to urinary tract symptoms.  Frequency
13     means I go frequently and urgency means I go
14     right now.
15 Q.  Now beyond that any other circumstances where
16     you believe he was indicating that he did not
17     have pain?
18         MS. POWELL:  What are the dates that we're
19     talking about?
20         MR. BACKMAN:  We're talking about the
21     dates covered by the two paragraphs that I
22     asked him to read.
23         THE WITNESS:  Because he complained of

Page 50

```
 1        pain intermittently.  He didn't complain of
 2        pain all the time.  He sometimes complained of
 3        discomfort, whatever he meant by that.  And
 4        sometimes he claimed that he had discomfort
 5        without pain so...
 6        BY MR. BACKMAN:
 7   Q.   You're saying that's reflected in the letter?
 8   A.   Yes.
 9   Q.   What's the difference between discomfort and
10        pain as you use it in this letter?
11   A.   As I use it in this letter is the way he used
12        it in his notes.  I have no idea of what he
13        means, but he stated that discomfort was not
14        pain.
15   Q.   And when you say he stated that, is that your
16        recollection that he stated it or is that -- is
17        that based on what you believe in view of what
18        you've written?
19   A.   He stated that it had been causing him
20        discomfort but no pain.  It's right in this
21        letter.
22   Q.   Okay.  So, again, that's -- you're making these
23        statements not based on your recollection as
```

| | | |
|---|---|---|
| 1 | | you sit here of what Mr. -- of what Mr. Hayes |
| 2 | | was telling you but rather how -- based on your |
| 3 | | assumption that what you've written is what was |
| 4 | | accurate? |
| 5 | A. | Based on my assumption that I will find this in |
| 6 | | the record from which I took this. |
| 7 | Q. | Understood. Do you have as you sit here today |
| 8 | | any recollection of Mr. Hayes? |
| 9 | A. | None at all. |
| 10 | Q. | As you sit here today do you have any |
| 11 | | recollection based on reviewing your letter of |
| 12 | | what might have been causing his pain? |
| 13 | A. | Based on what I have seen in the review that I |
| 14 | | have done I don't believe he had a great deal |
| 15 | | of pain. |
| 16 | Q. | Okay. Based on your review of the medical |
| 17 | | records? |
| 18 | A. | That's right. |
| 19 | Q. | Let me switch topics for a minute and ask you. |
| 20 | | What was -- Strike that. How frequently did -- |
| 21 | | did the doctors, you yourself and the others |
| 22 | | who worked in the medical unit, prescribe |
| 23 | | opiates? |

1   A.  Never.

2   Q.  Never -- That's you. You pointed at yourself?

3   A.  Never.

4   Q.  Okay. Why not?

5   A.  Why not?

6   Q.  Yes.

7   A.  Well, obviously you've never been in prison.
8       There are three basic reasons. One, they sell
9       them. Two, they confuse them. They change
10      their mental outlook. They decrease their
11      security so that they put themselves at risk of
12      some other inmate beating the devil out of
13      them.

14          And three they're addictive so that if the
15      doctors who were under me or myself ordered
16      opiates, the inmate was placed in the infirmary
17      and they would frequently refuse to go into the
18      infirmary.

19  Q.  So that was -- that was always the case.
20      Strike that. Just to be clear.

21          Are you saying you never prescribed them
22      but some of the other doctors did and in those
23      cases the patients had to go to the infirmary?

1  A.  That's right.
2  Q.  Okay.  Now what happened if you saw a patient
3      who -- whose level of pain or whose condition
4      warranted an opiate level of pain medication?
5  A.  Put them in the infirmary and observe them and
6      you very rapidly found out that Tylenol was all
7      they needed.  That was my experience.
8  Q.  Do you recall roughly how many prisoners were
9      at Hill during the period of time we're talking
10     about here?
11 A.  No, sir.
12 Q.  In a range?  A hundred, a thousand?
13 A.  More then -- Probably around 2,000.
14 Q.  That's fine.  How often did you have sick call?
15     How often did patients get to come to see the
16     doctors?  Was it every day?
17 A.  Five days a week.
18 Q.  Do you remember roughly you're open morning
19     till evening or were you open at night?  How
20     did that work?
21 A.  You usually start at about 8:30 and finish up
22     at about four.
23 Q.  Was it generally a steady stream of patients

Page 54

```
 1        who came or were there times that it was quiet?
 2   A.   Within the prison system there are times that
 3        because of the circumstances surrounding you
 4        you have absolutely nothing to do.  Whenever
 5        everything and movement was free and you were
 6        not in a max set-up, you were usually busy.
 7   Q.   Do you know what that system was for getting --
 8        that patients went through to get -- or
 9        offenders went through to get to see you?
10   A.   They would fill out a sick call request.  They
11        would then be seen by a nurse and if the nurse
12        could handle the problem via her nursing
13        protocols, she would handle the problem or she
14        would make the decision to refer them to the
15        physician and determine the frequency -- the
16        duration of time between the time they saw her
17        and the time they saw the physician.
18   Q.   Okay.  Just to be clear.  Would -- Would there
19        be days where people would sign up, that is
20        they put in their slips to be seen by the
21        nurse, but there were too many and they'd have
22        to get put off, or did everybody who requested
23        a nurse on a particular day get to see the
```

1       nurse?
2   A.  I'm sure that happened but it would be a rarity
3       because the nurses saw them on every shift.
4       There were three shifts and there was -- one or
5       two nurses were assigned to sick call and they
6       would either see them in the houses or see them
7       in the unit so that most of them were seen
8       within 48 hours of requesting being seen.
9   Q.  Were there ever situations in which an inmate
10      abused the privilege of getting -- getting to
11      see you -- not you particularly but the medical
12      unit and therefore they would put in slips but
13      the slips wouldn't -- wouldn't get them a
14      nurse's visit?
15  A.  This is a frequent occurrence.  They -- They
16      did not consider it abuse, but they would come
17      up with any little thing they could to get to
18      see a nurse.
19  Q.  Do you know -- What was it about their
20      situation that would cause -- in your view
21      cause prisoners to want to do that?
22  A.  Well, anything from wanting to see a female to
23      wanting to get out of their cell.

1   Q.   I understand. Do you by any chance know the
2        kind of -- the procedures by which the slips
3        that were filled out to see a nurse would work
4        their way to the medical unit?
5   A.   They would fill it out and put it in a box in
6        their house and the nurses on the shift
7        would -- would pick it up and it would be
8        picked up once every 24 hours, taken to the
9        healthcare unit and sorted and distributed.
10  Q.   Distributed to different nurses for that first
11       round?
12  A.   Yes.
13  Q.   Understood. Thank you. Okay.
14            MR. BACKMAN: Why don't we take a
15       five-minute break.
16                    (Whereupon a short recess was
17                     taken and proceedings resumed as
18                     follows.)
19            MR. BACKMAN: Back on the record.
20       BY MR. BACKMAN:
21  Q.   Let me just finalize a few questions about
22       that -- the policy with regard to opiates.
23       Were the other doctors --

1   A.   Did you say opiums?
2   Q.   Opiates.  Policy regarding opiates.  Am I using
3        the wrong word?
4   A.   I don't know.  I can't understand you.
5   Q.   O-p-i-a-t-e-s.  Is that an opiate?
6   A.   Oh, you're talking about drugs?
7   Q.   Yes.
8   A.   The policy was not to use them unless you
9        absolutely felt they were necessary.
10  Q.   Okay.  And that was the policy for the other
11       doctors as well?
12  A.   That's the policy for all physicians in DOC.
13  Q.   Were there medications that were not narcotics
14       but nonetheless more effective in pain relief
15       terms than Ibuprofen and Motrin that I see many
16       times in Mr. Hayes' records?
17            MS. POWELL:  Object to the relevance of
18       these questions.  There's no evidence in this
19       case that he ever needed any other medication
20       during the time frame that Dr. Hamby was
21       treating him so if we're talking about time
22       frames outside of his care and treatment, I
23       object as to relevance to that issue as well.

1  BY MR. BACKMAN:
2  Q. Okay. You can answer. Just in the realm of
3     medications that you and doctors working under
4     you used while you were director at Hill were
5     there other pain medications stronger than
6     Ibuprofen or Motrin that you used from time to
7     time?
8  A. What do you mean by stronger than Ibuprofen?
9  Q. What do I mean by -- Are you saying that that
10    question can't be answered?
11 A. I'm saying that I don't know how to answer that
12    question.
13 Q. Okay. Then let's talk about any other pain
14    medications that you used other than Motrin and
15    Ibuprofen and then I'll ask you about those.
16 A. The pain medicines that we use for the great
17    majority of inmates-offenders fell into the
18    category of nonsteroidals and that includes
19    aspirin and Tylenol.
20 Q. And Motrin and Ibuprofen?
21 A. Ibuprofen, Naproxen, and on up the list of the
22    nonsteroidals.
23 Q. And those generally are the nonprescription

Page 59

```
 1         ones that you can buy in a pharmacy like
 2         Walgreens or something?
 3    A.   You would use the whole gamut of nonsteroidal
 4         some of which were over-the-counter and some of
 5         which are not over-the-counter.
 6    Q.   Can you just for my edification -- which ones
 7         were not over-the-counter?
 8    A.   Basically Ibuprofen, aspirin, Tylenol are
 9         over-the-counter and many of the others are
10         not.
11    Q.   Okay.
12    A.   At least not as yet.
13    Q.   Can you give me an example of one just so I can
14         put it in a frame of reference?
15    A.   No.  Not right off the top of my head.
16    Q.   What about Naproxen?
17    A.   Naproxen is Aleve.  It's over-the-counter now.
18         What they've done is they've decreased the
19         dosage strength and made them over-the-counter
20         so that instead of getting an 800-milligram
21         Ibuprofen-Motrin, you get a 200-milligram
22         Ibuprofen.
23              So they wind up taking four of them
```

1  instead of two of them increasing the risk of
2  stomach problems and all of this other thing so
3  that you can't get an Ibuprofen
4  over-the-counter in the 800-milligram strength.
5  That's still not OTC.
6  Q. Am I correct that Motrin becomes more potent
7  with increased dosages up to roughly
8  800 milligrams?
9  A. The maximum dosage of the Ibuprofen is
10  800 milligrams three times a day.
11  Q. Let me just ask. In this -- Back to this
12  letter, Exhibit Z. I just want to ask you
13  about a sentence in the middle of that
14  carryover paragraph. Turn to the second page.
15  Not the carryover paragraph. I'm sorry. The
16  full paragraph in the middle. If you go down
17  to --
18      MS. POWELL: Are you talking about the
19  paragraph that begins he was seen on 10-4-01?
20      MR. BACKMAN: Correct. Thank you.
21  BY MR. BACKMAN:
22  Q. If you go down about I think to the -- I think
23  it's the ninth line. Starts -- and I'm looking