E-FILED
Thursday, 31 August, 2006 03:54:52 PM
Clerk, U.S. District Court, ILCD

A. I don't know who the doctor was.
Q. Did different doctors have different meanings for the word chronic when you were working at Hill?
A. Different doctors have had different meaning for the word chronic since time in memorial.
Q. Was there any settled meaning for the word chronic at Hill when you were the medical director there?
A. We never discussed the word chronic while I was there nor have I discussed the word chronic since I got out of medical school.
Q. Would it be your understanding from reading the reference to chronic here that it refers to an ongoing pain situation?
A. I again don't know whether or not he's talking about pain.
Q. Okay. Ongoing discomfort situation.
A. That could mean anything from pain that occurs once a month for six months to pain that occurs every day for six weeks.
Q. All right. Looking at the line below that. I can't tell -- oh, P. That's the plan. I'm

sorry. And it says referral for urology. Now can you see where it says that?

A. It says referral for urology work-up.

Q. Okay.

A. Whatever that means.

Q. So you don't know what that means?

A. I have no idea. He didn't fill out any form. He didn't spell out anything.

Q. Is that something that he would have needed approval from you for before he filled out the forms?

A. No one ever needs approval from anyone before they fill out a referral form.

Q. Well, yeah, that's a little broader than actually I'd like. Now at the time -- with respect to the time that you were medical director at Hill you're indicating therefore that the form -- the doctor would after referencing a referral in the notes, the next step would be to fill out the forms and then they would come to you?

A. If he was serious about requesting a referral for some kind of work-up, he should have listed

the work-up he wanted.

If that work-up was something that required referral to a urologist, then he should have requested referral to a urologist by filling out a form and sending that form through the medical director to the powers that be in whatever company he was working with.

Q. Thank you. Do you know what -- what the note is on the left-hand -- bottom left-hand side? See something. My copy's kind of cut out.

A. My copy's not much better than yours.

Q. Fair enough. How about in the middle there that has the arrow pointing away from it? Is that a see referral? You can't tell?

A. It says with the arrow over it or whatever that thing is that may be legible in the original, I don't know. But see referral for urology I think is what that says.

Q. Now the next page -- I'm looking at the bottom corner of the page, the entry for 1-13-02. That appears to be a nurse's note?

A. That is a nurse's note.

Q. Now there's a quote under S. Not under S.

Next to the S. Quote "My cyst is bigger I feel and I'm in pain. They don't want to check me out any further because I'm" -- Can you tell what that word is? It looks like short but I find it hard to believe that that's the word that she's writing.

A. That's the word she's writing.

Q. Because I'm short?

A. Yes.

MS. POWELL: I object to the relevance of the question.

BY MR. BACKMAN:

Q. Do you know what she means by that?

A. Yes.

Q. What?

A. She means that he's supposed to get out soon.

Q. Got it. Thank you. Is there any truth to the notion that treatment would differ for patients who were getting out soon as opposed to who had a long time to stay?

A. No truth whatsoever.

(Whereupon a discussion was held off the record.)

BY MR. BACKMAN:
Q. All right. I'm not going to go through all of these. Can you read the entry on page 65?
A. Sixty-five?
Q. That's correct.
MS. POWELL: His entry or some other entry?
THE WITNESS: Mine?
BY MR. BACKMAN:
Q. It would appear to be your entry, right. The 1-14 entry. That is yours, correct?
A. That's a jacket review, yes.
Q. What does a jacket review mean?
A. It means that I've looked at the chart and that he was supposed to be seen for pain in his left testicle, was supposed to be seen in November but he wasn't and he needs to be seen.
Q. Needs to be seen by whom?
A. By a physician.
Q. By a physician at Hill?
A. Yeah.
Q. Looking at the entry below that. Do you recognize whose signature that is at the

bottom?

A. There is no signature on that page at the bottom?

Q. That's correct. I'm talking about the carryover -- It's all one entry, right, for 1-25. That's a carryover entry from page 65 to 66?

A. That's right.

Q. At the bottom then does that appear to be the signature of R.H. Shute, Dr. Shute?

A. Yes.

Q. The observation left testicle -- on the top of page 66. Left testicle pulled upwards and much higher than right. Do you recall having any discussion with Mr. Shute -- Dr. Shute about that situation?

A. No.

Q. If you observed -- If you as Dr. Hamby observed that situation and there was pain accompanying it, what would you have done? What would be the next step?

A. Well, you're making the assumption there was pain accompanying it.

Q. Yes, I am.
A. I would have examined him and written down the results of my examination.
Q. Now at this point if he's got that testicle pulling up and there's also the reference to pain below that a few lines, wasn't the appropriate thing for Dr. Shute to do to refer him for a urology consult?
A. I wasn't there so I don't know and I didn't examine him. I have no idea what Dr. Shute should have done. I also see no reference to pain.
Q. Okay. If you -- looking at 1-25, page 66, is that not a reference to pain three lines below the end of the entry regarding the testicle pulled up?
A. He said he had increased pain lately while urinating. Says nothing to do with relating to pain with the pulled up testicle.
Q. That's not a ref -- You don't read that as a reference with the arrow pointing up to left --
A. That is not a reference to testicular pain. The testicle has nothing to do with urination.

Q. Right. But isn't the reference increased pain to left scrotum? Isn't that what he's writing?
A. Says increased pain lately while urinating.
MS. POWELL: You're looking in a different place I think. I think you're looking at two pages.
MR. BACKMAN: Page 66.
MS. POWELL: He's talking about this right here (indicating).
THE WITNESS: Increased pain to left scrotum.
BY MR. BACKMAN:
Q. To left scrotum.
A. I don't know what that means either.
Q. Okay. Now let's turn back to the letter for a moment, that is the Exhibit Z.
A. I'm sorry?
Q. Exhibit Z. It's right next to it.
A. Exhibit Z.
MS. POWELL: You had it right in your hand. It's right here.
BY MR. BACKMAN:
Q. Looking at the first page at the bottom there's

a sentence -- there's two sentences I'm interested in. One that starts on the second line from the bottom at the end. The right epididymal cyst was warm and tender to touch. Do you see that?

A. That's 9-24-01.

Q. Correct.

A. Yes.

Q. I'm going to refer you back there. I just wanted to read the rest of the sentence. He was given --

A. Doxycycline 100 milligrams.

Q. A hundred milligrams twice daily for ten days, wants to be seen in ten days. He was given Tylenol with codeine at bedtime for one week.

A. Yes. That was in September.

Q. So just looking back to that note do you know why he was given the codeine for a week back in September?

A. No, I do not.

Q. It would have been for a fairly severe pain, correct?

A. I have no idea.

Q. Well, policy would have required that it only be given for severe pain?

A. Policy is interpreted by doctors and I wasn't there so I don't know why the doctor gave him Tylenol codeine.

Q. Turning to page -- Well, let me ask you. Over the course of the period January through April, 2002, you'll note -- and if you want to go back and check please do -- that Floyd was given passes for ice packs from time to time.

A. According to the notes, yes, Dr. Shute gave him ice packs from time to time.

Q. Okay. How would -- how would a patient -- What was the process for getting ice packs on a day-to-day basis?

A. He would be given a slip that said he could have this which he would show to the guards.

Q. And then was the ice -- was this ice that was obtained from the medical unit or just from the floors?

A. Ice that was obtained in the house.

Q. In the house?

A. In his cellhouse.

Q. Understood. Okay. Thank you. Let's turn to page 73. The entry for June 14th. It indicates here -- That is your handwriting?

A. No, it's not.

Q. It's not. Okay. I'm sorry. Can you read what it says? 0800 something note.

A. Healthcare unit administrator note. Responded to inquiries regarding scrotal cysts.

Q. I understand. Thank you. All right. Then let's turn -- We're just about done with these. Turn to page -- page 75 and the entry for July 15th. Is that -- Is that your handwriting that is --

A. Yes, it is.

Q. It says medical director J.R. What's that a reference to?

A. Medical director note, grievance response completed.

MS. POWELL: The J.R. The jacket review. He said that before.

MR. BACKMAN: Oh, sorry. Let's do it again.

THE WITNESS: That's again another jacket

review of the lab results that were done for his chronic clinic. His total cholesterol was 205. His triglycerides were 602 and his HDL was 29.

BY MR. BACKMAN:

Q. Under what circumstances did you do these J.R.s, these jacket reviews?

A. He was in chronic clinic for hyperlipidemia and the jacket reviews were done based on lab results, x-ray results, this kind of thing or when one of the nurses or somebody else noted that he hadn't been seen or shown up.

Any time there was a question that someone might be missed in some way jacket reviews were done to pick-up -- to make sure that they got seen and that's what this is about. That he needs to be seen and treatment resumed for his triglycerides and his HDL.

Q. Neither of those two things relate to his scrotum issues, correct?

A. No.

Q. So, yes, that was correct?

A. Yes.

Q. Okay. Now noting the next two entries. It would appear that that is -- on the same page. I'm sorry. Below the 7-15 entry there's one for 7-23-2002 and one for 7-29-2002. Now the notes themselves are not your handwriting, correct? Those are R.N. notes?

A. Those are R.N. notes.

Q. But is that your handwriting signing off on them?

A. That is me signing off on it so that they know that I know that he has signed a refusal for his clinic to fulfill what I have ordered above.

Q. Okay. I understand. Now let's turn to the -- what should be just about the last page but anyway it's going to be my last question about these. The entry for 7-30-02. Those are your notes?

A. Yes.

Q. Where you refer to medicines have expired at the bottom of that note on the left-hand side, is that -- is that all medicines or the ones that are at issue with regard to your

recommendation that he be seen? Or if you can't tell, that's fine.

A. I can't tell, but the way it's written he was probably without any medicine at this time.

Q. Okay. Let me show you --

A. He has the right to refuse anything that he wants to refuse.

Q. I take it you don't have -- I shouldn't say that. Strike that.

Do you have any recollection of this situation where Floyd Hayes was refusing to get medical care and you were making a note of it?

A. You mean other than this?

Q. Right.

A. I have no recollection other than what I've written in the medical record, no.

Q. Okay. Let me show you the -- I'm going to mark the next document as double A. AA.

(Whereupon Deposition Exhibit AA was marked for identification.)

BY MR. BACKMAN:

Q. Do you recognize this form -- this type of form

as being a form you used at the Hill Correctional Center?

A. Yes.

Q. Do you know who JW -- the nurse's signature and initial -- who that is?

A. No, I don't. Not unless they're on here.

Q. And by here you're referring to?

A. On the papers that you gave me. Your Exhibit AA.

Q. Now would it appear from these documents without your knowing of course whether they're genuine or accurate or not -- would it appear from these documents that the first page of this document in particular -- that Mr. Hayes was prescribed 800 milligrams for pain of Motrin on July 13th, '02?

A. Yes.

Q. And then that would be -- then inside the chart there would be a reference -- or an initial at the place on the chart for July 13th, the 13th day of the month, right where it's initialed there in the middle?

A. On the 13th he was issued an eight-day supply

of Motrin.

Q. Okay.

A. 24, 400 milligrams.

Q. I see.

A. Which isn't even an eight-day supply because it was ordered at 800 milligrams.

Q. Thank you for pointing that out. How does the -- What does the stop date mean?

A. The stop date is the date that the prescription actually -- It's basically 30 days from the date the order is written. The medication expires and he should be given enough medicine to last him till the 13th of the -- of August according to this sheet. But the order expires after the medicines are issued.

So if he does not get the full amount, he cannot get any more until a new order is written.

Q. I understand. Okay. Now how would -- Strike that. Were the nurses authorized to give these prescriptions so to speak of Motrin, or did they have to get a doctor's approval for something like this?

A. The nurses have protocols under which they can give certain medications. This medication is not on those protocols so they cannot give out this medicine.
Q. So he would have had to be seen by --
A. He would have had to be seen by a physician again.
Q. Okay. Now can you reconcile then your entry on 7-30 in the charts on page 76 where it indicates has not seen physician since 4-17-02 with this prescription assuming again that this is an accurate document?
A. If you assume this is an accurate document, the prescription -- it should have been -- Had he written the prescription on 4-17-02, he could have written it for 90 days and this would be the last issue of that 90 days.
Q. All right. So just to be clear. How would this happen procedurally? When you say "he," you're talking about one of the other doctors I take it?
A. When I -- Any physician that saw an offender can write a medication for 90 days unless it

happens to be one of the restricted medications, but -- so that he can write it but they can only issue a maximum of one month's supply at any given time. So if I see an individual in April, he can be given medicine for April, May and June and it shouldn't run out.

So I cannot explain this one. But he can write it for 90 days, and I would have had to have gone back through the notes and seen a note that said that the last time he has a physician's note is 4-17. That's the only way I can tell you that I would have known that he had not seen a physician since 4-17.

Q. Was there -- Is there a purpose to making that note? What is that -- What's the reason for writing has not seen a physician since a certain date in a --

A. Simply to let everybody know that his medicines have expired because he has refused to see the doctor on this date.

Q. When you say everybody, who are you thinking about?