E-FILED
Thursday, 31 August, 2006 03:55:42 PM
Clerk, U.S. District Court, ILCD



A. Whoever has access to the chart.

MR. BACKMAN: You know what. Let's take a five-minute break and then we'll finish up.

(Whereupon a short recess was taken and proceedings resumed as follows.)

BY MR. BACKMAN:

Q. Okay. We're getting towards the end. Did you review anything during our break that caused you to want to clarify anything?

A. No.

Q. Okay.

A. The only thing that I have found is that this Motrin must have been ordered during the time that the -- he had a physical exam. There's a nurse's note on July the 13th. It says the physical exam was completed. See physician's exam.

The doctor should have written a progress note here and said that he ordered this and said why he ordered this.

Q. I see. Okay. Got it. Thank you.

A. But because it's under a nurse's note, when I

reviewed it I missed it. I didn't see that he had been seen for a physical exam.

Q. Okay. Let's put in these three documents. I'm going to mark three documents as a group Exhibit BB.

(Whereupon Deposition Exhibit BB was marked for identification.)

BY MR. BACKMAN:

Q. They're all very similar looking. Take a look. Let me know if by any chance you have any recollection of those. If not, I'm still going to ask you a couple of questions about them.

A. I would never have seen these.

Q. Okay.

A. These are nurse sick call requests.

Q. Do these look to be actual -- the forms without the handwriting -- the form --

A. This is the form that they would fill out in their cell and put in the sick call request box in their house. In their cellhouse.

Q. Let me clarify that I believe that the writing on the bottom is -- the no response to this

request and the date -- was written by Mr. Hayes, not -- and I'm excluding it from the question I'm going to ask you about each of these forms.

And the question is about each of them without that handwriting whether you would have any explanation as to why, if it's true, that Mr. Hayes submitted these sick call requests and did not then get seen by someone? Why he would get no response to the request?

A. No. This response -- No response to this request is written by the nurse.

MS. POWELL: Actually he just said that Mr. Hayes wrote that.

THE WITNESS: No. This response was not written by Mr. Hayes:

MR. BACKMAN: Oh, okay. That's just what I assumed. I see.

THE WITNESS: This response was written by whichever nurse was reviewing this so that Mr. Hayes was then based on this request sent a sick call appointment to come over and see the nurse and he did not come over and see the

nurse on 6-4-02. And I can't tell you why he didn't come.

BY MR. BACKMAN:

Q. Okay. Thank you for clarifying that. This would have been a note for you or for the unit --

A. No. This is a note for the record so that everybody knows that this sick call request was reviewed by a nurse and the nurse attempted to see Mr. Hayes and that Mr. Hayes refused to be seen for whatever reason. We don't know. And there are three of them here.

(Whereupon Deposition Exhibit CC was marked for identification.)

BY MR. BACKMAN:

Q. Okay. Then let me show you a document that's -- that we're going to mark now as Exhibit CC. That's two Cs. And I'll ask you if this is a document that you recall seeing or it's a sort of document that might have come to your attention?

A. This is a letter, a note, whatever, that would

have been sent to the assistant warden of programs and I would never have seen it.

Q. Now if you look at the portion in the middle of the middle paragraph of the first page of the letter where it says -- the sentence starting this abnormality causes me severe pain and discomfort which the doctor has refused to give me pain medication for. Although I was given pain medication in the past, they now refuse to do so.

MS. POWELL: I'm going to object and move to strike all of your reference to this Exhibit CC as the doctor's indicated he's never seen it before so there's no relevance to anything that he did with respect to this patient, and I object to you reading anything into the record that doesn't relate to him.

MR. BACKMAN: That's fine.

BY MR. BACKMAN:

Q. Based on the practices that you were aware of at Hill as the medical director would you be notified by anyone in administration if somebody was making a specific allegation that

they had pain -- that they had reported pain and that they weren't being treated for it?

A. This would be treated as a grievance.

Q. Okay.

A. It would go through the grievance complaint system. He would be told to fill out an appropriate grievance form instead of doing this. This might be discussed with the healthcare unit administrator. I can't even tell you that it would.

Q. But it wouldn't come to you particularly?

A. This would not come to me. It might indirectly get to me but I would never see any of this.

Q. Thank you. What generally speaking, if any, are the differences in the usage of Naproxen versus Motrin or Ibuprofen?

A. Naproxen --

MS. POWELL: Objection. Relevance.

THE WITNESS: They're all nonsteroidals, and you switch among nonsteroidals because they work differently on different individuals. Some people are tolerant of Ibuprofen, other people are tolerant of Naproxen, and basically

that's how you do it.

BY MR. BACKMAN:

Q. So it's an individualized thing.

A. Yes.

Q. Okay. What's Lopid, L-o-p-i-d?

A. Lopid is an anti -- It's a drug that's used to treat hyperlipidemia.

Q. And what is hyperlipidemia?

A. High triglycerides, high cholesterol. He had hyperlipidemia Type 5 which is why he was in the chronic clinics.

Q. I understand. If we could just pick up the medical records again which were Exhibit U.

A. V?

Q. I think it's U. Yes. The big -- Yeah, that's it. It's just hard to distinguish the difference. Turning to page 74 of that exhibit.

Looking at the reference at the top that does appear to be your handwriting and signature, correct?

A. At the top that is my handwriting.

Q. And on the right side that's William Hamby,

M.D.?

A. That's my signature.

Q. When you use the phrase grievance response completed, what are you indicating there?

A. I'm saying that I have given our healthcare unit administrator a response to a grievance that she has asked me to respond to.

Q. And is that typically something that would be in the progress notes?

A. This note? You mean the grievance?

Q. No.

A. Or the note?

Q. A note that you've completed the process.

A. This is something that's supposed to be put in the progress note, yes.

Q. What was -- Well, do you recall what your compensation was during the period that you were at Hill?

A. No.

Q. Okay. Do you recall whether it was a salary, hourly?

A. It was -- I was on a paid salary.

Q. Was your salary tied to any incentive type

of --

A. No.

Q. So was it -- Did it have any relevance to you whether patients were -- in terms of financial compensation whether patients were referred out or not referred to specialists outside the facility?

A. None whatsoever.

Q. Were there any policies of Wexford in terms of written or verbal in terms of limiting the use of specialists or outside referrals?

A. No. The limitation for referral was medical necessity and that's the way it has been and it is everywhere you go. The practice of medicine within the prison system and outside the prison system is essentially the same.

Q. When you speak of medical necessity, if somebody's having pain, even extreme pain but the pain is not -- is not related to a fatal illness or a deteriorating sort of illness, could that pain nonetheless be considered a medical necessity?

A. The pain could be and I emphasize could be

listed as a medical necessity if I could document a cause for the pain.

Q. So if somebody were complaining about severe pain or substantial pain and you couldn't document a cause, then would that person then not -- not be eligible to see a specialist?

A. I wouldn't know which specialist to send him to if I can't come up with a documented cause for pain such as reaching up, grabbing a testicle and pulling it down and having the guy go into spasm.

Q. And that's --

A. Or something like that. I don't -- don't need to come up with a documented diagnosis. I need to come up with something that I don't know what it is is causing pain that I can document.

Q. Let me just make sure I understand your answer then. Based on the review of Mr. Hayes' situation do you know why you didn't refer him to a urologist?

MS. POWELL: I'm going to object to the form of the question. You're not specifying a time with respect to Dr. Hamby's care and

treatment.

BY MR. BACKMAN:

Q. During any point at which you were a medical director at Hill do you -- do you know why you did not refer him to a urologist?

A. I think I've just answered your question by telling you at no time that I saw him did he have a documentable cause of pain. Nor did he have a documentable cause or need to be sent to someone outside of the facility.

Q. Is it fair to say that you were skeptical of Mr. Hayes' reports of pain?

A. No, it's not fair to say that. It is fair to say that I was unable to document a cause of severe pain.

Q. But wouldn't that be a reason to refer him to a specialist to see if the specialist could determine the cause?

A. No. No.

Q. Explain why not.

A. Because I can't come up with anything that's causing him to have pain.

Q. All right. But why does that answer my

question? Wouldn't the appropriate thing if you -- if a person's having pain in their testicles but you can't document the cause, wouldn't the appropriate thing to do --

A. Let me -- Let me get rid of this. If you're having pain in your testicles and I take a hold of your testicle, you're going to let me know that your testicle hurts. You're not going to say I have discomfort but no pain.

Q. Okay. So then is what you're indicating therefore that -- that your assessment based on your medical records of why Mr. Hayes didn't need to go to see a urologist was because of the level of pain he was reporting?

A. No, no. You're misstating everything.

Q. I don't think so.

A. I never ever mentioned myself that Mr. Hayes needed to see any other physician because I could not come up with a reason to put in writing that he needed to see another physician. And trust me. I sent lots of people out.

Q. But let me make sure I'm clear. Was it the

fact that when you saw him and that you reported that he had discomfort or tenderness, was that the reason why you didn't refer him out?

A. You see, you're trying to put words in my mouth.

Q. No, I'm really not.

A. If you read my notes -- If you read my notes, I never came up with any findings to justify sending him outside of the prison system to see a physician.

Q. Right. Okay. But what would have justified it in the case of testicular pain?

A. I have no idea.

Q. Well, if he had reported severe pain when you touched his testicles in the way you gave the example a minute ago, would that warrant then -- and you couldn't come up with a cause, would that warrant sending him to a urologist?

MS. POWELL: Objection to relevance.

THE WITNESS: I refuse to answer on the grounds I don't know what you're asking me. You're asking me to speculate on something that

I have no idea of what we're talking about.

MR. BACKMAN: Okay. Let's mark one last document.

(Whereupon Deposition Exhibit DD was marked for identification.)

BY MR. BACKMAN:

Q. I'm showing you a document marked as Exhibit DD. I am now showing it to you because I believe you've seen it though obviously if you haven't I'd like you to tell me, but I do want to ask you a question using some of the terminology in this letter.

A. I've never seen this before.

Q. Okay. Looking at the first sentence of the letter. Mr. Hayes has chronic myofascial pain into his -- it says crematic but I take it it means cremasteric muscles. Do you see that sentence?

A. Yes.

Q. Do you know what that condition refers to?

MS. POWELL: I'm going to object and move to strike. This letter is totally irrelevant

and came about at least two years after -- almost two years after the time.

MR. BACKMAN: I agree. I'm not asking about Mr. Hayes.

MS. POWELL: I still object to the document in reference to it.

MR. BACKMAN: I won't be seeking to use it in connection with any testimony here.

THE WITNESS: I don't see any need to answer that question. You can look this up in a medical dictionary.

BY MR. BACKMAN:

Q. I know but I'm asking you because you're the witness.

A. I do not wish to give you my interpretation of what this so-called pain management specialist classifies as myofascial pain. I have no idea.

Q. Okay.

A. Whether she's going to agree with me or disagree with me I don't know. Therefore I don't want to get involved in this.

Q. Have you ever been involved with a case at any point in the past let's say ten years where a

person was -- where a patient of yours or of some other doctor with whom you were involved was -- received injections into their cremasteric muscles to relieve cramping?

MS. POWELL: Objection. Relevance.

THE WITNESS: No.

MR. BACKMAN: Okay. Nothing further at this time.

MS. POWELL: Do you want to go ahead? Then I will.

EXAMINATION BY

MS. CHOATE

Q. Dr. Hamby, I'm Kelly Choate. I represent Director Snyder, Assistant Deputy Director Montgomery, former Warden Pierson, and former Assistant Warden Wanda Bass.

While you were the medical director at Hill did any of those people that I just named give you medical advice on how to treat Mr. Hayes?

A. No.

Q. Would you have accepted medical advice from them?

A. No.

Q. To your knowledge did any of those people prevent Mr. Hayes from coming to the healthcare unit to be seen by a nurse or by you or a physician?

A. No.

Q. Would you expect any of those people that I listed to be able to diagnose or treat Mr. Hayes?

A. No.

MS. CHOATE: I have nothing further.

MS. POWELL: Dr. Hamby, I just have a couple questions to ask you to clarify some things that you've testified to today.

EXAMINATION BY

MS. POWELL

Q. First let's start with Exhibit Z. Do you recall looking at that document which is -- the letter starts out To Whom It May Concern. Do you recall that?

A. Yes.

Q. Would it be fair to say that that document that has been marked for this deposition as Exhibit

C -- Z -- excuse me -- was something that you prepared in response to questioning from possibly the healthcare unit administrator regarding a grievance?

A. Yes.

Q. This document was not dictated as a part of the patient's care and treatment, was it?

A. No.

Q. Moreover, Dr. Hamby, Exhibit Z referenced care and treatment on a date that you did not see the patient, right?

A. Right.

Q. This was a summary of what you gleaned from looking at the medical records, right?

A. Yes.

Q. Would it be fair to say as we look through the medical records -- I think there was a reference made to the soap notes. S-o-a-p. Do you recall that?

A. Yes.

Q. And S is sometimes referred to as the subjective complaints?

A. Yes. Basically --