1   Q.  And that would be what the patient tells you?
2   A.  Basically that's the symptoms the patient gives
3       you and you write down what the patient tells
4       you.
5   Q.  And then the O would be your objective
6       findings?
7   A.  Yes.
8   Q.  And then A would be your assessment and P would
9       be your plan?
10  A.  Right.
11  Q.  Okay.  You were also asked some questions
12      regarding the sick call request forms.  Do you
13      recall that?
14  A.  Yes.
15  Q.  And I think -- yeah.  Those were referenced as
16      deposition Exhibit BB.  Sick call request forms
17      would not be presented to you, would they?
18  A.  No.
19  Q.  And I think you were asked some questions
20      previously about patients who may continually
21      complain.  They may not actually be seen in the
22      healthcare unit, right?
23  A.  They may not be seen in the healthcare unit but

1   they would be seen by a nurse and questioned by
2   a nurse.
3   Q. Okay. And the nurse would make that assessment
4      as to whether or not the patient needed to come
5      to the healthcare unit, right?
6   A. The nurse made the assessment of whether the
7      patient needed to come to the healthcare unit
8      and be seen by physical therapy or by another
9      nurse or by a doctor.
10  Q. Okay. I think counsel suggested that when a
11     sick call request form was filled out that your
12     answer indicated that the nurse may sometimes
13     discard those. Is that what you were saying?
14  A. No, that's not what I'm saying. If they
15     discarded them and were caught discarding them,
16     they would be fired.
17  Q. Okay. What they do is they pick up those
18     healthcare requests from the sick call box; is
19     that right?
20  A. That's right.
21  Q. And once they do that they would read it and
22     determine what the problem was and whether or
23     not they needed to respond, right?

1  A.  That's right.

2  Q.  Okay. So those request forms are always

3      analyzed by the nurses initially, right?

4  A.  Yes.

5  Q.  And whether or not something happens after that

6      would be determined by the nurse who reviewed

7      it, right?

8  A.  Yes.

9  Q.  With respect to this particular patient,

10     Dr. Hamby, would it be fair to say that the

11     first time you saw him would have been October

12     the 4th of 2001 as is noted on page 62 of

13     Exhibit U?

14  A.  Yes.

15  Q.  And on that particular date the patient

16     reported to you that he had frequency and

17     urgency with respect to his urination. Right?

18  A.  Yes.

19  Q.  And he also indicated that his epididymis at

20     that time was okay?

21  A.  Yes.

22  Q.  And on your assessment you found suprapubic

23     tenderness without R and R. That would be

```
 1        rebound --
 2   A.   Rebound or rigidity.
 3   Q.   And your assessment at that time was
 4        hyperlipidemia 5, right?
 5   A.   Right.
 6   Q.   And that would be high cholesterol, correct?
 7   A.   That's right.
 8   Q.   And number two was urinary tract infection and
 9        three was possibly gastritis?
10   A.   Correct.  One and three would have been based
11        on record review and two was my diagnosis at
12        the time.
13   Q.   Okay.  And based on that diagnosis you provided
14        him with a prescription for Keflex?
15   A.   Yes.
16   Q.   And he was given Tylenol?
17   A.   Right.
18   Q.   And he was to see you in ten days with a review
19        of his lipid and Tagamet for the gastritis?
20   A.   Right.
21   Q.   And then you would have seen him then again on
22        10-15 of 2001.
23   A.   Right.
```

1  Q. And at that time the patient reported that he still had discomfort in his left testicle, right?
4  A. Right.
5  Q. And on examination you noted he was tender but you identified no abnormality.
7  A. That's right.
8  Q. Okay. And you also assessed him at that time then as having resolving epididymitis?
10 A. Right.
11 Q. So that was going away, right?
12 A. Yes.
13 Q. And the plan at that time was simply to provide him with an athletic supporter and to come back in a couple of weeks?
16 A. Right.
17 Q. And when you say come back in a couple of weeks, that could have been to anybody in the healthcare unit?
20 A. Any physician in the healthcare unit.
21 Q. Right. That doesn't mean he has to see you, does it?
23 A. That's right. No.

1  Q. And actually, Doctor, based upon the records that we have labeled as Exhibit U would you agree with me that you never actually saw the patient again physically after that date?
5  A. No, I didn't according to these records.
6  Q. Okay. Now we do find that your name is referenced in here on some subsequent occasions and I'm going to address that here. The next time I see your name written would be on January 13th of 2002.
11 A. Right.
12 Q. Which would be page 64. Do you see that?
13 A. Right.
14 Q. And would it be fair to say that the note was actually written by a nurse?
16 A. Yes.
17 Q. And that nurse simply noted that she was discontinuing the patient's low cholesterol diet for noncompliance?
20 A. Right.
21 Q. That would be the sort of note that you would have to cosign in order to discontinue that?
23 A. That's right.

Page 120

```
1    Q.   The next time we see your signature was on
2         January the 14th of 2002, correct?
3    A.   Yes.
4    Q.   Okay.  And I noted that on January the 13th of
5         '02 which is on page 64 that the nurse
6         indicated in her plan that the patient was to
7         see the medical -- the M.D. to be scheduled.
8         Do you see that on her plan (indicating)?
9    A.   Yes.
10   Q.   Would that be a reason why you might do a
11        jacket review the next day?
12   A.   That probably was the reason I did the jacket
13        review the next day.  Because I -- I would have
14        to approve his being seen by a doctor.
15   Q.   At that time on January 14th as you previously
16        indicated you did a jacket review.  You did not
17        actually see the patient, right?
18   A.   That's right.
19   Q.   And you noted that the patient needed to be
20        seen, correct?
21   A.   Right.
22   Q.   And the patient was then seen on January 25th
23        of '02 by a physician, correct?
```

1   A.  Right.
2   Q.  And that would have been seen by -- he would
3       have been seen by a different physician, right?
4   A.  Yes.
5   Q.  You did not participate in the care and
6       treatment that was provided on January 25th of
7       '02?
8   A.  No.
9   Q.  And you did not interfere with that care and
10      treatment, did you?
11  A.  No.
12  Q.  With respect to February 12th of '02 again you
13      did a jacket review. Do you see that?
14  A.  Yes.
15  Q.  And would it be fair to say that you reviewed
16      those records because x-rays were taken and an
17      assessment needed to be made regarding those
18      results?
19  A.  I reviewed it because we received the x-ray
20      results from the x-ray where it was taken on
21      the 9th.
22  Q.  Okay. And you indicate in your plan at that
23      time to continue the present management of the

Page 122

1      physician that had been seeing the patient
2      previously, right?
3  A.  That's right.
4  Q.  So not only did you not interfere, you approved
5      of whatever that physician recommended, right?
6  A.  That's right.
7  Q.  And you did make a note at that time that the
8      results showed there was a benign bone lesion?
9  A.  That's right.
10  Q.  And in your opinion would benign mean not
11      harmful?
12  A.  Benign means that it's of no clinical
13      significance.
14  Q.  And then again we don't see your name until
15      July the 10th of 2002 where you make a note
16      that you responded to the grievance.  Is that
17      accurate?
18  A.  Yes.
19  Q.  And would it be fair to assume that that note
20      coincides with the letter that was written to
21      the healthcare unit administrator?
22  A.  I think it does although that letter really
23      doesn't have a date on it.

1  Q.  I did note that the -- when this was provided
2      to me previously the grievance officer's report
3      said it was received on June 21st of '02 and
4      reviewed July the 12th and if your note was
5      July the 10th that would make sense, wouldn't
6      it?
7  A.  Yes.
8  Q.  Okay.  The next note that we reference was
9      July 15th of '02 which is on page 75 of Exhibit
10     U.  You see that?
11 A.  Yes.
12 Q.  And again that was a jacket review, correct?
13 A.  Yes.
14 Q.  And again you're reviewing lab results?
15 A.  The lab results, yes.
16 Q.  And those lab results all have to do with the
17     patient's hyperlipidemia, correct?
18 A.  Right.
19 Q.  No complaints or anything regarding anything
20     else, right?
21 A.  Correct.
22 Q.  And you note at that time that the patient
23     should be seen with respect to his

```
 1        hyperlipidemia, right?
 2   A.   Right.
 3   Q.   And then we see that the next notes of July
 4        23rd and 29th indicate that the patient
 5        actually refused to be seen with respect to
 6        that particular issue, right?
 7   A.   That's right.
 8   Q.   Wasn't it that the first -- When you saw the
 9        patient back on October the 4th of 2001, that
10        was the patient's main problem was the
11        hyperlipidemia, wasn't it?
12   A.   Yes.
13   Q.   If an inmate refuses to receive medical care,
14        is there much of anything you can do about
15        that?
16   A.   I'm sorry?
17   Q.   Is there anything you can do when a patient
18        refuses to be seen?
19   A.   No.  They have the right to refuse to be seen.
20        They have the right to refuse to take medicine.
21   Q.   And in fact, Doctor, on page 76 on July 30th of
22        2002 you so indicated that the patient refused
23        to be seen and that he had such a right.  Is
```

Page 125

1      that accurate?
2  A.  Yes.
3  Q.  Not only did he refuse to be seen with respect
4      to the hyperlipidemia, he also refused his EKG?
5  A.  That's correct.
6  Q.  And if he did have any medications that were
7      still valid or any orders, can a patient obtain
8      medicine without being seen by the physician if
9      that expires?
10 A.  No.
11 Q.  That's all I have.  Thanks.
12                FURTHER EXAMINATION BY
13                    MR. BACKMAN
14 Q.  Doctor, just to be clear.  Your attorney was
15     asking you a series of questions about what was
16     said, what -- what happened on certain dates.
17          All of that testimony was based on the
18     notes you were reading, correct, not based on
19     your memory of these events?
20 A.  They're all based on my actual reading of the
21     medical record.
22 Q.  Now taking a look quickly back to Exhibit 11.
23     I'm sorry.  Exhibit Z.

Page 126

1   A.  V?
2           MS. POWELL:  Z.
3           MR. BACKMAN:  The letter from -- Well, it
4   doesn't really have a date.
5           MS. POWELL:  This thing (indicating).
6   BY MR. BACKMAN:
7   Q.  Now the copy that -- You'll note that the copy
8       that your attorney just showed to you which I
9       know is just as a courtesy, there are stamps on
10      yours that are not on -- that is stamps on the
11      copy that you have in front of you that are
12      marked as Exhibit Z that are not on the copy
13      that Miss Powell showed you, correct?  And
14      those in particular -- I'm referring to the
15      stamp received May, 2002.  The two stamps at
16      the top.  You see those?
17  A.  Yes.
18  Q.  Okay.  Do you recognize these stamps?  I mean,
19      was this something that was used at Hill that
20      you recall?
21  A.  No.  This is something that would have been
22      used in the warden's office.
23  Q.  Okay.  So it appears that -- or tell me if you

1  disagree that it appears that this letter was
2  actually received back in their office in May
3  of 2002, not in the later time frame that was
4  indicated?
5  A. It says here that they received it on May 17th
6  in the administrative office and they received
7  it in the programs office on May the 28th.
8      MR. BACKMAN: I have nothing further.
9      MS. CHOATE: Nothing further.
10     MS. POWELL: We're done. Now I want to
11  make sure that all of these get attached just
12  so I know we're all looking at the same things.
13     MR. BACKMAN: I agree.
14     MS. POWELL: Do you want to read it over
15  before it goes out or do you want to waive
16  signature?
17         (Whereupon a discussion was held
18            off the record.)
19     MS. POWELL: We'll just waive. I normally
20  do, too.
21         FURTHER DEPONENT SAYETH NOT;
22         BY AGREEMENT SIGNATURE WAIVED.
23

```
1                    C E R T I F I C A T E
2          I, SUE A. PHELPS, a Certified Shorthand
3    Reporter of the State of Illinois, do hereby
4    certify that WILLIAM M. HAMBY, M.D., was first
5    duly sworn by me to testify the truth; that the
6    above deposition was recorded stenographically
7    by me and reduced to typewriting by me; and
8    that the foregoing transcript of the said
9    deposition is a true and correct transcript of
10   the testimony given by the said witness at the
11   time and place previously specified.
12              I further certify that I am not
13   counsel for nor in any way related to any of
14   the parties to this suit, nor am I in any way
15   interested in the outcome thereof.
16              IN WITNESS WHEREOF, I have hereunto
17   set my hand this 19th day of June, 2006.
18
19
20        _____
21              SUE A. PHELPS, C.S.R.
22              License No. 084-002707
23
```