```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                       STATE OF ILLINOIS
 3
    FLOYD K. HAYES,              )
 4                               )
            Plaintiff,           )
 5                               )
    -vs-                         )No. 04 CV 1062
 6                               )
    DONALD N. SNYDER, JESSE      )
 7  MONTGOMERY, MARK A. PIERSON,)
    WANDA L. BASS, WILLIAM M.    )
 8  HAMBY, M.D, Ph.D., each in   )
    their individual capacities )
 9  only,                        )
                                 )
10          Defendants.          )
11
12                      DEPOSITION
13     The deposition of NARAYAN R. AMIN, M.D., a
    citizen of the State of Illinois, a witness of lawful
14  age; produced, sworn, and examined upon his corporeal
    oath, at the VA Medical Center, Building 58, 1900
15  East Main, Danville, Illinois, on the 14th day of
    July, 2006, before Amy L. Prillaman Neubaum, CSR,
16  License No. 084-003275, in and for the County of
    Vermilion and State of Illinois; as a witness in a
17  certain suit and matter now pending and undetermined
    in the United States District Court for the Central
18  District of Illinois.
19
20
21
22                    EXHIBIT
23                       4
24
```

EXHIBIT 4

```
 1
         APPEARANCES:
 2
                 Mr. Jonathan A. Backman (By Phone)
 3               LAW OFFICE OF JONATHAN A. BACKMAN
                 117 North Center Street
 4               Bloomington, Illinois  61701
                 Appearing for the Plaintiff
 5               jbackman@backmanlawoffice.com
 6               Ms. Theresa Powell
                 HEYL, ROYSTER, VOELKER & ALLEN
 7               National City Center
                 1 North Old State Capitol Plaza
 8               Springfield, Illinois  62705
                 Appearing for Dr. Hamby
 9               tpowell@hrva.com
10               Ms. Kelly Choate (By Phone)
                 Illinois Attorney General's office
11               Assistant Attorney General
                 500 South Second Street
12               Springfield, Illinois  62706
                 Appearing for the Defendants
13               kchoate@atg.state.il.us
14
15
16
17
18
19
20
21
22
23
24
```

```
 1              I N D E X
 2      EXAMINATION,                                4
        BY: MS. THERESA POWELL:
 3      EXAMINATION CONDUCTED:                     19
        BY: MS. KELLY CHOATE:
 4      EXAMINATION CONDUCTED:                     20
        BY: MR. JONATHAN A. BACKMAN:
 5      RE-EXAMINATION,                            30
        BY: MS. THERESA POWELL:
 6      RE-EXAMINATION,                            32
        BY: MR. JONATHAN A. BACKMAN:
 7      RE-EXAMINATION,                            33
        BY: MS. THERESA POWELL:
 8
                   (No Exhibits Marked)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1              (Commencing at 1:00 PM)
 2              NARAYAN R. AMIN, M.D.,
 3    the deponent herein, called as a witness after having
 4    been first duly sworn, was examined and testified as
 5    follows:
 6    EXAMINATION,
 7    BY: MS. THERESA POWELL:
 8         Q.   Doctor, state your name for the record.
 9         A.   Narayan R. Amin.
10         Q.   Spell your last name for us.
11         A.   A M I N.
12         Q.   Okay.  Doctor, it's my understanding you
13    currently practice at the Veterans Hospital in
14    Danville, Illinois?
15         A.   Correct.
16         Q.   How long have you been practicing here?
17         A.   I am here since January 13, 2002.
18              MR. BACKMAN:  Theresa, can you move the
19    microphone a little closer to Dr. Amin?
20              MS. POWELL:  Yeah.
21         A.   I am here in VA Danville, since January 13,
22    2002.
23         Q.   What is your current specialty practice?
24         A.   Urology.
```

```
 1      Q.    Are you board certified in urology?
 2      A.    Twice.
 3      Q.    Okay.  And when you say twice, what does
 4   that mean?
 5      A.    The one is original certification and
 6   second is recent certification.
 7      Q.    When were you recertified?
 8      A.    I am recertified in 1998.
 9      Q.    Okay.  And can you explain to us what board
10   certification means?
11      A.    Board certification means you have to
12   finish the urology residency and be in practice for
13   two years before you take the board.
14      Q.    And then you took those boards, right?
15      A.    I took the part one, part two board, both
16   the board.
17      Q.    And you passed those?
18      A.    I passed, 1976, and which is a grandfather
19   for life.  But I also just to show my current ability
20   I took the recertification in 1998.
21      Q.    Okay.  Now, doctor, I am here to ask you
22   some questions about a patient you saw by the name of
23   Floyd Hayes.
24      A.    Yes.  Correct.
```

1    Q.    Okay.  My records indicate that Mr. Hayes
2    was a patient at the Danville VA Hospital back in
3    2002, would you agree with that?
4    A.    Yeah.
5    Q.    Now, I handed you a record that was bates
6    stamped 1970 and 1971.  Do you see that?
7    A.    That's right what I see, right.  Correct.
8    Q.    And those records are dated it appears
9    August 22nd of 2002?
10   A.    That's correct.
11   Q.    All right.  Is that the only time that you
12   saw Mr. Hayes?
13   A.    This is the only time I saw till I saw
14   recently and I look in his bladder.
15   Q.    Oh, you have seen him --
16   A.    I think if it is the same guy.  I'm not
17   hundred percent sure, because they give me a
18   different chart, okay?  So, please, forget about that
19   thing, I don't recollect.  But this patient I saw
20   only at one time.
21   Q.    Okay.  Actually the records that you had
22   with you might have been for a different person.
23   A.    A different person.
24   Q.    So based on what I showed you, that is the

1   only time you saw Mr. Hayes?
2       A.   Right.
3       Q.   And at that time, doctor, would it be fair
4   to say that the patient was referred to you by a
5   Dr. Barcenilla?
6       A.   That's right.
7       Q.   And she's a staff physician; is that
8   correct?
9       A.   Right.
10      Q.   Now, is she -- would she be a general
11  practitioner?
12      A.   Most probably, family practitioner and
13  sometimes internist, I have no way to know.
14      Q.   Okay.  And would the reason that the
15  patient be referred to you is because the complaints
16  the patient made would fall under a urology
17  specialty?
18      A.   That's correct.
19      Q.   Okay.  And in this particular case would it
20  be fair to say that the referral was made based on
21  the patient's complaints that he had a testicular
22  mass and pain and swelling?
23      A.   That's fine.  That's correct.
24      Q.   Okay.  So then Dr. Barcenilla would have

1  referred the patient to you. At the time the patient
2  was referred would you have had access to the notes
3  that Dr. Barcenilla would have made?
4       A.    Yes, I would have access, right.
5       Q.    The records I have received from the
6  Danville Correctional Center that are bates stamped
7  and provided to me by plaintiff's counsel from --
8  numbers 1950 through 2015, would these records be
9  kept in the ordinary course of business?
10      A.    No, we don't keep them in the ordinary
11 course. If the patient -- if Dr. Barcenilla was in
12 VA, VA at that time, then there is a comprised
13 record.
14      Q.    And that's what they are, right?
15      A.    If it occurred that is a comprised record.
16      Q.    Let me ask that again. Doctor, you
17 maintain these records in the course of your
18 practice, right?
19      A.    Right.
20      Q.    That's what I'm asking when I say if they
21 are kept in the ordinary course of business.
22      A.    That's fine.
23      Q.    You don't keep them personally?
24      A.    No.

```
 1      Q.    The VA keeps them?
 2      A.    The VA keeps them.
 3      Q.    They are made in the ordinary course of
 4   your practice as a physician?
 5      A.    Yeah.
 6      Q.    You would rely upon these records in
 7   treating the patient, correct?
 8      A.    Yes, correct.
 9      Q.    Okay. So, doctor, on August 22nd of 2002,
10   did you examine the patient on that date?
11      A.    I did.
12      Q.    Okay. And at that particular time the
13   patient originally reported to you that he had severe
14   pain particularly on the left side, right?
15      A.    Particularly on the left side, right.
16      Q.    And this is what he told you.
17      A.    Right.
18      Q.    He told you he had no trouble with
19   urination.
20      A.    Right.
21      Q.    And no history of previous problems, right?
22      A.    Right. That's what he said.
23      Q.    Now you did an examination, correct?
24      A.    Right.
```

1    Q.    And based on your examination, let me ask
2    you this, when you do an examination what
3    specifically would you have done?
4    A.    We always check the abdomen, genital, and
5    the prostate.
6    Q.    Okay.
7    A.    And if it is -- yeah, that's right. I
8    checked the prostate.
9    Q.    Okay. And would you have examined or
10   assessed the patient physically in looking at him as
11   well?
12   A.    Right.
13   Q.    Okay. And based upon the record that I am
14   looking at, doctor, it appears that Mr. Hayes
15   appeared to be healthy and not in pain, correct?
16   A.    That's right.
17   Q.    Okay. And on examination of the abdomen
18   you noted it was soft and nontender, correct?
19   A.    Right.
20   Q.    Would that be a normal finding?
21   A.    That's a normal finding.
22   Q.    Then you also noted that there were no
23   masses felt, right?
24   A.    In abdomen.

```
 1    Q.    In the abdomen.
 2    A.    Part of the abdomen, right.
 3    Q.    That was normal as well?
 4    A.    That's normal.
 5    Q.    You also noted good bowel sounds?
 6    A.    Right.
 7    Q.    That's also normal?
 8    A.    Normal.
 9    Q.    Flanks are unremarkable.
10    A.    Normal.
11    Q.    And the flank would be what?
12    A.    On the backside of the kidney.
13    Q.    Okay.  So those are also normal.  You have
14  the urinary bladder is not palpable.  So you
15  couldn't -- you couldn't feel that, right?
16    A.    Yeah, that makes it not distended.
17    Q.    That's good, too, right?
18    A.    Yeah, that's normal.
19    Q.    The hernial orifices are normal?
20    A.    Right.
21    Q.    No hernias, right?
22    A.    Right.
23    Q.    The penis is unremarkable, right?
24    A.    Right.
```

```
1      Q.   The right testicle was unremarkable, right?
2      A.   Right.
3      Q.   And then there was a 1 to 1.5 centimeter
4  cystic swelling seen over the globus major, a typical
5  spermatocele, is that right?
6      A.   That's right, you can mention it like that.
7  The organ is called epididymis.
8      Q.   Okay.  Is that basically some sort of a
9  mass or a swelling in the area?
10     A.   No, epididymis is a normal part of the
11 scrotum, just behind the testicle.
12     Q.   Okay.
13     A.   And it store the sperm and then pass it
14 onwards.
15     Q.   Was this a normal finding?
16     A.   No, this is not a normal finding.  1 to 1.5
17 centimeter is abnormal finding.
18     Q.   Okay.  And you indicated that you could not
19 detect the hydrocele on the right side?
20     A.   Right, I could not.
21     Q.   You indicate that the left testicle was
22 normal?
23     A.   Right.
24     Q.   And the left epididymis was fine?
```

```
 1        A.    Right.
 2        Q.    Okay.  You did not see any cystic swelling
 3   or hydrocele on the left.
 4        A.    That's correct too.
 5        Q.    Okay.  And those are good things, right?
 6        A.    Yeah, that's all good.
 7        Q.    Okay.  And no varicocele.  What's that?
 8        A.    That means, okay, about eight to 10 percent
 9   of the people have a varicocele, that means a dilated
10   and distended vein in the scrotum.
11        Q.    He didn't have that?
12        A.    He didn't have that.
13        Q.    Okay.  Your rectal exam revealed a 15 to 20
14   gram prostate that was firm, smooth and clinically
15   benign.  That's a good thing?
16        A.    That's normal.
17        Q.    Okay.  So your diagnosis and impression at
18   the time was a small spermatocele on the left side?
19        A.    Left side, right.
20        Q.    At that time you recommended no treatment,
21   right?
22        A.    Right.
23        Q.    And why is that?
24        A.    You don't need a treatment for the small
```

1  spermatocele, if it does not cause any discomfort, if
2  it does not cause any large mass that is hanging out
3  on the scrotum.
4      Q.  Okay.  And you told him at that time that
5  if the swelling got bigger then you would advise that
6  maybe that area be removed, correct?
7      A.  It's called spermatocelectomy, right.
8      Q.  At the time you saw him in August of 2002
9  you did not recommend any surgery?
10     A.  No.
11     Q.  Okay.  You did not recommend any pain
12 medication?
13     A.  Any, that's right too.
14     Q.  And you didn't recommend any follow-up care
15 unless he had more problems.
16     A.  More problems, right.
17     Q.  Okay.  The patient indicated to you on that
18 date that he had a lot of pain, correct?
19     A.  Right.
20     Q.  But based upon your objective assessment of
21 the patient, you did not find any evidence of pain,
22 did you?
23     A.  No.
24     Q.  Okay.  And when you say that you found no

1  objective evidence, can you tell me specifically --
2      A.   Objective means you can see, subjective
3  means somebody tell me the pain.
4      Q.   So there wasn't --
5      A.   -- any indication for me to suspect the
6  patient having severe pain.
7      Q.   Okay.
8      A.   Or any type of pain really.
9      Q.   Would it be fair to say then there was
10 nothing medically that you found in August of 2002 to
11 indicate that the patient should be or -- should be
12 causing him some sort of pain?
13     A.   That's correct.
14     Q.   Okay.  You found no infection on that date.
15     A.   No.
16     Q.   And in fact, doctor, your note indicates
17 that you thought the patient may be seeking pain
18 medication, right?
19     A.   That's my suspicion.
20     Q.   Okay.  Did you refer the patient then back
21 to Dr. Barcenilla?
22     A.   They always go back.  Consultation only one
23 time or if I need more assessment I call them back,
24 but otherwise it's done, this is the advice to the

1  primary care physician.
2      Q.  And doctor, if the patient would have had
3  any other problems relating to urology, would you
4  have made a note of those?
5      A.  Exactly.
6      Q.  Okay. So obviously anything that you saw
7  you wrote down, right?
8      A.  That's right.
9      Q.  And can we then fairly assume that if you
10 didn't write it down there wasn't anything that you
11 noted.
12     A.  That's correct.
13     Q.  Okay. And based on what we have here do
14 you have any indication that you've seen the patient
15 since?
16     A.  Based on this thing I don't have any
17 indication.
18     Q.  Okay.
19     A.  And I don't remember I have seen him again.
20     Q.  Okay. And have you had any conversations
21 with any of his subsequent treating physicians?
22     A.  No.
23     Q.  Okay. You've not had any input or
24 involvement in his subsequent care, have you?

1    A.    No.

2    Q.    Okay.  Did you have any conversations with
3 the physicians who had been treating him while he was
4 an inmate?

5    A.    No.

6    Q.    And doctor, would it be fair to say that
7 all of the testimony you've given me today is within
8 a reasonable degree of medical certainty?

9    A.    That's correct.

10   Q.    Doctor, I'm also going to show you what we
11 have marked here as part of the records, I've already
12 shown you bates stamp numbers 1950 and 1951.  This
13 was the ultrasound that was done on the same date,
14 actually the day before, August 21st of 2002?

15   A.    Right.

16   Q.    That would have already been done before
17 you saw the patient, right?

18   A.    Yes.

19   Q.    Would you have also relied upon this
20 finding in making your assessment?

21   A.    I also supplemented that thing with my -- I
22 confirm my finding with this thing.

23   Q.    The records we reviewed with your signature
24 that are found on bates stamped numbers 1970 and 1971

```
 1   include the findings that we show on pages 1950 and
 2   1951, correct?
 3       A.   That's right.  That -- that -- that is my
 4   understanding of the report.
 5       Q.   Okay.
 6       A.   That report is also signed by the different
 7   doctor who is expert in that.  I am not an expert in
 8   nuclear medicine or ultrasound.
 9       Q.   Okay.  Would you agree with the findings
10   that were made with respect to the ultrasound?
11       A.   Can I see that?
12       Q.   Sure.
13       A.   The finding on the left side, left
14   epididymis was more prominently enlarged and mild
15   reactive hydrocele, I cannot document it.
16       Q.   Okay.  So to that extent you did note that
17   in your record that you disagreed with that, right?
18       A.   Yeah, that's right.
19       Q.   And clinically you did not find any
20   evidence of that, correct?
21       A.   That's right, clinically I find nothing.
22       Q.   And that is what a physician would do is
23   once a test shows a certain result the doctor needs
24   to verify that clinically, correct?
```