1:04-cv-01062-MMM-JAG   # 32-13   Page 1 of 17

E-FILED
Thursday, 31 August, 2006 03:58:47 PM
Clerk, U.S. District Court, ILCD

NARAYAN AMIN

Page 19

1    A.   That's correct.
2    Q.   And without any clinical findings there is
3  nothing to treat, is there?
4    A.   No.
5    Q.   Doctor, I'm also going to show you
6  documents, lab results, on pages 1952, 53 and 54.
7  Would you have referenced those as well in making
8  your assessment that there was no infection?
9    A.   That's right.
10   Q.   Okay.
11        MS. POWELL:  Doctor, I believe that's all I
12 have.  Thank you very much.  The other attorneys may
13 have a couple questions for you.
14   A.   All right.  I am here.
15        MS. POWELL:  Kelly, did you have anything?
16        MS. CHOATE:  Yes.
17 EXAMINATION CONDUCTED:
18        BY: MS. KELLY CHOATE:
19   Q.   Doctor, I'm Kelly Choate and I represent
20 the Illinois Department of Corrections, defendants in
21 this case.  I just have a couple of questions for
22 you.  Was the condition that you saw -- for which you
23 saw Mr. Hayes one that a lay person would be able to
24 diagnose?

```
 1      A.   No.  A lay person cannot diagnose that.
 2      Q.   They also wouldn't be able to determine any
 3 sort of treatment for someone with that condition,
 4 would they?
 5      A.   Lay person cannot treat anything anyway.
 6      Q.   Also do you have any knowledge that
 7 Mr. Hayes was ever denied access to health care
 8 personnel while he was incarcerated?
 9      A.   I don't have any knowledge.
10           MS. CHOATE:  I have nothing further.
11           MR. BACKMAN:  I have a few questions.
12 EXAMINATION CONDUCTED:
13           BY: MR. JONATHAN A. BACKMAN:
14      Q.   This is John Backman.  Good afternoon.
15      A.   Good afternoon.
16      Q.   Can you hear me okay?
17      A.   Yes, very good.
18      Q.   What documents do you have in front of you
19 as I'm speaking to you?
20      A.   The document I have is my consultation
21 report done on August 22, 2002.
22      Q.   Just those two pages?
23      A.   Just two pages.
24           MS. POWELL:  Actually --
```

1    A.    Plus she showed me a copy of the lab report
2    which I included in my report anyway.
3            MS. POWELL:  I have all the records.
4            MR. BACKMAN:  So he was testifying that
5    those -- that set of records was kept in the ordinary
6    course?
7            MS. POWELL:  That's correct.  But he's
8    testifying from the -- I made an extra set of copies
9    for him to look at because those are the two pages
10   that he actually authored.
11           MR. BACKMAN:  Perfect.  Okay.
12           BY MR. BACKMAN:
13   Q.    Who is in the room with you right now there
14   at the deposition?
15   A.    Right now, the lawyer -- two ladies here,
16   one is a lawyer and one is a stenotypist.
17           MS. POWELL:  John, I'm going to object to
18   these types of questions because if I need to use
19   this for an evidence deposition, that is irrelevant.
20           MR. BACKMAN:  That's fine.
21   Q.    Now, Dr. Amin, have you ever had a
22   situation where a patient comes to you complaining of
23   pain and you see them and you don't -- you don't know
24   the cause the first time but you subsequently

```
1    discover it?
2            MS. POWELL:  I'm going to object.  This is
3    irrelevant.
4       A.   Do you still want me to answer?
5       Q.   Yes.
6       A.   All right.  It can happen.
7       Q.   Okay.  Now, you indicated that when Mr.
8    Hayes came to see you he was -- he was reporting that
9    he was in severe pain, correct?
10      A.   That's right.
11      Q.   Now why didn't you believe him?
12      A.   My physical finding, report and -- report
13   and my general impression about the patient.
14      Q.   Have you completed your answer?
15      A.   Yes.
16      Q.   Okay.  Did you -- did you have any
17   discussion with Mr. Hayes about cramping of his
18   cremasteric muscle?
19      A.   No, I didn't have any -- any -- he
20   didn't -- he did not tell me anything, no discussion
21   about cremasteric muscle.
22      Q.   Okay.  Now have you ever have a situation
23   where a patient is having cramping of the cremasteric
24   muscle?
```

```
 1            MS. POWELL:  Objection, this is beyond the
 2    scope of my direct.
 3        A.    Do you want me to still answer?
 4            MS. POWELL:  Sure.
 5        Q.    Yes.
 6        A.    Can you repeat the question, please?
 7        Q.    Have you had situations where a patient had
 8    had cramping of that cremasteric muscle?
 9        A.    I don't -- I did not encounter without --
10    any of my physical finding.
11            MS. POWELL:  I think he is talking about
12    any patient ever as opposed to this patient.
13        A.    No.
14            MS. POWELL:  Is that what you mean, John?
15        A.    No.
16        Q.    You have never had a patient with that
17    problem?
18        A.    No.
19        Q.    Now, if Mr. Hayes had continued to complain
20    about pain and if you were to see him again, were
21    there any other tests or examinations you could have
22    sent him for?
23            MS. POWELL:  Object, irrelevant.  Beyond
24    the scope and speculative.
```

1     MR. BACKMAN: He can answer.
2     MS. POWELL: You can answer.
3     A.    If a patient continued to have and comes to
4  me again and again and I want to rule out any rare
5  possibility, I might do the ultrasound again and I
6  may look in his bladder called cystoscopy and I may
7  order kidney x-rays.
8     Q.    Let me ask you what would you have done had
9  Mr. Hayes reported to you that he was having cramping
10 and retraction of his cremasteric muscle?
11    MS. POWELL: Objection. Same objections.
12    A.    Nothing. Unless I find something to treat.
13    Q.    I'm sorry. Could you repeat that last part
14 of your answer?
15    A.    Yes, unless I find some reason for that
16 cremasteric reflex or spasm you are talking about.
17    Q.    So you're saying you would have needed to
18 know why it was happening in order to treat it?
19    A.    That's right. If there is negative
20 finding, I won't treat.
21    Q.    But suppose you witnessed the retraction,
22 what would be your next step?
23    MS. POWELL: Same objections.
24    A.    I cannot tell you anything about it unless

1  I see the patient again and again.

2    Q.  What I'm trying to understand here, if

3  Mr. Hayes, if you had objective evidence of a

4  cremasteric muscle retraction together with a report

5  of severe pain, what would then be the next thing to

6  do?  To allow him to just continue with the pain?

7    MS. POWELL:  I'm going to object to this

8  line of continuing speculative testimony.  We are

9  here to ask him about his care and treatment himself

10  and I think under the federal rules he is not to be

11  giving opinions about care and treatment that he did

12  not provide himself because he works for the

13  Department of Veterans Affairs.  They're not to give

14  testimony beyond the scope of their own care and not

15  to give additional opinions.

16    MR. BACKMAN:  This has to do with his

17  testimony that he did not believe Mr. Hayes.  And

18  what I'm asking is --

19    MS. POWELL:  You're asking him questions

20  about what if he would have found something that he

21  didn't find.  Those are opinions, they are not based

22  upon the care that he actually assessed.

23    MR. BACKMAN:  We don't know that.  We don't

24  know what Mr. Hayes -- based on this discussion we

1  don't know what Mr. Hayes said to him and I'm asking
2  him if he were told that there was cremasteric muscle
3  spasms or if he witnessed it --
4      A.   That is speculative, I'm not going to
5  answer it.
6           MR. BACKMAN:  I believe you just interfered
7  with my deposition improperly, that was a perfectly
8  legitimate question.
9           MS. POWELL:  You can ask what you want to,
10 he's not -- he can do what he wants to and he doesn't
11 even have to give this deposition as you well know.
12          BY MR. BACKMAN:
13     Q.   Dr. Amin, if I can ask you again.
14     A.   Go ahead.
15     Q.   If you have -- if you have a person, in
16 this case Mr. Hayes, reporting severe pain and you
17 have cramping of the myofascial muscle -- the
18 cremasteric myofascial muscles.
19     A.   I --
20          MS. POWELL:  Wait.
21     A.   I'm not answering that.
22          MS. POWELL:  I'm going to object for the
23 record as well that that's speculative and no
24 foundation because there is no testimony and no

1   record to indicate that those complaints were
2   actually made to Dr. Amin by this patient.
3           MR. BACKMAN: Okay. Give me a minute then.
4           BY MR. BACKMAN:
5       Q.  Dr. Amin, in assessing this patient did you
6   review any of his medical records from before he had
7   come to the Veterans Administration for treatment?
8       A.  Before he come to the Veterans
9   Administration?
10      Q.  Right.
11      A.  No.
12      Q.  Okay. And how long had he been at the
13  Veterans Administration when you examined him?
14      A.  When I examine -- I came in January and I
15  examined August of same year.
16      Q.  No, how long -- not you, I'm sorry. How
17  long had Mr. Hayes been at the Veterans
18  Administration there in Danville for treatment when
19  you assessed him?
20      A.  I -- I don't recall the complete record. I
21  see what I -- what I did.
22      Q.  Can you be a little more specific then with
23  me as to what it was about your examination of him
24  that made -- that led you to believe that he was

```
 1   seeking pain medication improperly?
 2        A.   That's my impression by examining him and
 3   my general experience of examining the similar
 4   patient in the past.
 5        Q.   Similar patients in the past?
 6        A.   My practice, what I call is my experience
 7   in treating the patient of my 35 years of urology
 8   practice.
 9        Q.   Okay.
10        A.   I'm sorry, 33.
11        Q.   According to -- I think you were shown this
12   before that, the radiology report?
13        A.   Yeah.
14             MS. POWELL:  The ultrasound?
15             MR. BACKMAN:  It says at the top of my page
16   radiology report, ultrasound.
17        A.   Right.  Right.
18        Q.   At the bottom it's No. 1950?
19        A.   Right, I saw that.
20        Q.   Do you know, at the bottom, maybe I didn't
21   hear you clearly, but there is a reference to
22   abnormality, attention needed.  Can you explain
23   again, what was the abnormality?
24        A.   That is his reading and that is spermato --
```

NARAYAN AMIN

Page 29

1   the spermatocele is a cystic lesion, here we mention
2   3.5 to 4 centimeter minimum diameter, which I saw
3   about -- which I saw - the spermatocele was smaller.
4   That spermatocele that needed attention according to
5   the radiologist or nuclear medicine, the ultrasound
6   guy.
7       Q.   What is the spermatocele?
8       A.   Spermatocele is small cystic swelling, it
9   is a cystic swelling arising from epididymis.
10      Q.   Now, can that swelling increase and
11  decrease over time?
12      A.   No, it all -- it only slowly increasing.
13      Q.   So now this report was -- this exam was
14  done on August 21st and then your examination is
15  August 22nd, is it possible that the size changed
16  during that 24 hour period?
17      A.   No.
18      Q.   Okay.
19      A.   Let me tell you something different here.
20  You are talking about totally different thing.  There
21  was a testicular size the guy was mentioning, 3.5 to
22  4, and the lesion is 2.5 by 2.1.  That is what the
23  actual spermatocele size reported by ultrasound guy.
24      Q.   Okay.

NARAYAN AMIN

Page 30

```
 1      A.    So that is -- I am sorry I made a mistake
 2  there.
 3      Q.    Do you know how long your meeting with
 4  Mr. Hayes was on the day you examined him?
 5      A.    About 15 minutes.
 6      Q.    Did you go through a full medical history
 7  with him?
 8      A.    I go through the pertinent medical history
 9  belong to my specialty.
10      Q.    Regarding your facility?
11      A.    No, my specialty.
12      Q.    Your specialty?
13      A.    Right.
14      Q.    I see.  Do you recall whether Mr. Hayes
15  gave you any specific details about what was
16  happening with his testicle?
17      A.    Whatever I mention in my note, that's all I
18  recall.  I don't have any other information.
19      Q.    Okay.
20            MR. BACKMAN:  I have nothing further.
21            MS. POWELL:  I just have a couple
22  follow-ups for you, doctor.
23  RE-EXAMINATION,
24      BY: MS. THERESA POWELL:
```

AREA WIDE REPORTING SERVICE

```
 1        Q.   First of all, in addition to the history
 2   that you would have taken of the patient yourself,
 3   there would have been the history taken by
 4   Dr. Barcenilla when the patient first arrived,
 5   correct?
 6        A.   That's correct.
 7        Q.   So any history that was taken with respect
 8   to overall status would also have been available to
 9   you and contained within the records, right?
10        A.   That's right.
11        Q.   The history you would have taken would have
12   been specifically related to urology problems, right?
13        A.   That's right.
14        Q.   Okay.  Doctor, also, with respect to the
15   radiology report, radiologists don't treat urological
16   conditions, do they?
17        A.   No.
18        Q.   They basically interpret the findings that
19   were documented from the ultrasound, right?
20        A.   That's right.
21        Q.   It would be the urologist's specialty and
22   determination as to whether or not a specific
23   condition actually exists and whether or not
24   treatment needed to be rendered, right?
```

```
 1        A.    That's my responsibility.
 2        Q.    Okay.  And, doctor, you're not affiliated
 3   with the Department of Corrections in Illinois, are
 4   you?
 5        A.    No.
 6        Q.    And --
 7        A.    Never.
 8        Q.    And you have never been?
 9        A.    Right.
10        Q.    You are also not affiliated with Wexler
11   Health Sources, are you?
12        A.    No.
13        Q.    Before today we have never met, have we?
14        A.    Never.
15        Q.    And we have never had any conversations
16   about this patient or anything else, have we?
17        A.    Never.
18              MS. POWELL:  That's all I have.  Thank you
19   very much.
20              MR. BACKMAN:  I have one last question.
21   RE-EXAMINATION,
22      BY: MR. JONATHAN A. BACKMAN:
23        Q.    I wanted to clarify a question you asked in
24   your first question, is that okay, Theresa?
```

1          MS. POWELL: Yeah, go ahead.
2      Q.   Doctor, when you testified that everything
3   that you had testified to on the original
4   examinations was to a reasonable degree of medical
5   certainty, did that include, are you indicating that
6   you have a reasonable degree of medical certainty
7   that Mr. Hayes did not experience pain or merely that
8   there was no objective evidence of it?
9      A.   I cannot tell that, the pain is subjective
10  thing.
11         MR. BACKMAN: I have nothing further.
12         MS. POWELL: I want a follow-up.
13  RE-EXAMINATION,
14    BY: MS. THERESA POWELL:
15     Q.   Doctor, you can't treat a condition that
16  you can't find, can you?
17     A.   Exactly right.
18         MS. POWELL: That's all I have.
19         MR. BACKMAN: Actually, I'm sorry, the
20  question was you can't treat a condition that you
21  can't find?
22     A.   That's right.
23         MR. BACKMAN: I have nothing further.
24         MS. POWELL: Okay. You're done.

```
 1              (Concluding at 1:32 PM)
 2      AND FURTHER THE DEPONENT SAITH NOT
 3                 (Signature Waived)

                 _____
 4              NARAYAN R. AMIN, M.D.
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1   STATE OF ILLINOIS  )
                        )
 2   COUNTY OF VERMILION)
 3
             I, Amy L. Prillaman Neubaum, a Certified
 4   Shorthand Reporter, in and for the County of
     Vermilion, State of Illinois, do hereby certify that
 5   NARAYAN R. AMIN, M.D., the deponent herein, was by me
     first duly sworn to tell the truth, the whole truth
 6   and nothing but the truth, in the aforementioned
     cause of action.
 7           That the foregoing deposition was taken on
     behalf of the Defendant, at the VA Medical Center,
 8   Building 58, 1900 East Main, Danville, Illinois, on
     the 14th of July, 2006;
 9           That said deposition is a true record of the
     testimony given by the deponent and was taken down in
10   stenograph notes and afterwards reduced to
     typewriting under my instruction; and that it was
11   agreed by and between the witness and attorneys that
     said signature on said deposition would be waived.
12           I do hereby certify that I am a disinterested
     person in this cause of action; that I am not a
13   relative of any party or any attorney of record in
     this cause, or an attorney for any party herein, or
14   otherwise interested in the event of this action, and
     am not in the employ of the attorneys for either
15   party.
             IN WITNESS WHEREOF, I have hereunto set my hand
16   this 19th day of July, 2006.
17

                         _____
18                       AMY L. PRILLAMAN NEUBAUM, CSR
19
20
21
22
23
24
```