E-FILED
Thursday, 31 August, 2006  04:02:57 PM
Clerk, U.S. District Court, ILCD

76

1      Q.  How soon after you noticed you had a

2    problem with your testicle did you request to be

3    seen in the health care unit?

4      A.  What happened, to be quite honest about

5    it, I was watching a show on the Discovery

6    Channel on the TV.  And they were talking about

7    women and breast cancer and how they should

8    examine themselves once a month.  And the

9    narrator said a man should examine himself once a

10    month.  So when I took a shower that night, just

11    out of the clear blue sky I decided that I would

12    examine myself.  And I found a lump that scared

13    the absolute shit out of me, excuse me, if you

14    want the truth.  I immediately put in for a

15    nurses screening, went to health care the next

16    day and told them that I had a nodule or a growth

17    on my testicle.  I had found it in the shower.

18      Q.  So you saw the nurse the next day, is

19    that correct?

20      A.  Yes.

21      Q.  Did you see the doctor the next day as

22    well?

23      A.  The day after.

24      Q.  So two days after you noticed this lump

77

1    in your testicle, you were seen by a physician?

2        A.  Right.

3        Q.  Was that Doctor Shute?

4        A.  That was Doctor Choudry.

5        Q.  And what did Doctor Choudry do for you?

6        A.  Well, he examined me; and he felt it.

7    And he was the medical director then, so he

8    ordered the ultrasound.

9        Q.  And that ultrasound then was performed,

10   is that correct?

11       A.  Right.  They took me out of the prison

12   and took me to the hospital in Galesburg there

13   and had an ultrasound done.

14       Q.  And then you were seen subsequently for

15   the problems with your testicle as well, is that

16   correct?

17       A.  Right.

18       Q.  As it turned out, the lump on your

19   testicle that you described finding in the

20   shower, did that have anything to do with the

21   cremasteric problems you were having later?

22       A.  No, it did not.

23       Q.  When did you begin having the problems

24   with the cremasteric muscle relative to when you

ASSOCIATED COURT REPORTERS

78

1    found the lump, how far after?

2         A.  I'm purely guessing because I don't have

3    my medical file with me.  I have a copy of it.

4    But I would say it was possibly six months or

5    less.

6         Q.  So immediately you were seen for the

7    lump that you found in your testicle?

8         A.  Right.

9         Q.  And that's what the ultrasound was done

10   for?

11        A.  Right.

12        Q.  About how -- relative to when you found

13   the lump, about how long after then did you

14   discover that you had a problem with your arm?

15        A.  Again, I'm just guessing; but it was

16   just a few months later I noticed my fingers

17   tingling and I was getting pain in my arm and my

18   ring finger and little finger and the palm of my

19   hand was starting to tingle a little bit.  You

20   know, it just didn't feel right.

21        Q.  And what did you do when you discovered

22   that?

23        A.  I went to sick call.

24        Q.  And who did you see at sick call?

ASSOCIATED COURT REPORTERS

79

```
 1        A.  It was Doctor Shute.  I found a lump in
 2    my arm here right up there where the scar is is
 3    where I found that lump at.  And you could feel
 4    it.  It was growing out from the bone.
 5        Q.  So you're pointing to a place on the
 6    outer portion of your arm below your elbow?
 7        A.  Right.  Approximately three inches,
 8    three or four inches from my wrist, right along
 9    in there for that lump, you could feel it.
10        Q.  Was the lump causing you pain?
11        A.  Yeah, yeah.  When you touched it or
12    rubbed it or something, it would shoot down
13    though here down into my fingers and so forth.
14        Q.  So it would then trigger the numbness in
15    your fingers?
16        A.  Right, right, it would trigger the pain.
17        Q.  Did you go to sick call the same day you
18    discovered that?
19        A.  If I recall right, I was seeing Doctor
20    Shute about my testicles; and I brought it up
21    that I had found this while I was there.  And he
22    ordered the x-ray to be done on me.
23        Q.  And was that x-ray performed?
24        A.  Yeah, that x-ray was performed at Hill.
```

80

1    They had an x-ray machine.  They didn't have to

2    take you out to get x-rays.  And on x-rays it

3    showed the nodule.

4         Q.  So would you say that you saw Doctor

5    Shute or brought up the issue with your arm

6    within a few days of finding the lump?

7         A.  Yeah, within a few days, yeah.

8         Q.  And you were also seen then subsequent

9    to that for the complaints with your arm, is that

10   correct?

11        A.  Right.

12        Q.  You were seen by Doctor Shute for that?

13        A.  Right.

14        Q.  Were you also -- you also said that you

15   brought these problems to Doctor Hamby's

16   attention as well, is that correct?

17        A.  Correct.

18        Q.  Were there other doctors that you saw

19   for either of those two complaints?

20        A.  No.  There was that one doctor that come

21   in to fill in when they had personnel problems.

22   Doctor Choudry had a patient to die on him, and

23   he left.  And they brought different physicians

24   in to fill in until Doctor Hamby came.  He came

81

1   from Menard.  He was a doctor down at Menard.  He

2   came up to Hill and took over as medical

3   director.  And then Doctor Shute.  And then

4   things calmed down when we had a regular doctor.

5                But a period of time in there,

6   there was all kinds of different doctors in the

7   health care.  There wasn't nobody permanently

8   assigned.

9        Q.  You testified earlier that at some point

10  while you were at Hill the health care unit

11  access procedures changed?

12       A.  Yes.

13       Q.  Did you have difficulty accessing the

14  health care unit under either system?

15       A.  The new system.

16       Q.  And the new system was?

17       A.  You had to fill out a request slip, put

18  it in a box, the nurses came around and gathered

19  up the request slips and then called you to

20  health care.  I filled out four and never got

21  called.

22       Q.  And was that in relation to the ice that

23  you were wanting from Doctor Hamby?

24       A.  I was wanting my ice back, right,

82

1  because ice would numb my testicles.

2      Q.  So for those four requests, you weren't

3  bringing up any new physical ailment?

4      A.  No, no.

5      Q.  And it was nothing that you hadn't been

6  seen for in the past, is that correct?

7      A.  Correct.

8      Q.  So they could tell from your request

9  slip that you were wanting ice, is that right?

10     A.  I was wanting to see a doctor.  And the

11  main reason behind that was to get a new -- you

12  had to have a permission slip.  It was a slip

13  that was filled out and signed by the doctor that

14  I could get a bag of ice in the housing unit for

15  my own personal use.  Okay.  And that was to put

16  between my legs.

17     Q.  And so that request slip was to be seen

18  so you could get your ice reinstated.  And you

19  were never called?

20     A.  I was never seen.

21     Q.  Do you know who would have received the

22  request slips?

23     A.  The nurses.

24     Q.  Now you said that after you left Hill

ASSOCIATED COURT REPORTERS

83

1    Correctional Center and were paroled, you went to
2    Danville VA?
3           A.   Went to Danville straight -- draw a
4    straight line down the road, and that's the way I
5    went.  I went straight from Hill straight to the
6    VA in Danville and checked myself in.
7           Q.   So at Danville you said you were treated
8    for the PTSD, is that correct?
9           A.   That's correct.
10          Q.   Did you complain to the doctors at
11   Danville about your testicles?
12          A.   Yes, I did.
13          Q.   What did they tell you?
14          A.   They give me -- they gave me ice and
15   same procedure there, you have to wait your turn.
16   But I was only there ten days.  And the reason I
17   was there only ten days is I had put in for
18   interstate parole and my approval hadn't came
19   back yet.  But while I was at Danville, my
20   approval came in.  And I could go to Kentucky.
21   And I bought a bus ticket and went to Kentucky.
22          Q.   Were you given any pain medications at
23   Danville for your testicles?
24          A.   I was given Tylenol Three if I remember

84

1    right, and something else.  But I don't remember

2    what it was.  And I was given ice packs.

3        Q.  Okay.  How about your complaints of the

4    nodule on your arm, were you treated for that

5    while at Danville?

6        A.  Requests were put in, but I didn't stay

7    there long enough to follow-up on those.

8        Q.  So within ten days while you were at

9    Danville, there was no treatment for your arm?

10       A.  There was no treatment at all because I

11   was gone.

12       Q.  But you did complain about your arm to

13   them?

14       A.  Yes, I did; yes, I did.  My arm, my

15   testicle and everything, told them what kind of

16   treatment I was on.  They put me back on my PTSD

17   medications because they had a record from when I

18   was in there before.  They put me back on those

19   medications, gave me pain medication and ice

20   packs, put in a request for me to see a

21   urologist, an orthopaedic doctor.  But I wasn't

22   there long enough to show up for appointments.

23       Q.  Okay.  Now you sued former Director

24   Snyder, at the time the director, is that

85

1    correct?

2         A.   Right, he was the director.

3         Q.   Why did you sue Director Snyder?

4         A.   Because I wrote him a letter.  And my

5    two grievances were to directed to him and denied

6    by him.

7         Q.   Do you know that he ever personally

8    reviewed or received either of those letters or

9    the grievances?

10        A.   Yes, he did.  His signature is on the

11   denial.

12        Q.   Do you know that that is his signature

13   as opposed to that of a designee?

14        A.   That, I do not know.  I just know it's

15   his name on there.

16        Q.   And what did you want Director Snyder to

17   do for you?

18        A.   I wanted him to tell the health care

19   unit to send me to a hospital outside the prison,

20   to get my treatment.  And the letter I got from

21   Montgomery, Assistant Deputy Director, said that

22   he had been instructed by Director Snyder to

23   write to me.  See, I wrote a letter to everybody

24   in the chain of command.  And I got a response

86

1    from Montgomery.

2         Q.  And what was your understanding of

3    Montgomery's response?

4         A.  He was saying that he had contacted the

5    medical unit and that my condition was being

6    monitored, my treatment was monitored.

7         Q.  Did it say not treated, but monitored?

8    Or is that your understanding that it was not

9    treated?

10        A.  Well, I'm saying it was not treated.  He

11   said it was being monitored.

12        Q.  So you don't know that he meant by it

13   was not being treated, is that correct?

14        A.  No, that's my saying, not his.  It's my

15   words.

16        Q.  Is it your understanding that Director

17   Snyder is not a physician?

18        A.  Yes.

19        Q.  Is it your understanding that Deputy

20   Director Montgomery is not a physician?

21        A.  Yes.

22        Q.  How about Assistant Warden Bass?

23        A.  She's in charge of programs.  Health

24   care comes underneath her.

87

1     Q.  Is she a doctor?

2     A.  No.

3     Q.  Was Warden Pearson a physician to your

4 knowledge?

5     A.  No.

6     Q.  So you're saying that you sued Director

7 Snyder because he didn't direct the medical care

8 at Hill that you wanted, is that fair?

9     A.  He was in the chain of command.  I'm an

10 ex-military.  There's a chain of command in

11 everything.  He was the top dog.  I wrote a

12 letter to him saying, look, I'm in pain, this is

13 what's going on, I have to pull my testicle down,

14 I have to unbend my penis, I have to do all this;

15 and all I'm getting is Ibuprofen, and I want

16 someone to take me to a hospital.

17     Q.  Did you expect him to diagnose you?

18     A.  No, I didn't expect him -- I expected

19 him to tell someone to take me to a hospital is

20 what I wanted out of him.

21     Q.  And how about Deputy Director

22 Montgomery?

23     A.  He was the one that I corresponded with

24 because he told me in his letter that he had been

88

1    directed by Director Snyder to handle this

2    complaint.  And we corresponded back and forth.

3        Q.  So from Deputy Director Montgomery's

4    response to you, is it your understanding that

5    Director Snyder had some input into his looking

6    into your complaints?

7        A.  I take it because he said he was

8    directed by Director Snyder to answer my letter.

9        Q.  So why are you suing Deputy Director

10   Montgomery?

11       A.  Because he had the authority to tell the

12   health care unit to get me treated, and he didn't

13   do it.

14       Q.  From his letter was it your

15   understanding that Deputy Director Montgomery

16   thought you were being seen for these problems in

17   the health care unit?

18       A.  I don't know what was said between the

19   health care and him.

20       Q.  I'm talking from your understanding from

21   his letter.

22       A.  From his letter I understood that he had

23   talked to the health care unit, and they had told

24   him that I was being monitored.  And that was it.

89

1      Q.  So you expected Deputy Director

2  Montgomery then to somehow overrule what was

3  going on at health care unit in Hill?

4      A.  Right, right.  That's the chain of

5  command.

6      Q.  Did you expect Deputy Director --

7      A.  Well, I even sent them a letter, excuse

8  me for interrupting you.  I even sent a letter to

9  Montgomery and Snyder both that I was a disabled

10  veteran and they didn't have to pay for anything,

11  all they had to do was take me to a VA hospital.

12      Q.  Did you expect Deputy Director

13  Montgomery to examine you?

14      A.  No.

15      Q.  Did you expect him to prescribe

16  treatment for you?

17      A.  No.

18      Q.  Now you also sued Warden Pearson.  Why

19  are you suing Warden Pearson?

20      A.  Because he was the warden, and I wrote

21  letters to him.  And he wrote back and said I

22  know of your conditions, but there's nothing I

23  can do.

24      Q.  Did you expect Warden Pearson to examine

90

1    your complaints?

2        A.  No.

3        Q.  Did you expect him to prescribe

4    medication?

5        A.  No.

6        Q.  Did you expect Warden Pearson to order

7    any sort of tests for you?

8        A.  No.

9        Q.  Would you expect that any of these

10   Defendants, Snyder, Pearson, Bass or Montgomery,

11   could order tests for you, medical tests?

12       A.  The only thing I expected out of them

13   was to order the health care unit to seek medical

14   attention outside of Hill Correctional Center.

15       Q.  And Assistant Warden Bass, is it the

16   same for her?

17       A.  Right.

18       Q.  When you asked these four Defendants to

19   check into your medical care, is it your

20   understanding that they did check into it?

21       A.  As far as I know, they did.

22       Q.  They did or didn't?

23       A.  Did.

24       Q.  So is it fair to say that your complaint