E-FILED
Thursday, 31 August, 2006  04:03:23 PM
Clerk, U.S. District Court, ILCD

91

1    overall in this lawsuit is that you weren't

2    satisfied with the medical treatment that you did

3    receive at Hill?

4        A.   I wasn't satisfied because I was in pain

5    and nobody was treating the pain or treating the

6    condition whatsoever.  They didn't give me the

7    shots for Peyronies, they didn't give me pain

8    shots, they didn't give me no pain medication

9    except for Ibuprofen.  They didn't do anything.

10   And what was helping, that bag of ice, they even

11   took it away from me.

12       Q.   Are you suggesting that either or any

13   Director Snyder, Montgomery, Pearson or Bass had

14   anything to do with taking the ice pack away from

15   you?

16       A.   I don't -- I was told that doctor --

17   like I said earlier, when I come in the housing

18   unit one afternoon to get my ice, I was told that

19   Doctor Shute had been fired; and that my medical

20   record was unreviewed and that I couldn't get ice

21   anymore for my condition.

22       Q.   But no one told you that any of the four

23   Defendants we're talking about now had anything

24   to do with the ice, is that correct?

ASSOCIATED COURT REPORTERS

92

1          A.  No, they did not.  See, the grievance --

2                         MR. BACKMAN:  There is no

3    question.

4                         THE WITNESS:  All right.

5                         MS. CHOATE:  I don't have

6    anything further.

7                         MS. POWELL:  I don't having

8    anything else.

9                         THE WITNESS:  You done?

10                        MS. CHOATE:  I have one more

11   if you don't mind.

12                Did you ever personally speak with

13   Defendant Snyder?

14                        THE WITNESS:  Personally?

15        Q.  Face to face?

16        A.  No.

17        Q.  Or on the telephone?

18        A.  No.

19        Q.  Did you ever personally speak about

20   these medical conditions with Warden Pearson?

21        A.  Personally?

22        Q.  Yes.

23        A.  No.  All by letter communications.

24        Q.  How about Assistant Warden Bass?

ASSOCIATED COURT REPORTERS

93

1        A.  Same way, letter.

2        Q.  And how about Deputy Director

3  Montgomery?

4        A.  Letter.

5        Q.  Okay.

6        A.  No person to person.  It was all done by

7  letter.

8        Q.  That's all I have.

9                MR. BACKMAN:  I have

10  nothing.

11               REDIRECT EXAMINATION

12               CONDUCTED BY MS. POWELL:

13        Q.  I have a couple little things.  Can you

14  buy ice at the commissary?

15        A.  No.

16        Q.  Why not?

17        A.  They don't sell it.

18        Q.  Okay.  That's something they just don't

19  have?

20        A.  They just don't.

21        Q.  And it was your understanding that at

22  one point in time you had been given a

23  prescription for ice, is that what it was?

24        A.  It was a permission slip to get a bag of

94

1   ice, okay, signed by a doctor.  You know, like

2   guys will sprain their ankles; and they give them

3   permission slips to get a bag of ice to keep the

4   swelling down, stuff like that, same thing.  I

5   had swelling in my testicles, and they gave me a

6   bag of ice.  And the ice numbed my testicles and

7   numbed the pain.

8       Q.  How long did you have it?

9       A.  I had it for several months.  I don't

10  remember what the exact time frame was, but at

11  least for several months.

12                  MR. BACKMAN:  Ice is the

13  question?

14                  MS. POWELL:  Yes.  And then

15  at some point in time the correctional officer

16  said that you don't have a permission slip any

17  longer.

18                  THE WITNESS:  Right.  When I

19  came back from work, I was coming back from work,

20  and that's when I'd get it.  When I come back

21  from work, you know, I'd get me a plastic bag;

22  and I'd go get me a bag of ice and take it to my

23  cell.  And this one day when I come in, Whiteside

24  was the correctional officer's name, Whiteside

1    told me that Doctor Shute had been fired, that my

2    medical records were under review; and I could

3    not get any more ice.

4        Q.  And did you have -- I don't remember if

5    you told me this or not -- did you have a

6    conversation with Doctor Hamby about that?

7        A.  No, I never got back over to see him.

8        Q.  Okay.  Did you ever see any physician

9    after that?

10        A.  Nope.

11        Q.  Did you ever see any nurses after that?

12        A.  Nope.

13        Q.  And was it shortly after that you were

14    released?

15        A.  (Witness shakes head yes.)

16                    MR. BACKMAN:  You have to

17    answer.

18                    THE WITNESS:  Yes, ma'am.

19    Excuse me, I'm sorry.

20        Q.  That's okay.  Do you know how long it

21    was between the time that the ice stopped and the

22    date that you were released?

23        A.  I think the ice stopped if I can recall

24    correctly, and I'm not absolutely sure, but I

96

1    think it stopped the first part of July; and I

2    was released in mid, August 15th.

3         Q.   And from the first part of July until

4    the time you were released, you were never seen

5    in the health care unit?

6         A.   Never.   I sent four request slips.   I

7    have copies of them.

8         Q.   Did anyone ever tell you why you weren't

9    seen in the health care unit?

10        A.   I had no communications at all.   They

11   never contacted me in any form, face or fashion.

12        Q.   And is it your understanding that the

13   request slip specifically referenced the ice?

14        A.   No, it was a request to see a doctor.

15        Q.   Okay.   It was a generic request, right?

16        A.   Right.

17        Q.   Did you ever indicate to anybody that

18   you had an emergency?

19        A.   No.

20        Q.   And other than filling out a request

21   form or telling someone that you have an emergent

22   medical condition, was there any other way to be

23   seen in the health care unit?

24        A.   No, ma'am.

97

1          Q.   I think that's all I have.   Thanks.

2                    (Signature Waived)

3                    (Deposition Concluded)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

98

1

2    STATE OF ILLINOIS            )
     COUNTY OF CHRISTIAN          )
3

4

5                    CERTIFICATE

6            I, Tammy S. Wagahoff, CSR, affiliated

7    with Associated Court Reporters, P.O. Box 684,

8    Taylorville, Illinois, do hereby certify that I

9    reported in shorthand the foregoing proceedings

10   and the foregoing is a true and correct

11   transcript of my shorthand notes.

12           I further certify that I am in no way

13   related to or associated with any of the parties

14   or attorneys involved herein, nor am I

15   financially interested in the action.

16

17            _Tammy S. Wagahoff_
18            TAMMY S. WAGAHOFF, CSR.
             CSR License No. 084-002841

19
     Dated this  18th  day
20   of  January  , 2005.

21

22

23

24