E-FILED
Friday, 15 September, 2006 02:52:57 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

FLOYD K. HAYES, )
)
Plaintiff, )
)
-vs- ) No. 04-1062
)
DONALD N. SNYDER, et al., )
)
Defendants. )

**MEMORANDUM OF APPLICABLE LAW AND ARGUMENT IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

NOW COME the Defendants, DONALD N. SNYDER, JR., JESSE MONTGOMERY, and WANDA BASS, by and through their attorney, Lisa Madigan, Attorney General for the State of Illinois, and in support of their Motion for Summary Judgment, submit the following Memorandum of Applicable Law and Argument

## I. INTRODUCTION

Plaintiff is a former inmate of the Illinois Department of Corrections, who brings his complaint pursuant to 42 U.S.C. §1983 alleging deliberate indifference to serious medical needs in violation of the Eighth Amendment. Specifically, Plaintiff alleges on September 18, 2000, Plaintiff was examined by Dr. Chaudry, the Medical Director at Hill Correctional Center. An ultrasound performed on or about October 9, 2000 revealed a cyst on Plaintiff's right testicle and a smaller cyst on his left testicle. Plaintiff alleges that between October, 2000 and February, 2001, Plaintiff asked Dr. Chaudry for a biopsy of the cysts, but Dr. Chaudry refused to order the biopsy. Plaintiff alleges he filed a grievance on March 27, 2001 regarding this denial, but that the grievance was denied by the warden and subsequently by Defendant Snyder.

Plaintiff next alleges on or about September, 2001, he began to experience extreme pain in his testicles, that his testicles were swollen and "drawn up like a leg cramp," creating an abnormal curve in his penis. Plaintiff admits he was seen in the Health Care Unit on October 4, 2001, October 15, 2001, October 29, 2001, January 13, 2002, January 14, 2001, and January 25, 2002 for treatment of infections and the pain and cramping of his testicles. Plaintiff alleges he was given antibiotics for the infection and ibuprofen for the pain.

On January 25, 2002, Plaintiff alleges he was seen by Dr. Shute, who ordered a repeat ultrasound, but that Dr. Hamby (named in the complaint as Dr. Chaudry's successor) refused to authorize the repeat ultrasound. Plaintiff further alleges he was diagnosed with a bony lesion on his forearm on or about February 6, 2002, for which Dr. Shute ordered a nerve conduction test to be scheduled. However, Plaintiff alleges that Dr. Hamby refused to allow this test to be performed also.

Plaintiff alleges he filed and appealed grievances regarding these issues from April, 2002, through July, 2002, but that the grievances were denied. Plaintiff alleges Dr. Hamby terminated Dr. Shute from his position at Hill Correctional Center in or about May of 2002, and that after Dr. Shute left, Plaintiff filed four (4) sick call requests, which Dr. Hamby ordered his staff to ignore. Plaintiff was released on parole on August 15, 2002.

Plaintiff alleges this failure by the Defendants to "grant plaintiff access to the ordered diagnostic tests or to appropriate pain medication" constituted cruel and unusual punishment in violation of the Eighth Amendment.

## II. MATERIAL FACTS CLAIMED TO BE UNDISPUTED

1. Mr. Hayes was seen by a nurse the day after he discovered a nodule in his testicle and put in a sick call slip (Plaintiff's Dep., p. 76, l. 4 - 20).

2. Mr. Hayes was seen by a physician two days after he discovered a nodule in his testicle (Plaintiff's Dep., p. 76, l. 21 - 23).

3. Two days after he discovered a nodule in his testicle, Dr. Chaudry examined Mr. Hayes and ordered an ultrasound, which was completed at the hospital in Galesburg (Plaintiff's Dep., p. 77, l. 4 -13).

4. Plaintiff was seen in the Health Care Unit subsequently for the nodule in his testicle (Plaintiff's Dep., p. 77, l. 14 - 17).

5. Plaintiff admits the nodule in his testicle had nothing to do with the problems with his cremasteric muscle (Plaintiff's Dep., p. 77, l. 18 - 22).

6. A few months after Plaintiff discovered the nodule in his testicle, he began having problems with his arm (Plaintiff's Dep., p. 78, l. 12 - 20.

7. Plaintiff was seen by Dr. Shute for the lump on his arm when he raised the issue while being seen for the nodule in his testicle (Plaintiff's Dep., p. 79, l. 1 - 21).

8. An x-ray of Plaintiff's arm was ordered and performed at Hill Correctional Center (Plaintiff's Dep., p. 79, l. 21 - 24).

9. Plaintiff was examined for the lump on his arm within a few days of finding the lump (Plaintiff's Dep., p. 80, l. 4 - 7).

10. Plaintiff was subsequently seen by Dr. Shute, Dr. Hamby, and at least one other physician that came into the institution for his complaints about his arm (Plaintiff's Dep., p. 80, l. 8 - p. 81, l. 8).

11. Plaintiff put in four request slips requesting ice for his testicles, but raised no new complaints in those request slips (Plaintiff's Dep., p. 81, l. 17 - p. 82, l. 20).

12. The request slips would have been seen by the nurses (Plaintiff's Dep., p. 82, l. 21 - 23).

13. Plaintiff believes that Defendant Snyder saw his grievances and letters because his signature was on the denial of the grievance, but does not know if the signature was his or a designee's (Plaintiff's Dep., p. 85, l. 3 - 15).

14. Plaintiff wrote to Defendant Montgomery and received a response that he had contacted the medical unit (Plaintiff's Dep., p. 85, l. 18 - p. 86, l. 15).

15. Plaintiff sued Director Snyder because he was "in the chain of command." (Plaintiff's Dep., p. 87, l. 6 - 20).

16. Plaintiff sued Deputy Director Montgomery because "he had the authority to tell the health care unit to get [him] treated, and he didn't do it," and because he expected Montgomery to overrule what was going on at the Health Care Unit at Hill (Plaintiff's Dep., p. 88, l. 9 - p. 89, l. 5).

17. Plaintiff sued Warden Pierson because he wrote to Warden Pierson who wrote back and said he knew of Plaintiff's conditions, but that there was nothing he could do (Plaintiff's Dep., p. 89, l. 19 - 23).

18. Plaintiff expected Defendants Snyder, Montgomery, Bass and Pierson to order the Health Care Unit to seek medical attention outside of Hill Correctional Center (Plaintiff's Dep., p. 90, l. 9 - 17).

19. Plaintiff believes the four defendants checked into his medical care (Plaintiff's Dep., p. 90, l. 18 - 23).

20. Plaintiff does not believe Defendants Snyder, Montgomery, Bass or Pierson had anything to do with taking his ice pack away (Plaintiff's Dep., p. 91, l. 12 - 21).

21. Plaintiff never spoke directly with Defendants Snyder, Montgomery, Bass or Pierson about his medical complaints (Plaintiff's Dep., p. 92 - 93).

22. The medical problems with which Plaintiff presented were not the sort that a layperson could diagnose or determine what treatment was appropriate (Dr. Bigham's Dep., p. 117, l. 15 - 23).

23. Defendant Pierson's designee concurred on April 4, 2001 and July 18, 2002 with the grievance officer's recommendations on grievances regarding Plaintiff's medical care (Pierson Affidavit).

24. When a grievance regarding medical care was filed at Pinckneyville, it was the practice at Hill Correctional Center to contact the Health Care Unit for their review and response (Pierson Affidavit).

25. Neither the administrative staff, nor the grievance officers were trained to review grievances regarding medical care and determine whether there was any merit to the offender's complaints (Pierson Affidavit).

26. Defendant Pierson sent Plaintiff a memo on July 1, 2002 regarding his medical care that reflected Plaintiff's medical concerns were being addressed and that Defendant Bass had also addressed Plaintiff's concerns (Pierson Affidavit).

27. At the time he drafted the memo to Plaintiff on July 1, 2002, Defendant Pierson determined Plaintiff's concerns had been addressed appropriately. Defendant Pierson based this determination on his knowledge that Hill Correctional Center maintained a Health Care Unit staffed with physicians and other trained medical

personnel, and his knowledge that any medical concern that could not be addressed in house, could be sent to an outside medical vendor. He also based his response on the information provided in the grievance responses he reviewed. (Pierson Affidavit; Axhibit A).

28. Defendant Pierson is not a physician and was not licensed or trained to determine what care should be provided to offenders at Hill Correctional Center. (Pierson Affidavit).

29. Defendant Pierson usually delegated the task of reviewing offender's grievances to his designee, most often, Assistant Warden Bass (Pierson Affidavit).

30. Defendant Snyder did not personally receive, review or respond to offender's grievances (Anderson Affidavit).

31. Defendant Snyder's designee for reviewing and responding to offenders' grievances was the Administrative Review Board (Anderson Affidavit).

32. The May 1, 2001 letter to Plaintiff regarding his grievance received April 16, 2001 was reviewed by Leora Harry and signed on behalf of Defendant Snyder by Leora Harry (Anderson Affidavit; Exhibit H).

33. Terri Anderson is familiar with the initials of Leora Harry and the signatures of both Donald Snyder and Leora Harry (Anderson Affidavit).

34. Defendant Bass discussed Plaintiff's concerns about his health care with the Health Care Unit Administrator, who reviewed Plaintiff's medical records (Exhibit B).

35. The medical records indicated that Plaintiff was seen by a urologist on December 16, 2000, and that the Medical Director determined Plaintiff did not require further care (Exhibit B).

36. Plaintiff wrote a letter to Defendant Montgomery on April 16, 2002 concerning his medical care, and referencing a previous response he had received from Defendant Montgomery (Exhibit C).

37. Either Defendant Montgomery or his designee directed staff at Hill Correctional Center to look into Plaintiff's concerns about his medical care (Exhibit D).

38. As a result of Defendant Montgomery's request, Dr. Hamby, the Medical Director at Hill Correctional Center provided a response outlining Plaintiff's medical care beginning in September of 2000 and running through April of 2002 (Exhibit E).

39. Responses to Plaintiff's grievances dated March 27, 2001 and June 20, 2002 reveal that the Health Care Unit was notified and asked to give a response to Plaintiff's concerns. The responses reflected Plaintiff's medical care and diagnostic tests performed for his physical complaints (Exhibits F and G).

## III. DELIBERATE INDIFFERENCE

### A. Applicable Law on Deliberate Indifference to Serious Medical Needs.

In Estelle v. Gamble, 429 U.S. 97 (1976), the Supreme Court held that in order to violate a prisoner's Eighth Amendment rights as they relate to medical care, an official must demonstrate deliberate indifference to the serious medical needs of that inmate, and concluded that "deliberate indifference to serious medical needs of prisoners" constitutes the "unnecessary and wanton infliction of pain," 429 U.S. 97, 104 (1976). However, the Court drew a distinction between an "inadvertent failure to provide adequate medical care," Estelle at 105, and "an unnecessary and wanton infliction of pain" that is "repugnant to the conscience of mankind." Estelle at 106.

"To raise an Eighth Amendment issue, 'the infliction [of punishment] must be deliberate or otherwise reckless in the criminal law sense, which means that the

Defendant must have committed an act so dangerous that his knowledge of the risk can be inferred or that the Defendant actually knew of an impending harm easily preventable.'" Snipes v. Detella, 95 F.3d 586, 590, *citing* Antonelli v. Sheahan, 81 F.3d 1422, 1427 (7th Cir. 1995). Furthermore, "mere negligence or even gross negligence does not constitute deliberate indifference." Id., *citing* Wilson v. Seiter, 501 U.S. 294,305 (1991). Likewise, "medical decisions that may be characterized as 'classic example[s] of matter[s] for medical judgment *such as whether one course of treatment is preferable to another'* are beyond the Amendment's purview." Snipes v. Detella, 95 F.3d 586, 591 (7th Cir. 1996)(emphasis added).

While the state has "an affirmative obligation under the Eighth Amendment to provide persons in its custody with a medical care system that meets minimal standards of adequacy," (Meriwether v. Faulkner, 821 F.2d 408, 4ll (7th Cir. 1987)), inmates are not entitled to unqualified access to health care. Hudson v. McMillian, 503 U.S. 1, 112 S.Ct. 995, 1000 (1992); *see also* Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321 (1991). "A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." Snipes at 592.

Finally, "except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals." Johnson v. Doughty, 433 F.3d 1001, 1011 (7th Cir. 2006) *quoting* Bond v. Aguinaldo, 228 F.Supp. 218, 236 (N.D.Ill. 2002).

**B. Plaintiff received medical care for his complaints, Defendants Pierson, Bass and Montgomery responded reasonably to his complaints.**

Plaintiff admitted in his complaint that he was seen by physicians for his complaints regarding his testicle and his arm (see Complaint generally). Moreover, he admitted in his deposition that he was seen by a nurse in sick call the day after he discovered a nodule in his testicle and put in a sick call slip (Fact 1), and was seen by a physician the day after that (Fact 2). Dr. Chaudry, who examined Plaintiff at that time ordered an ultrasound of his testicle which was completed at a local hospital (Fact 3). Plaintiff admitted that he was seen in the Health Care Unit subsequently for the nodule in his testicle (Fact 4). Plaintiff admitted that the nodule in his testicle had nothing to do with the later diagnosed problems with his cremasteric muscle (Fact 5).

A few months after he began having problems with the nodule in his testicle, Plaintiff alleged he began having problems with his arm (Fact 6). The lump on his arm was examined by Dr. Shute at the same time he was being seen for the nodule in his testicle and within a few days of Plaintiff finding the lump (Facts 7 and 9), and Plaintiff received an x-ray of his arm (Fact 8). Plaintiff admitted he was seen by Dr. Shute, Dr. Hamby, and at least one other physician that came into the institution for the complaints about his arm (Fact 10).

While Plaintiff alleges he put in four request slips requesting ice for his testicles that were not answered, he admitted he did not raise any new medical concerns in the requests (Fact12). He also admitted he believed the requests would have been seen by the nurses (Fact 13), and admitted that none of these defendants had any part in taking away his ice packs(Fact 20). Additionally, Plaintiff admitted he never spoke directly with any of the defendants about his medical concerns (Fact 21), but that he

expected the defendants to order the Health Care Unit to seek medical attention outside of Hill Correctional Center (Fact 18). Plaintiff also admitted he believed the four defendants checked into his medical care (Fact 19). Specific allegations against Defendants Montgomery, Pierson, and Bass follow, along with the responses they gave to Plaintiff's concerns.

**Response of Defendant Montgomery:**

Plaintiff sued Defendant Montgomery because Plaintiff believed he had the authority to tell the Health Care Unit to get him treated, and he did not do it (Fact 16). Plaintiff bases his belief on the fact that he wrote to then Assistant Deputy Director, Jesse Montgomery, regarding his medical concerns (Facts 14, Exhibit C). He admitted he received a response that indicated Defendant Montgomery had contacted the Health Care Unit (Fact 14). Indeed, either Defendant Montgomery or his designee contacted Hill Correctional Center and asked that Plaintiff's concerns be investigated (Exhibit D). In response to Defendant Montgomery's request, Dr. Hamby reviewed the records and wrote an overview of Plaintiff's medical care (Exhibit E). This response to Plaintiff's letter revealed that Plaintiff was treated from September 18, 2000 until approximately April 17, 2002 for his epididymal cyst and the nodule on his right arm. Plaintiff was examined by physicians and received diagnostic testing which included a sonogram of his testicle, lab tests, an x-ray of his arm. The letter also revealed that Dr. Hamby consulted with a urologist, who did not feel further interventions were indicated at that time (12/1600). Plaintiff was given antibiotics, pain medication and topical medications. The letter finally concluded with Dr. Hamby's recommendation that Plaintiff's epididymal cysts did not require biopsy or surgical intervention, and that the nodule on his right ulna did not require treatment at that time (Exhibit E).

**Response of Defendant Bass:**

Defendant Bass responded to Plaintiff's complaints about his medical care as Defendant Pierson's designee (Facts Pierson Affidavit; Exhibits A and B). She indicated in her responses to Plaintiff's complaints that she had discussed Plaintiff's concerns with the Health Care Unit Administrator, and that the medical concerns had been reviewed by the appropriate medical staff, which included a review of Plaintiff's medical records (Exhibit B). In her memo dated June 17, 2002, Defendant Bass indicated that if Plaintiff required further education regarding his cysts, he could sign up for nurse sick call (Exhibit B).

**Response of Defendant Pierson:**

Plaintiff stated he sued Defendant Pierson because Plaintiff wrote to Defendant Pierson, but when Pierson responded, he stated there was nothing he could do (Fact 17).

Defendant Pierson delegated the routine review of inmate's grievances to his designee, usually Defendant Bass (Fact 29; Fact 23). However, when he received correspondence from Plaintiff, he responded in a memo that he believed Plaintiff's medical concerns were being addressed, and that Defendant Bass had also responded to Plaintiff's concerns (Fact 27). Defendant Pierson based his response on the fact that he knew Hill Correctional Center had a Health Care Unit staffed with physicians and other trained medical personnel (Fact 27). He also based it on his knowledge that if a medical concern could not be addressed at Hill Correctional Center, the inmate could be sent outside for additional medical care (Fact 27). Additionally, Defendant Pierson knew that because his administrative staff and grievance officers were not medical personnel, those individuals would have contacted the Health Care Unit whenever a

grievance was filed regarding medical care (Fact 24). Finally, he based it on information provided in grievance responses he reviewed (Fact 27). Defendant Pierson is not a physician and not able to determine what care is appropriate for inmates (Fact 28), and therefore relied on the physicians who he knew were treating Plaintiff.

On this record, none of these Defendants could be liable for deliberate indifference to Plaintiff's serious medical needs. Each took reasonable steps to determine that Plaintiff's medical needs were being met. When faced with a complaint about his medical care, all any of the defendants could do was to determine Plaintiff was being seen by the appropriate medical personnel for his complaints. This is especially important because the medical conditions that Plaintiff had were not of the type that a layperson could diagnose or determine what treatment was appropriate (Fact 22). According to Johnson, in the situation in which these defendants found themselves, their actions, in relying on the expertise of medical personnel was appropriate, and therefore, the defendants are entitled to summary judgment. *See* Johnson, supra.

## IV. PERSONAL INVOLVEMENT

### A. Law in Personal Involvement

In order to impose individual liability under 42 U.S.C. §1983, a Plaintiff must prove that the Defendant had some personal responsibility for the alleged violation. Duckworth v. Franzen, 780 F.2d 645 (7th Cir. 1985).

### B. Argument on Defendant Snyder's Lack of Personal Involvement

Plaintiff did not allege that he ever directly spoke with or contacted defendant Snyder (Fact 21); however, he sued Defendant Snyder because he was "in the chain of command" (Fact 15) and Plaintiff believed that Defendant Snyder saw his grievances

(Fact 13). However, Defendant Snyder delegated his duty to receive, review, and respond to inmates' grievances to the Administrative Review Board (Facts 30 and 31). The May 1, 2001 letter to Plaintiff was signed on Defendant Snyder's behalf by Leora Harry (Facts 31 and 32).

Because Defendant Snyder had no knowledge of, nor involvement in responding to Plaintiff's grievances, he cannot have the requisite personal involvement for liability under §1983.

## V. QUALIFIED IMMUNITY

### A. Applicable Law on Qualified Immunity

Defendants are also entitled to qualified immunity. The Supreme Court in Harlow v. Fitzgerald held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800 (1982).

In defining the right, the Court stated that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violates the right. . . it is to say that in the light of the preexisting law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

While the "Plaintiff bears the burden of establishing the existence of the allegedly clearly established constitutional right," (Rakovich v. Wade, 850 F.2d 1180, 1209 (7th Cir. 1988)) it is not enough to simply invoke a particular right in its most general terms. If this were the case, "any action that violates that clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right."

Anderson, 483 U.S. at 639. This would bear "no relationship to the 'objective legal reasonableness' that is the touchstone of Harlow." Id.

**B. Argument on Qualified Immunity**

In order to overcome Defendants' qualified immunity defense, the plaintiff would have to show, not only that he was constitutionally entitled to a particular treatment for his medical complaints, but that these non-medical defendants would have been on notice that to fail to order outside care when they were aware of Plaintiff's ongoing care at the institution, would violate the Constitution. Plaintiff cannot show this.

In fact, in Johnson v. Doughty, correctional administrators were deemed to have acted reasonably when, for example, the Warden concurred with a denial of a grievance because he knew the inmate was being treated for the grieved condition. The Assistant Warden was deemed to have acted reasonably when faced with the inmate's complaints, she met with the Health Care Unit Administrator to discuss the inmate's medical care. Her actions in taking the inmate's complaint seriously and investigating the matter, and then relying on the judgment of the medical professionals did not evidence deliberate indifference. Johnson v. Doughty, 433 F.3d 1001, 1012 (7th Cir. 2006). While the Assistant Deputy Director of IDOC was not a defendant in the Johnson case, Defendant Montgomery's response to Plaintiff's medical concerns was similar to the Warden and Assistant Warden's in Johnson, and he is covered by the same precedent.

In light of clearly established law, none of these defendants would be on notice that to take an inmate's concerns seriously, to investigate his claims, and to then rely on the medical judgment of his treating physicians would violate the Constitution. Therefore, each of these defendants is entitled to qualified immunity.

**CONCLUSION**

Plaintiff received abundant medical care for his medical conditions. Nonetheless, when confronted with his concerns about his medical care, each of the defendants who were aware of his concerns, investigated the claims and then reasonably relied on the expertise of the medical personnel who were treating Plaintiff. Because their acts do not evidence deliberate indifference, each of these defendants is entitled to summary judgment in their favor.

Respectfully submitted,

DONALD N. SNYDER, JR., JESSE MONTGOMERY, and WANDA BASS,

Defendants,

LISA MADIGAN, Attorney General, State of Illinois

By: s/ Kelly R. Choate
Kelly R. Choate, #6269533
Assistant Attorney General
Attorney for Defendants
500 South Second Street
Springfield, Illinois 62706
Telephone: (217) 782-9026
Facsimile: (217) 524-5091
E-Mail: kchoate@atg.state.il.us

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| FLOYD K. HAYES, Plaintiff, | ) | |
| -vs- | ) | No. 04-1062 |
| DONALD N. SNYDER, et al., Defendants. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2006, I electronically filed a Memorandum of Applicable Law and Argument in Support of Defendants' Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following:

Jonathan A. Backman
Law Office of Jonathan Backman
jbackman@backlawoffice.com

Theresa M. Powell
Heyl, Royster, Voelker & Allen
tpowell@hrva.com

and I hereby certify that on September 15, 2006, I mailed by United States Postal Service, the document(s) to the following non-registered participant(s):

None

Respectfully Submitted,
s/ Kelly R. Choate

Kelly R. Choate, #6269533
Assistant Attorney General
Attorney for Defendants
500 South Second Street
Springfield, Illinois 62706
Telephone: (217) 782-9026
Facsimile: (217) 524-5091
E-Mail: kchoate@atg.state.il.us