E-FILED
Friday, 15 September, 2006  02:53:52 PM
Clerk, U.S. District Court, ILCD

1           IN THE UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF ILLINOIS

3                   PEORIA DIVISION

4

5

6

7   FLOYD K. HAYES,              )
                                 )
8              Plaintiff,        )
                                 )
9      vs.                       )     No. 04-CV-1062
                                 )
10   DONALD N. SNYDER, et. al.,  )
                                 )
11             Defendants.       )

12

13           Discovery deposition of FLOYD K.

14   HAYES, taken before Tammy S. Wagahoff, CSR, at

15   the instance of the Defendant, on the 14th day of

16   January, 2005, at the hour of 11:30 A.M., at the

17   Law Offices of Heyl, Royster, Voelker & Allen,

18   Suite 575, National City Center, Springfield,

19   Illinois, pursuant to attached stipulation.

20

21

22             ASSOCIATED COURT REPORTERS
                  1-800-252-9915
23                 P.O. Box 684
             Taylorville, Illinois    62568
24

2

## S T I P U L A T I O N

It is stipulated between the parties herein, through their attorneys, that the discovery deposition of FLOYD K. HAYES may hereby be taken upon oral interrogatories, on the 14th day of January, 2005, at the hour of 11:30 A.M., at Heyl, Royster, Voelker & Allen, Suite 575, National City Center, Springfield, Illinois, before the instance of the Defendant, and before Tammy S. Wagahoff, CSR.

That the oral interrogatories and the answers of the witness may be taken down in shorthand by the Reporter and afterwards transcribed.

That the reading and signing of said deposition is waived.

That the deposition or any portions thereof may be used by any of the parties hereto, without foundation proof, for any purpose for which depositions are competent.

That copies of the deposition may be furnished to any of the parties at his or her own expense.

3

1    APPEARANCES:    (January 14, 2005.)

2

3

4    LAW OFFICES OF JONATHAN A. BACKMAN
     By Mr. Jonathan A. Backman
     Attorney at Law
5    1217 North Lee Street
     Bloomington, Illinois   61701
6        Appeared on behalf of the Plaintiff;

7    HEYL, ROYSTER, VOELKER & ALLEN
     By Ms. Theresa Powell
8    Attorney at Law
     575 National City Bank Center
9    P.O. Box 1687
     Springfield, Illinois   62705
10       Appeared on behalf of the Defendant,
         Doctor Hamby;

11
     ATTORNEY GENERAL
12   By Ms. Kelly Choate
     Attorney at Law
13   500 South Second Street
     Springfield, Illinois   62709
14       Appeared on behalf of the Defendants,
         Snyder, Montgomery, Bass.

15

16

17

18

19                    I N D E X

20   Witness          Direct      Cross     Redirect
     FLOYD K. HAYES      4          74         93
21

22

23   Exhibit          E X H I B I T S        Marked

24                  **NO EXHIBITS**

75

1    health care unit.   What were your duties there?

2        A.   I checked the inmates in.   They come

3    over on a call pass.   The way that call pass

4    works, you have to check out with the guard in

5    your housing unit or where you're working at, he

6    signs you out.   You come to the health care unit,

7    an officer signs you in.   Okay.   And we had a

8    master file, a computer print out.   And I kept

9    the computer print out of inmates moving in and

10   out, plus whatever duties the health care center,

11   you know, if they want me to run copies or

12   assemble medical binders, you know, for new

13   people coming in, stuff like that.

14       Q.   Okay.   And you enjoyed that?

15       A.   Oh, yeah.

16       Q.   Now when you first noticed the problems

17   with your testicle and your arm, was that about

18   the same time?

19       A.   No.   The testicle was first, and then

20   the arm later.

21       Q.   Approximately when did you first notice

22   the problems with your testicle?

23       A.   I'd have to consult my health record to

24   give you an exact date.

76

1      Q.  How soon after you noticed you had a

2   problem with your testicle did you request to be

3   seen in the health care unit?

4      A.  What happened, to be quite honest about

5   it, I was watching a show on the Discovery

6   Channel on the TV.  And they were talking about

7   women and breast cancer and how they should

8   examine themselves once a month.  And the

9   narrator said a man should examine himself once a

10  month.  So when I took a shower that night, just

11  out of the clear blue sky I decided that I would

12  examine myself.  And I found a lump that scared

13  the absolute shit out of me, excuse me, if you

14  want the truth.  I immediately put in for a

15  nurses screening, went to health care the next

16  day and told them that I had a nodule or a growth

17  on my testicle.  I had found it in the shower.

18      Q.  So you saw the nurse the next day, is

19  that correct?

20      A.  Yes.

21      Q.  Did you see the doctor the next day as

22  well?

23      A.  The day after.

24      Q.  So two days after you noticed this lump

77

1    in your testicle, you were seen by a physician?

2         A.   Right.

3         Q.   Was that Doctor Shute?

4         A.   That was Doctor Choudry.

5         Q.   And what did Doctor Choudry do for you?

6         A.   Well, he examined me; and he felt it.

7    And he was the medical director then, so he

8    ordered the ultrasound.

9         Q.   And that ultrasound then was performed,

10   is that correct?

11        A.   Right.   They took me out of the prison

12   and took me to the hospital in Galesburg there

13   and had an ultrasound done.

14        Q.   And then you were seen subsequently for

15   the problems with your testicle as well, is that

16   correct?

17        A.   Right.

18        Q.   As it turned out, the lump on your

19   testicle that you described finding in the

20   shower, did that have anything to do with the

21   cremasteric problems you were having later?

22        A.   No, it did not.

23        Q.   When did you begin having the problems

24   with the cremasteric muscle relative to when you

78

1    found the lump, how far after?

2         A.  I'm purely guessing because I don't have

3    my medical file with me.  I have a copy of it.

4    But I would say it was possibly six months or

5    less.

6         Q.  So immediately you were seen for the

7    lump that you found in your testicle?

8         A.  Right.

9         Q.  And that's what the ultrasound was done

10   for?

11        A.  Right.

12        Q.  About how -- relative to when you found

13   the lump, about how long after then did you

14   discover that you had a problem with your arm?

15        A.  Again, I'm just guessing; but it was

16   just a few months later I noticed my fingers

17   tingling and I was getting pain in my arm and my

18   ring finger and little finger and the palm of my

19   hand was starting to tingle a little bit.  You

20   know, it just didn't feel right.

21        Q.  And what did you do when you discovered

22   that?

23        A.  I went to sick call.

24        Q.  And who did you see at sick call?

79

1       A.   It was Doctor Shute.  I found a lump in
2   my arm here right up there where the scar is is
3   where I found that lump at.  And you could feel
4   it.  It was growing out from the bone.
5       Q.   So you're pointing to a place on the
6   outer portion of your arm below your elbow?
7       A.   Right.  Approximately three inches,
8   three or four inches from my wrist, right along
9   in there for that lump, you could feel it.
10      Q.   Was the lump causing you pain?
11      A.   Yeah, yeah.  When you touched it or
12  rubbed it or something, it would shoot down
13  though here down into my fingers and so forth.
14      Q.   So it would then trigger the numbness in
15  your fingers?
16      A.   Right, right, it would trigger the pain.
17      Q.   Did you go to sick call the same day you
18  discovered that?
19      A.   If I recall right, I was seeing Doctor
20  Shute about my testicles; and I brought it up
21  that I had found this while I was there.  And he
22  ordered the x-ray to be done on me.
23      Q.   And was that x-ray performed?
24      A.   Yeah, that x-ray was performed at Hill.

80

1    They had an x-ray machine.  They didn't have to

2    take you out to get x-rays.  And on x-rays it

3    showed the nodule.

4         Q.  So would you say that you saw Doctor

5    Shute or brought up the issue with your arm

6    within a few days of finding the lump?

7         A.  Yeah, within a few days, yeah.

8         Q.  And you were also seen then subsequent

9    to that for the complaints with your arm, is that

10   correct?

11        A.  Right.

12        Q.  You were seen by Doctor Shute for that?

13        A.  Right.

14        Q.  Were you also -- you also said that you

15   brought these problems to Doctor Hamby's

16   attention as well, is that correct?

17        A.  Correct.

18        Q.  Were there other doctors that you saw

19   for either of those two complaints?

20        A.  No.  There was that one doctor that come

21   in to fill in when they had personnel problems.

22   Doctor Choudry had a patient to die on him, and

23   he left.  And they brought different physicians

24   in to fill in until Doctor Hamby came.  He came

81

1    from Menard.  He was a doctor down at Menard.  He

2    came up to Hill and took over as medical

3    director.  And then Doctor Shute.  And then

4    things calmed down when we had a regular doctor.

5                  But a period of time in there,

6    there was all kinds of different doctors in the

7    health care.  There wasn't nobody permanently

8    assigned.

9         Q.  You testified earlier that at some point

10   while you were at Hill the health care unit

11   access procedures changed?

12        A.  Yes.

13        Q.  Did you have difficulty accessing the

14   health care unit under either system?

15        A.  The new system.

16        Q.  And the new system was?

17        A.  You had to fill out a request slip, put

18   it in a box, the nurses came around and gathered

19   up the request slips and then called you to

20   health care.  I filled out four and never got

21   called.

22        Q.  And was that in relation to the ice that

23   you were wanting from Doctor Hamby?

24        A.  I was wanting my ice back, right,

ASSOCIATED COURT REPORTERS

82

1    because ice would numb my testicles.

2         Q.  So for those four requests, you weren't

3    bringing up any new physical ailment?

4         A.  No, no.

5         Q.  And it was nothing that you hadn't been

6    seen for in the past, is that correct?

7         A.  Correct.

8         Q.  So they could tell from your request

9    slip that you were wanting ice, is that right?

10         A.  I was wanting to see a doctor.  And the

11   main reason behind that was to get a new -- you

12   had to have a permission slip.  It was a slip

13   that was filled out and signed by the doctor that

14   I could get a bag of ice in the housing unit for

15   my own personal use.  Okay.  And that was to put

16   between my legs.

17         Q.  And so that request slip was to be seen

18   so you could get your ice reinstated.  And you

19   were never called?

20         A.  I was never seen.

21         Q.  Do you know who would have received the

22   request slips?

23         A.  The nurses.

24         Q.  Now you said that after you left Hill

83

1    Correctional Center and were paroled, you went to

2    Danville VA?

3        A.   Went to Danville straight -- draw a

4    straight line down the road, and that's the way I

5    went.  I went straight from Hill straight to the

6    VA in Danville and checked myself in.

7        Q.   So at Danville you said you were treated

8    for the PTSD, is that correct?

9        A.   That's correct.

10       Q.   Did you complain to the doctors at

11   Danville about your testicles?

12       A.   Yes, I did.

13       Q.   What did they tell you?

14       A.   They give me -- they gave me ice and

15   same procedure there, you have to wait your turn.

16   But I was only there ten days.  And the reason I

17   was there only ten days is I had put in for

18   interstate parole and my approval hadn't came

19   back yet.  But while I was at Danville, my

20   approval came in.  And I could go to Kentucky.

21   And I bought a bus ticket and went to Kentucky.

22       Q.   Were you given any pain medications at

23   Danville for your testicles?

24       A.   I was given Tylenol Three if I remember

84

1    right, and something else.  But I don't remember

2    what it was.  And I was given ice packs.

3         Q.  Okay.  How about your complaints of the

4    nodule on your arm, were you treated for that

5    while at Danville?

6         A.  Requests were put in, but I didn't stay

7    there long enough to follow-up on those.

8         Q.  So within ten days while you were at

9    Danville, there was no treatment for your arm?

10        A.  There was no treatment at all because I

11   was gone.

12        Q.  But you did complain about your arm to

13   them?

14        A.  Yes, I did; yes, I did.  My arm, my

15   testicle and everything, told them what kind of

16   treatment I was on.  They put me back on my PTSD

17   medications because they had a record from when I

18   was in there before.  They put me back on those

19   medications, gave me pain medication and ice

20   packs, put in a request for me to see a

21   urologist, an orthopaedic doctor.  But I wasn't

22   there long enough to show up for appointments.

23        Q.  Okay.  Now you sued former Director

24   Snyder, at the time the director, is that

85

1    correct?

2        A.   Right, he was the director.

3        Q.   Why did you sue Director Snyder?

4        A.   Because I wrote him a letter.  And my

5    two grievances were to directed to him and denied

6    by him.

7        Q.   Do you know that he ever personally

8    reviewed or received either of those letters or

9    the grievances?

10        A.   Yes, he did.  His signature is on the

11    denial.

12        Q.   Do you know that that is his signature

13    as opposed to that of a designee?

14        A.   That, I do not know.  I just know it's

15    his name on there.

16        Q.   And what did you want Director Snyder to

17    do for you?

18        A.   I wanted him to tell the health care

19    unit to send me to a hospital outside the prison,

20    to get my treatment.  And the letter I got from

21    Montgomery, Assistant Deputy Director, said that

22    he had been instructed by Director Snyder to

23    write to me.  See, I wrote a letter to everybody

24    in the chain of command.  And I got a response

86

1    from Montgomery.

2         Q.  And what was your understanding of

3    Montgomery's response?

4         A.  He was saying that he had contacted the

5    medical unit and that my condition was being

6    monitored, my treatment was monitored.

7         Q.  Did it say not treated, but monitored?

8    Or is that your understanding that it was not

9    treated?

10        A.  Well, I'm saying it was not treated.  He

11   said it was being monitored.

12        Q.  So you don't know that he meant by it

13   was not being treated, is that correct?

14        A.  No, that's my saying, not his.  It's my

15   words.

16        Q.  Is it your understanding that Director

17   Snyder is not a physician?

18        A.  Yes.

19        Q.  Is it your understanding that Deputy

20   Director Montgomery is not a physician?

21        A.  Yes.

22        Q.  How about Assistant Warden Bass?

23        A.  She's in charge of programs.  Health

24   care comes underneath her.

87

1    Q.  Is she a doctor?

2    A.  No.

3    Q.  Was Warden Pearson a physician to your

4    knowledge?

5    A.  No.

6    Q.  So you're saying that you sued Director

7    Snyder because he didn't direct the medical care

8    at Hill that you wanted, is that fair?

9    A.  He was in the chain of command.  I'm an

10   ex-military.  There's a chain of command in

11   everything.  He was the top dog.  I wrote a

12   letter to him saying, look, I'm in pain, this is

13   what's going on, I have to pull my testicle down,

14   I have to unbend my penis, I have to do all this;

15   and all I'm getting is Ibuprofen, and I want

16   someone to take me to a hospital.

17   Q.  Did you expect him to diagnose you?

18   A.  No, I didn't expect him -- I expected

19   him to tell someone to take me to a hospital is

20   what I wanted out of him.

21   Q.  And how about Deputy Director

22   Montgomery?

23   A.  He was the one that I corresponded with

24   because he told me in his letter that he had been

88

1    directed by Director Snyder to handle this

2    complaint.  And we corresponded back and forth.

3        Q.  So from Deputy Director Montgomery's

4    response to you, is it your understanding that

5    Director Snyder had some input into his looking

6    into your complaints?

7        A.  I take it because he said he was

8    directed by Director Snyder to answer my letter.

9        Q.  So why are you suing Deputy Director

10   Montgomery?

11       A.  Because he had the authority to tell the

12   health care unit to get me treated, and he didn't

13   do it.

14       Q.  From his letter was it your

15   understanding that Deputy Director Montgomery

16   thought you were being seen for these problems in

17   the health care unit?

18       A.  I don't know what was said between the

19   health care and him.

20       Q.  I'm talking from your understanding from

21   his letter.

22       A.  From his letter I understood that he had

23   talked to the health care unit, and they had told

24   him that I was being monitored.  And that was it.

89

1    Q.  So you expected Deputy Director

2  Montgomery then to somehow overrule what was

3  going on at health care unit in Hill?

4    A.  Right, right.  That's the chain of

5  command.

6    Q.  Did you expect Deputy Director --

7    A.  Well, I even sent them a letter, excuse

8  me for interrupting you.  I even sent a letter to

9  Montgomery and Snyder both that I was a disabled

10  veteran and they didn't have to pay for anything,

11  all they had to do was take me to a VA hospital.

12    Q.  Did you expect Deputy Director

13  Montgomery to examine you?

14    A.  No.

15    Q.  Did you expect him to prescribe

16  treatment for you?

17    A.  No.

18    Q.  Now you also sued Warden Pearson.  Why

19  are you suing Warden Pearson?

20    A.  Because he was the warden, and I wrote

21  letters to him.  And he wrote back and said I

22  know of your conditions, but there's nothing I

23  can do.

24    Q.  Did you expect Warden Pearson to examine

90

1    your complaints?

2         A.  No.

3         Q.  Did you expect him to prescribe

4    medication?

5         A.  No.

6         Q.  Did you expect Warden Pearson to order

7    any sort of tests for you?

8         A.  No.

9         Q.  Would you expect that any of these

10   Defendants, Snyder, Pearson, Bass or Montgomery,

11   could order tests for you, medical tests?

12        A.  The only thing I expected out of them

13   was to order the health care unit to seek medical

14   attention outside of Hill Correctional Center.

15        Q.  And Assistant Warden Bass, is it the

16   same for her?

17        A.  Right.

18        Q.  When you asked these four Defendants to

19   check into your medical care, is it your

20   understanding that they did check into it?

21        A.  As far as I know, they did.

22        Q.  They did or didn't?

23        A.  Did.

24        Q.  So is it fair to say that your complaint

91

1    overall in this lawsuit is that you weren't

2    satisfied with the medical treatment that you did

3    receive at Hill?

4         A.   I wasn't satisfied because I was in pain

5    and nobody was treating the pain or treating the

6    condition whatsoever.  They didn't give me the

7    shots for Peyronies, they didn't give me pain

8    shots, they didn't give me no pain medication

9    except for Ibuprofen.  They didn't do anything.

10   And what was helping, that bag of ice, they even

11   took it away from me.

12        Q.   Are you suggesting that either or any

13   Director Snyder, Montgomery, Pearson or Bass had

14   anything to do with taking the ice pack away from

15   you?

16        A.   I don't -- I was told that doctor --

17   like I said earlier, when I come in the housing

18   unit one afternoon to get my ice, I was told that

19   Doctor Shute had been fired; and that my medical

20   record was unreviewed and that I couldn't get ice

21   anymore for my condition.

22        Q.   But no one told you that any of the four

23   Defendants we're talking about now had anything

24   to do with the ice, is that correct?

92

1      A.  No, they did not.  See, the grievance --

2                      MR. BACKMAN:  There is no

3      question.

4                      THE WITNESS:  All right.

5                      MS. CHOATE:  I don't have

6      anything further.

7                      MS. POWELL:  I don't having

8      anything else.

9                      THE WITNESS:  You done?

10                     MS. CHOATE:  I have one more

11     if you don't mind.

12              Did you ever personally speak with

13     Defendant Snyder?

14                     THE WITNESS:  Personally?

15        Q.  Face to face?

16        A.  No.

17        Q.  Or on the telephone?

18        A.  No.

19        Q.  Did you ever personally speak about

20     these medical conditions with Warden Pearson?

21        A.  Personally?

22        Q.  Yes.

23        A.  No.  All by letter communications.

24        Q.  How about Assistant Warden Bass?

93

1          A.  Same way, letter.

2          Q.  And how about Deputy Director

3     Montgomery?

4          A.  Letter.

5          Q.  Okay.

6          A.  No person to person.  It was all done by

7     letter.

8          Q.  That's all I have.

9                    MR. BACKMAN:  I have

10    nothing.

11                    REDIRECT EXAMINATION

12                    CONDUCTED BY MS. POWELL:

13         Q.  I have a couple little things.  Can you

14    buy ice at the commissary?

15         A.  No.

16         Q.  Why not?

17         A.  They don't sell it.

18         Q.  Okay.  That's something they just don't

19    have?

20         A.  They just don't.

21         Q.  And it was your understanding that at

22    one point in time you had been given a

23    prescription for ice, is that what it was?

24         A.  It was a permission slip to get a bag of

94

1    ice, okay, signed by a doctor.  You know, like

2    guys will sprain their ankles; and they give them

3    permission slips to get a bag of ice to keep the

4    swelling down, stuff like that, same thing.  I

5    had swelling in my testicles, and they gave me a

6    bag of ice.  And the ice numbed my testicles and

7    numbed the pain.

8        Q.  How long did you have it?

9        A.  I had it for several months.  I don't

10   remember what the exact time frame was, but at

11   least for several months.

12                   MR. BACKMAN:  Ice is the

13   question?

14                   MS. POWELL:  Yes.  And then

15   at some point in time the correctional officer

16   said that you don't have a permission slip any

17   longer.

18                   THE WITNESS:  Right.  When I

19   came back from work, I was coming back from work,

20   and that's when I'd get it.  When I come back

21   from work, you know, I'd get me a plastic bag;

22   and I'd go get me a bag of ice and take it to my

23   cell.  And this one day when I come in, Whiteside

24   was the correctional officer's name, Whiteside

95

1    told me that Doctor Shute had been fired, that my

2    medical records were under review; and I could

3    not get any more ice.

4          Q.  And did you have -- I don't remember if

5    you told me this or not -- did you have a

6    conversation with Doctor Hamby about that?

7          A.  No, I never got back over to see him.

8          Q.  Okay.  Did you ever see any physician

9    after that?

10         A.  Nope.

11         Q.  Did you ever see any nurses after that?

12         A.  Nope.

13         Q.  And was it shortly after that you were

14   released?

15         A.  (Witness shakes head yes.)

16                    MR. BACKMAN:  You have to

17   answer.

18                    THE WITNESS:  Yes, ma'am.

19   Excuse me, I'm sorry.

20         Q.  That's okay.  Do you know how long it

21   was between the time that the ice stopped and the

22   date that you were released?

23         A.  I think the ice stopped if I can recall

24   correctly, and I'm not absolutely sure, but I

98

<pre>
 1

 2    STATE OF ILLINOIS        )
      COUNTY OF CHRISTIAN       )
 3

 4

 5                      CERTIFICATE

 6          I, Tammy S. Wagahoff, CSR, affiliated

 7    with Associated Court Reporters, P.O. Box 684,

 8    Taylorville, Illinois, do hereby certify that I

 9    reported in shorthand the foregoing proceedings

10    and the foregoing is a true and correct

11    transcript of my shorthand notes.

12          I further certify that I am in no way

13    related to or associated with any of the parties

14    or attorneys involved herein, nor am I

15    financially interested in the action.

16

17          _____
            TAMMY S. WAGAHOFF, CSR.
18          CSR License No. 084-002841

19
      Dated this ___18th___ day
20    of ___January___, 2005.

21

22

23

24
</pre>