UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

FLOYD K. HAYES,                          )
                                         )
            plaintiff,                   )
                                         )
v.                                       )
                                         )     Case No. 04- CV-1062
                                         )
Donald N. Snyder, Jesse Montgomery,      )
Mark. A. Pierson, Wanda L. Bass,         )
William M. Hamby, MD., PhD.,             )
each in their individual                 )
capacities only,                         )
                                         )
            defendants.                  )

---

## PLAINTIFF'S CONSOLIDATED RESPONSE TO DEFENDANTS' SEPARATE MOTIONS FOR  SUMMARY JUDGMENT

---

Jonathan A. Backman
Law Office of Jonathan A. Backman
117 North Center Street
Bloomington, Illinois 61701-5001
(309) 820-7420
FAX: (309) 820-7430
jbackman@backlawoffice.com                    October 16, 2006

*Attorneys for Plaintiff Floyd K. Hayes*

<u>Table of Contents</u>

A.    INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B1.   RESPONSE TO DR. HAMBY'S STATEMENT OF UNDISPUTED FACTS . . . . . . . 3

    (1)    Undisputed Material Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    (2)    Disputed Material Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    (3)    Immaterial Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

B2.   RESPONSE TO DOC DEFENDANTS' STATEMENT
      OF UNDISPUTED FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    (1)    Undisputed Material Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    (2)    Disputed Material Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    (3)    Immaterial Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B3.   ADDITIONAL MATERIAL FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

C.    ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

    I.     Applicable Legal Standards and Plaintiffs' Claims  . . . . . . . . . . . . . . . . . . 34

    II.    Dr. Hamby's Arguments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    III.   The DOC Defendants' Arguments.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

D.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

i

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Floyd K. Hayes, by his undersigned counsel, and in accordance with CDIL-LR 7.1, respectfully submits this consolidated response to (i) the Motion for Summary Judgment filed by defendant Dr. William Hamby (the "Hamby Motion"), and (ii) the Motion for Summary Judgment (the "DOC Defendants' Motion") filed by defendants Donald N. Snyder, Jesse Montgomery, Mark A. Pierson and Wanda L. Bass (collectively, the "DOC Defendants").

## A.    INTRODUCTION

Since 2001, while incarcerated at Hill Correctional Center (sometimes "HCC" or the "Center"), plaintiff has suffered from an uncommon medical condition in which the cremastreric muscle adjoining his left testicle swells, cramps and retracts, causing excruciating pain and suffering, and requiring substantial pain medication and management.  From September 2001 through August 2002, when he was released from HCC, plaintiff repeatedly complained about and requested treatment for this pain — first from the HCC medical unit (the "Medical Unit") and Dr. Hamby, the unit's Medical Director, and then with increasing urgency from the other DOC Defendants.

Dr. Hamby knew about plaintiff's extraordinary pain from no later than October 4, 2001, when he examined plaintiff for the first time.  But he refused to provide plaintiff with anything stronger than Tylenol for it — because "Tylenol was all [any of the estimated 2,000 prisoners at HCC ever] needed."  And after plaintiff complained about his treatment to more senior prison officials, Dr. Hamby

refused to provide him even with this wholly inadequate relief.  As for the DOC Defendants (except, perhaps, for Mr. Snyder, as to whom we hereby are consenting to a grant of summary judgment[1]), they knew about plaintiff's pain, and about Dr. Hamby's refusal to treat it, and yet they did nothing.

Defendants' motions for summary judgment do not dispute that plaintiff suffered from severe testicular pain, nor do they deny that Dr. Hamby, or an outside specialist, could have provided plaintiff with substantial relief from it. Instead, Dr. Hamby maintains that plaintiff cannot hold him responsible under the Eighth Amendment for ignoring his pain and suffering because the doctor's chosen course of "care and treatment" — i.e., doing virtually nothing to treat the pain — was "reasonable and appropriate".  And the other defendants insist that they are not culpable because they are not medical experts and because they relied entirely on Dr. Hamby to manage the situation — even though Dr. Hamby never advised them that plaintiff was <u>not</u> in pain, and never advised them that he was adequately treating it.

Under the settled law, defendants' efforts to escape responsibility for their intentional and reckless disregard of plaintiff's suffering are wholly inadequate.  As discussed further below, the Eighth Amendment required, at the

---

[1]    Although Mr. Snyder's signature appears on certain documents, the Affidavit of Terry Anderson dated August 28, 2006, which the DOC Defendants have submitted with their motion, states that a designee of Mr. Snyder actually signed the documents, and that Mr. Snyder never received, reviewed or signed any document at issue in this case.  Accordingly, plaintiff consents to the entry of summary judgment for Mr. Snyder.

very least, that defendants either determine that plaintiff was not actually suffering from his reported pain, or ensure that it was treated appropriately. And because none of the defendants did either of these things, plaintiff is entitled to a trial on his claims against them.

### B.1    RESPONSE TO HAMBY'S STATEMENT OF UNDISPUTED FACTS

#### (1)    Undisputed Material Facts:

Plaintiff agrees that the following facts in Dr. Hamby's Statement of Undisputed Material Facts (referred to hereinafter as "Hamby Statement" or "Hamby Stat.") are (a) arguably material to the outcome of this case, and (b) undisputed by the parties: ¶¶ 1-3, 7, 9, 12-14, 17-19, 23-27, 29, 32-34, and 38.

#### (2)    Disputed Material Facts:

Plaintiff disputes the following paragraphs of the Hamby Statement. These statements, and plaintiff's responses, will require resolution at trial. Plaintiff supports its responses below with references to (a) plaintiff's statement of Additional Material Facts (referenced hereinafter as "Plaintiff Statement ¶ __" or "Pl. Stat. ¶ __"), (b) the deposition transcripts (and their exhibits) that the various defendants have attached to their motions for summary judgment, and (c) the additional exhibits that plaintiff is filing concurrently herewith[2]. We hereinafter

---

[2]    Plaintiff is attaching hereto the following additional exhibits: (i) the medical progress notes from plaintiff's treatment at the Danville, Illinois Veteran's Hospital identified as Bates Nos. 1950-2015 ("Pl. Ex. I"); (ii) the deposition transcript of Dr. Alacia Bigham ("Bigham Dep.") including the deposition exhibits

(continued...)

refer to plaintiff's responses to the Hamby Statement as "Pl. Resp. Hamby Stat. ¶ __ ".[3]

4.      On October 4, 2001, the patient reported to Dr. Hamby that he had frequency and urgency with respect to urination. He also indicated that his epididymis at that time was okay. (Exhibit 3, p 62; Exhibit 2, p. 116.)

**Response:** This statement is disputed as incomplete and misleading.

Plaintiff reported to Dr. Hamby during this visit that his testicles were swollen and

causing him pain. *See* Pl. Stat ¶ 4-7. Furthermore, the medical notes from

plaintiff's prior visit (with a different doctor) reflected that his level of pain was so

severe that the doctor had prescribed Tylenol with codeine (a narcotic). Pl. Ex. V at

15 (very bottom of page). Thus, while the manner in which Dr. Hamby chose to

memorialize his examination may be relevant to the inquiry here, it does not

---

[2](...continued)
marked therein ("Pl. Ex. II"); (iii) the deposition transcript of Dr. Joseph Atallah ("Atallah Dep.") including the deposition exhibits marked therein ("Pl. Ex. III"); (iv) the Declaration of plaintiff ("Hayes Decl.") with Exhibits AA-DD attached ("Pl. Ex. IV"); and (v) plaintiff's medical records from and after September 2000 as maintained by the Department of Corrections and marked and identified as Exhibit U during the deposition of Dr. William Hamby ("Pl. Ex. V").

[3]      As a result of (i) plaintiff's unexpected change of residences in the weeks immediately prior to the submission of this response, (ii) plaintiff's counsel's longer-than-expected trial before Judge Gorman from October 2 through October 10, 2006, and (iii) plaintiff's lack of access to a fax machine, plaintiff's counsel was unable to obtain plaintiff's signature on the Hayes Declaration in time to file it with this response brief. Nevertheless, plaintiff's counsel has read the declaration to plaintiff word-for-word, and plaintiff has confirmed its truth and accuracy. Plaintiff will be receiving, signing and returning the declaration to counsel within a few days of the filing hereof, at which point plaintiff's counsel immediately will electronically file it with the Court.

represent an accurate reflection of either plaintiff's symptoms at the time or of Dr.

Hamby's knowledge about those symptoms.  *See* Pl. Ex. IV (Hayes Decl.) at 2 ¶ 7.

      5.    Dr. Hamby performed an evaluation and assessment and found suprapubic tenderness without rebound or rigidity. His assessment at that time was hyperlipidemia (high cholesterol).  (Exhibit 2, pp. 116-117; Exhibit 3, p. 62.)

      **Response:**  This statement is disputed as incomplete for the same

reasons set forth in plaintiff's response to paragraph 4 above.

      6.    Dr. Hamby also noted that the patient had possible urinary tract infection or gastritis. Based upon that diagnosis, the patient was prescribed Keflex and Tylenol. (Exhibit 2, p. 117; Exhibit 3, p. 62.)

      **Response:** This statement is disputed as both inaccurate and

misleading.  The cited medical records (and common sense) indicate that Dr. Hamby

prescribed Tylenol for plaintiff's testicular pain (the same pain that had caused the

doctor who saw plaintiff previously to prescribe an opiate for the pain).

      8.    The patient was seen as suggested on October 15, 2001.  At that time, the patient reported that he still had discomfort in his left testicle. (Exhibit 2, pp. 117-118; Exhibit 3, p. 62.)

      **Response:** This statement is disputed as incomplete.  Plaintiff reported

that he had chronic pain and swelling in his left testicle, and that the testicle would

cramp and retract, thereby causing intense pain.   *See* Pl. Ex. V at 14-15.  As

indicated earlier, how Dr. Hamby chose to memorialize his examination in the

manner described in his notes may be relevant to the inquiry here, but it is not a

complete reflection of either plaintiff's symptoms at the time or Dr. Hamby's

knowledge about those symptoms.  *See also* Pl. Stat ¶ 4-7.

10.    Dr. Hamby noted the patient was tender but identified no abnormality. (Exhibit 2, p. 118; Exhibit 3, p. 62.)

**Response:** This statement is disputed as both inaccurate and incomplete. It is incomplete for the reasons set forth in plaintiff's response to paragraph 8 above. But it also is also inaccurate because Dr. Hamby specifically noted that plaintiff had Epididymitis, which is an <u>abnormal swelling</u> of the epididymis that can cause severe pain. *See* plaintiff's response to paragraph 11 below.

11.    Dr. Hamby further assessed the patient as having resolving epididymis, which was going away at the time. (Exhibit 2, p. 118.; Exhibit 3, p. 62.)

**Response:** This statement is disputed. Plaintiff could not have had a "resolving epididymis" — because the epididymis is a part of the human anatomy (specifically, a part of the male reproductive organ). Instead, plaintiff was suffering from epididymitis — i.e., a swelling of the epididymis. And although Dr. Hamby noted (without explanation) that this "epididymitis" was "resolving", such was not the case as the swelling continued along with the testicular cramping and severe pain. *See* Pl. Stat ¶ 4-7.

15.    Other physicians continued to treat Mr. Hayes for any medical complaints he made to them. (Exhibit 3.)

**Response:** This statement is disputed as incomplete and misleading. Although other doctors at the prison examined plaintiff, Dr. Hamby controlled plaintiff's treatment both (i) when he reviewed and altered other doctors' plan of

6

care, and (ii) when he signed off on nurse's notes without prescribing proper treatment for plaintiff's severe testicular pain. *See* Pl. Ex. V at 17-19, 21, 26-29; Pl. Stat. ¶¶ 18, 23.

16.    At no time did Dr. Hamby interfere with care and treatment provided by other physicians. (Exhibit 2, p. 122.)

**Response:** This statement is disputed as incomplete. Dr. Hamby declined to continue the prescribed course of pain medication for plaintiff that another doctor had initiated in September 2001, and also declined to proceed with Dr. Shute's recommendation of an urological ultrasound in October 2001. *See* Pl. Ex. V at 14-16; Pl. Stat ¶¶ 16-18, 23; Hamby Dep. at 108[4] (indicating that he could document no reason to send plaintiff to a physician outside the prison system).

20.    At no time did Dr. Hamby document any significant complaints of pain from Mr. Hayes regarding his testicles, but only noted a complaint of discomfort. (Exhibit 3, p. 62.)

**Response:** This statement is disputed as incomplete and wholly misleading to the extent that it suggests either (i) that Dr. Hamby's failure to document plaintiff's repeated complaints of, and clear suffering from, extreme testicular pain could mean that plaintiff did not report such pain to Dr. Hamby and to the other medical personnel who reported those symptoms to Dr. Hamby, or (ii) that Dr. Hamby was not aware of this pain.

---

[4] The entire transcript of plaintiff's deposition is attached to the Hamby Motion as Exhibit 6. To avoid duplication, plaintiff is not attaching this transcript to his response, and refers to the transcript herein as "Hayes Dep. at ___."

28.    Mr. Hayes advised Dr. Amin that he had no trouble with urination and history of previous problems. (Exhibit 4, p. 9; Group Exhibit 5.)

**Response:** This statement is disputed because it flagrantly misstates what Group Exhibit 5 says.  The relevant portion of the exhibit reads as follows:

> "He says there is severe pain, particularly on the left side.  He has no trouble with urination.  <u>I do not have any detailed history of previous problems on him</u>."  (Emphasis added.)

Thus, the only statement by plaintiff that Dr. Amin reports here is that plaintiff was in "severe pain".  The note does <u>not</u> state that <u>plaintiff</u> reported no trouble with urination, only that the doctor noted none.  Likewise, the report does <u>not</u> state that plaintiff advised Dr. Amin of no prior history of testicular problems, but instead that Dr. Amin did not have access to such history.

30.    Based upon the examination performed by Dr. Amin, he found Mr. Hayes to be healthy and not in pain. (Exhibit 4, p. 10; Group Exhibit 5.)

**Response:** This statement is disputed as wholly inaccurate.  Dr. Amin indicated (in response to <u>Dr. Hamby's</u> attorney's questioning) that he rejected plaintiff's complaints of severe pain based not only on his physical examination of plaintiff, but also on the entire medical record available to him at the time.  Amin Dep. at 31; Pl. Ex. I.  And these records contained a report from the Department of Corrections that plaintiff's "primary problems are psychiatric" and that the DOC "has a number of behavioral problems with this veteran and that he feels that he needs to see a physician almost daily."  Pl. Ex. I at 2014-2015; Pl. Stat. ¶ 61.

8

Based on these medical records and his 15 minute examination of plaintiff, Dr. Amin initially determined that "the patient <u>may</u> be seeking pain medicine, and I am not going to go for it."  Amin Dep. at 30 and Group Ex. 5 at 1971 (emphasis added).  Shortly after this examination, however, Dr. Amin (or another Danville Hospital doctor) prescribed plaintiff with a narcotic pain medication.  Pl. Stat. ¶ 63.

43.    There was no objective evidence to indicate that the patient was having severe pain or any type of pain. (Exhibit 4, p. 15; Group Exhibit 5.)

**Response:** This statement is disputed because plaintiff described the swelling, cramping and retraction of his left testicle, and these symptoms, when they occur, constitute objective evidence of pain.

46.    In fact, Dr. Amin thought the patient might be seeking pain medication. (Exhibit 4, p. 15; Group Exhibit 5.)

**Response:** This statement is disputed as incomplete and misleading. As indicated in plaintiff's response to paragraph 30 above, Dr. Amin's conclusion in this regard was predicated in part on the DOC's report that plaintiff's problems were primarily psychiatric, and that plaintiff was a problem prisoner because of his (impliedly unfounded) requests to see a physician almost daily.  Pl. Ex. I at 2014-2015.  Moreover, following the examination, plaintiff received narcotic pain medication from Danville.  *See* Pl. Stat. ¶ 63.

9

(3)    **Immaterial Facts:**

The following paragraphs of the Hamby Statement are immaterial to

the resolution of Dr. Hamby's motion.

21.    The last notation made by Dr. Hamby in the patient's medical
records was on July 30, 2002 wherein Dr. Hamby noted the patient refused to be
seen with respect to follow-up of his hyperlipidemia. (Exhibit 2, p. 124; Exhibit 3, p.
76.)

**Response:** This statement is immaterial because plaintiff's

hyperlipidemia is not at issue in this case.

22.    Prior to that time, Dr. Hamby had also made notes on July 15,
2002 regarding the hyperlipidemia lab results. (Exhibit 2, p. 123; Exhibit 3, p. 75.)

**Response:** This statement is immaterial because plaintiff's

hyperlipidemia is not at issue in this case.

31.    Also on that occasion, Dr. Amin's examination reflected that the
patient had an unremarkable penis. (Exhibit 4, p. 11.)

**Response:** This statement is immaterial to the resolution of this

motion because it was plaintiff's testicles, not his penis, that were causing him

excruciating pain.  Nevertheless, plaintiff reserves the right to submit evidence of

his Peronies disease in the event that the Court permits defendants to introduce Dr.

Amin's progress notes at trial.

35.    Dr. Amin's diagnosis of the patient on August 22, 2002 was that
the patient had a small spermatocele on the left side. (Exhibit 4, p. 13; Group
Exhibit 5.)

10

**Response:** This statement is immaterial for the reasons set forth in plaintiff's response to paragraph 30 above regarding the misinformation that Dr. Amin received from the DOC.

36.     At that time, no treatment was recommended. (Exhibit 4, p. 13; Group Exhibit 5.)

**Response:** This statement is immaterial for the reasons set forth in plaintiff's response to paragraph 30 above regarding the misinformation that Dr. Amin received from the DOC.  Pl. Ex. I at 2014-2015.

37.     Dr. Amin noted that no treatment was needed for the small spermatocele if it did not cause any discomfort and it did not cause any large mass hanging out on the scrotum. (Exhibit 4, pp. 13-14; Group Exhibit 5.)

**Response:** This statement is immaterial for the reasons set forth in plaintiff's response to paragraph 30 above regarding the misinformation that Dr. Amin received from the DOC.  Pl. Ex. I at 2014-2015.

39.     No surgical treatment was recommended in August of 2002. (Exhibit 4, p. 14; Group Exhibit 5.)

**Response:** This statement is immaterial for the reasons set forth in plaintiff's response to paragraph 30 above regarding the misinformation that Dr. Amin received from the DOC.  Pl. Ex. I at 2014-2015.

40.     No pain medication was recommended at that time by Dr. Amin. (Exhibit 4, p. 14; Group Exhibit 5.)

**Response:** This statement is immaterial for the reasons set forth in plaintiff's response to paragraph 30 above regarding the misinformation that Dr. Amin received from the DOC.  Pl. Ex. I at 2014-2015.  The statement also is misleading because Danville Hospital prescribed plaintiff with narcotic pain medication within days of Dr. Amin's initial examination.  Pl. Stat. ¶ 63.

41.    Dr. Amin did not recommend any follow-up care regarding the patient's urological issues. (Exhibit 4, p. 14; Group Exhibit 5.)

**Response:**  This statement is immaterial for the reasons set forth in plaintiff's response to paragraph 30 above regarding the misinformation that Dr. Amin received from the DOC.  Pl. Ex. I at 2014-2015.

42.    Based upon Dr. Amin's objective assessment, he did not find any reproducible evidence of pain. (Exhibit 4, p. 14; Group Exhibit 5.)

**Response:** This statement is immaterial for the reasons set forth in plaintiff's response to paragraph 30 above regarding the misinformation that Dr. Amin received from the DOC.  Pl. Ex. I at 2014-2015.

44.    There was nothing medically found by Dr. Amin in August of 2002 that was causing the patient any pain. (Exhibit 4, p. 15; Group Exhibit 5.)

**Response:** This statement is immaterial for the reasons set forth in plaintiff's response to paragraph 30 above regarding the misinformation that Dr. Amin received from the DOC.  Pl. Ex. I at 2014-2015.  The statement also is misleading because either Dr. Amin, or another doctor at Danville Hospital, apparently found something "medically wrong" with plaintiff on or before August

12

25, 2002, when they prescribed plaintiff with narcotic pain medication. Pl. Stat. ¶ 63.

      45.    Dr. Amin found no infection on August 22, 2002. (Exhibit 4, p. 15; Group Exhibit 5.)

**Response:** This statement is immaterial because plaintiff is not claiming an infection, or a failure to diagnose one, by Dr. Hamby or any other defendant.

      47.    Dr. Amin found no clinical evidence of any medical problems with respect to the Plaintiff's presentation. (Exhibit 4, pp. 18-19; Group Exhibit 5.)

**Response:** This statement is immaterial for the reasons set forth in plaintiff's response to paragraph 30 above regarding the misinformation that Dr. Amin received from the DOC. Pl. Ex. I at 2014-2015.

      48.    After Floyd Hayes was released from the Department of Corrections, Dr. Hamby was not consulted regarding the appropriate course of care for Mr. Hayes' complaints.

**Response:** This statement is immaterial because plaintiff's claims of wrongdoing by Dr. Hamby are limited to the time period during which plaintiff was a prisoner under Dr. Hamby's direct and indirect care.

## B2.   RESPONSE TO DOC'S STATEMENT OF UNDISPUTED FACTS

### (1)   Undisputed Material Facts:

Plaintiff agrees that the following facts in the DOC's Statement of Undisputed Material Facts (referred to hereinafter as "DOC Statement" or "DOC

13

Stat.") are (a) arguably material to the outcome of this case, and (b) undisputed by the parties: ¶¶ 1-5, 12-14, 21, 23, 25, 29-34, and 36-39.

### (2)    Disputed Material Facts:

Plaintiff disputes the following paragraphs of the DOC Statement. These statements, and plaintiff's responses, will require resolution at trial. We hereinafter refer to plaintiff's responses to the DOC Statement as "Pl. Resp. DOC Stat. ¶ __".

11.    Plaintiff put in four request slips requesting ice for his testicles, but raised no new complaints in those request slips (Plaintiff's Dep., p. 81, l. 17 - p. 82, l. 20).

**Response:** This statement is disputed as ambiguous and self-contradictory. Each request for ice constituted a "new complaint" that he was in pain.

15.    Plaintiff sued Director Snyder because he was "in the chain of command." (Plaintiff's Dep., p. 87, l. 6 - 20).

**Response:** This statement is both immaterial and disputed. It is immaterial because the reason for plaintiff's bringing suit against Mr. Snyder is not relevant to Mr. Snyder's liability for what he actually did, or did not do, in connection with the claims at issue here. The statement is disputed because, while Mr. Snyder's position in the chain of command is part of the reason for plaintiff's claims against him, plaintiff also included Mr. Snyder as a defendant because plaintiff addressed complaints of his pain and suffering to him.

14

16.    Plaintiff sued Deputy Director Montgomery because "he had the authority to tell the health care unit to get [him] treated, and he didn't do it," and because he expected Montgomery to overrule what was going on at the Health Care Unit at Hill (Plaintiff's Dep., p. 88, l. 9 - p. 89, l. 5)

**Response:** This statement is both immaterial and disputed.  It is immaterial because the reason for plaintiff's bringing suit against Mr. Montgomery is not relevant to what he actually did, or did not do, in connection with the claims at issue here.  The statement is disputed because Mr. Montgomery not only failed to "overrule" what the Health Care Unit was doing, but he intentionally and knowingly allowed plaintiff's pain to continue despite the absence of any indication from the Health Care Unit (or anyone else) that either (i) plaintiff was not actually experiencing pain, or (ii) that the pain was being properly treated.

17.    Plaintiff sued Warden Pierson because he wrote to Warden Pierson who wrote back and said he knew of Plaintiff's conditions, but that there was nothing he could do (Plaintiff's Dep., p. 89, l. 19 - 23).

**Response:** This statement is both immaterial and disputed.  It is immaterial because the reason for plaintiff's bringing suit against Mr. Pierson is not relevant to what he actually did, or did not do, in connection with the claims at issue here.  The statement is disputed because Mr. Pierson not only advised plaintiff that there was nothing Mr. Pierson could do about plaintiff's situation, but he also intentionally and knowingly allowed plaintiff's pain to continue despite the absence of any indication from the Health Care Unit (or anyone else) that either

15

(i) plaintiff was not actually experiencing pain, or (ii) that the pain was being

properly treated.

18.　　Plaintiff expected Defendants Snyder, Montgomery, Bass and
Pierson to order the Health Care Unit to seek medical attention outside of Hill
Correctional Center (Plaintiff's Dep., p. 90, l. 9 - 17).

**Response:** This statement is both immaterial and disputed.  It is

immaterial because the course of action that plaintiff expected the defendants to

take was to provide him with relief from his agonizing pain, and the fact that

plaintiff had in mind one possible way by which this could be accomplished has no

relevance to whether defendants took appropriate action to alleviate the pain.  The

statement is disputed because it is incomplete and misleading in that plaintiff,

albeit asking for medical attention outside the Hill Correctional Center when the

Center failed to treat him appropriate, wanted first and foremost for the Center to

treat and alleviate his pain and suffering.

22.　　The medical problems with which Plaintiff presented were not
the sort that a layperson could diagnose or determine what treatment was
appropriate (Dr. Bigham's Dep., p. 117, l. 15 - 23).

**Response:** This statement is disputed because, while the cause of

plaintiff's pain could not be diagnosed by a layperson, a layperson knows that pain

is painful, and that it requires treatment.

24.　　When a grievance regarding medical care was filed at
Pinckneyville, it was the practice at Hill Correctional Center to contact the Health
Care Unit for their review and response (Pierson Affidavit).

16

**Response:** Plaintiff disputes this statement, in part, because he does

not understand the reference to "Pinckneyville", which does not appear to contained

within Mr. Pierson's affidavit.  Plaintiff does not dispute the remainder of this

statement.

26.    Defendant Pierson sent Plaintiff a memo on July 1, 2002
regarding his medical care that reflected Plaintiff's medical concerns were being
addressed and that Defendant Bass had also addressed Plaintiff's concerns (Pierson
Affidavit).

**Response:** Plaintiff disputes this statement to the extent that it

suggests that plaintiff's medical concerns actually were being address — because

they were not.  Plaintiff does not dispute that Mr. Pierson sent the referenced memo

to plaintiff on or about July 1, 2002.

27.    At the time he drafted the memo to Plaintiff on July 1, 2002,
Defendant Pierson determined Plaintiff's concerns had been addressed
appropriately. Defendant Pierson based this determination on his knowledge that
Hill Correctional Center maintained a Health Care Unit staffed with physicians
and other trained medical personnel, and his knowledge that any medical concern
that could not be addressed in house, could be sent to an outside medical vendor. He
also based his response on the information provided in the grievance responses he
reviewed. (Pierson Affidavit; Exhibit A).

**Response:** Plaintiff disputes this statement because the assertion that

Mr. Pierson determined that plaintiff's concerns had been addressed appropriately

is contradicted by the record and the reasonable inferences deriving from it.  More

specifically, nowhere does the record (including Mr. Pierson's affidavit) indicate

either (i) that plaintiff was not actually experiencing pain, or (ii) that the pain was

17

being properly treated.  Thus, Mr. Pierson <u>could not</u> have determined that Mr.

Hayes' pain was being "addressed appropriately".

28.     Defendant Pierson is not a physician and was not licensed or trained to determine what care should be provided to offenders at Hill Correctional Center. (Pierson Affidavit).

**Response:** Plaintiff disputes this statement to the extent that it asserts

or implies that Mr. Pierson was not trained to determine that pain requires medical

treatment.  As the prison warden, and as a male, Mr. Pierson undoubtedly knew

both that the law requires that the prison officials treat prisoners who are suffering

from extreme pain, and also knew that testicular problems, including cramping and

swelling, can result in extreme pain.

35.     The medical records indicated that Plaintiff was seen by a urologist on December 16, 2000, and that the Medical Director determined Plaintiff did not require further care (Exhibit B).

**Response**: This statement is disputed because the medical records do

not indicate that plaintiff saw a urologist in December 2000, and in fact plaintiff did

not see a urologist at that or any other time while at HCC.  *See* Pl. Ex. V at 8.

Plaintiff also disputes the second clause of this statement because it fails to identify

the time period during which the Medical Director determined that plaintiff did not

require further care.

18

(3)    <u>**Immaterial Facts:**</u>

The following paragraph of the DOC Statement are immaterial to the resolution of their motion.

6.    A few months after Plaintiff discovered the nodule in his testicle, he began having problems with his arm (Plaintiff's Dep., p. 78, l. 12 - 20.

**Response:** This statement is immaterial because plaintiff is not pursuing a claim with respect to the pain he was suffering from the bony lesion in his arm. Nevertheless, plaintiff reserves the right to submit evidence regarding the problems with his arm at trial if defendants seek to make it an issue there.

7.    Plaintiff was seen by Dr. Shute for the lump on his arm when he raised the issue while being seen for the nodule in his testicle (Plaintiff's Dep., p. 79, l. 1 - 21).

**Response:**  This statement is immaterial because plaintiff is not pursuing a claim with respect to the pain he was suffering from the bony lesion in his arm.   Nevertheless, plaintiff reserves the right to submit evidence regarding the problems with his arm at trial if defendants seek to make it an issue there.

8.    An x-ray of Plaintiff's arm was ordered and performed at Hill Correctional Center (Plaintiff's Dep., p. 79, l. 21 - 24).

**Response:**  This statement is immaterial because plaintiff is not pursuing a claim with respect to the pain he was suffering from the bony lesion in his arm.   Nevertheless, plaintiff reserves the right to submit evidence regarding the problems with his arm at trial if defendants seek to make it an issue there.

9.    Plaintiff was examined for the lump on his arm within a few days of finding the lump (Plaintiff's Dep., p. 80, l. 4 - 7).

19

**Response:**  This statement is immaterial because plaintiff is not pursuing a claim with respect to the pain he was suffering from the bony lesion in his arm.  Nevertheless, plaintiff reserves the right to submit evidence regarding the problems with his arm at trial if defendants seek to make it an issue there.

10.    Plaintiff was subsequently seen by Dr. Shute, Dr. Hamby, and at least one other physician that came into the institution for his complaints about his arm (Plaintiff's Dep., p. 80, l. 8 - p. 81, l. 8).

**Response:**  This statement is immaterial because plaintiff is not pursuing a claim with respect to the pain he was suffering from the bony lesion in his arm.   Nevertheless, plaintiff reserves the right to submit evidence regarding the problems with his arm at trial if defendants seek to make it an issue there.

19.    Plaintiff believes the four defendants checked into his medical care (Plaintiff's Dep., p. 90, l. 18 - 23).

**Response:** This statement is immaterial in that plaintiff's belief as to what one or more of the defendants did or did not do is not relevant to what they actually did or did not do, and it is the latter that determines their liability here.

20.    Plaintiff does not believe Defendants Snyder, Montgomery, Bass or Pierson had anything to do with taking his ice pack away (Plaintiff's Dep., p. 91).

**Response:** This statement is immaterial in that plaintiff's belief as to what one or more of the defendants did or did not do is not relevant to what they actually did or did not do, and it is the latter that determines their liability here.

20

### B.3.   Plaintiff's Additional Material Facts

The following additional facts, which we referenced above and in the Argument below as "Plaintiff's Statement" or "Pl. Stat. ¶ __", are material to the outcome of this case:

1.     Plaintiff is a sixty year old Vietnam Veteran and a former Kentucky State Trooper.  Pl. Ex. I at 1978; *see* Hamby Stat. at 4 ¶ 25 and Ex. 4 at 9 (Dr. Amin's deposition testimony that the documents bearing Bates Nos. 1950-2015 (Pl. Ex. I) are medical records of the Danville Veterans' Administration Hospital kept in the ordinary course of the Hospital's business).

2.     In 1997, during a drunken blackout, plaintiff struck and sexually assaulted his wife.  He subsequently received a sentence of 10 years in the Illinois Department of Corrections ("DOC").  *Id.*

3.     In April 1998, after being incarcerated in Schuyler County Jail and then briefly at the DOC facility in Pinckneyville, plaintiff was transferred to Hill Correctional Center in Knox County, Illinois.  DOC Defendants' Answer to Complaint at 2 ¶ 10.

4.     At some point prior to September 2001, plaintiff began suffering from daily pain as a result of spasming of the cremastreric muscle that controls his left testicle.  Hayes Dep. at 10-11.

5.     During the spasms, plaintiff's left testicle "pulls and draws and goes up inside of [him], ... caus[ing him] a tremendous amount of pain." Hayes Dep. at 11; see also Hayes Dep. at 33.

21

6.    On September 23, 2001, plaintiff, who previously had been diagnosed with non-cancerous cysts in his testicles, visited the Medical Unit and reported to the nurse that he was experiencing pain in his left testicle, that his testicle was swollen and that he had to "pull down [the] testicle to urinate".  Pl. Ex. V at 14.

7.    The following day, an unidentified doctor at the Medical Unit examined plaintiff and prescribed an antibiotic for a possible infection as well as Tylenol 3  (i.e., Tylenol with codeine, a narcotic) for the pain.  Pl. Ex. V at 14 (very bottom of page); Hayes Dep. at 26.

8.    Besides Dr. Hamby  (who, as set forth below, never prescribes pain killer stronger then Tylenol), the other doctors at the Medical Unit during this time period only prescribed narcotics where absolutely necessary to alleviate pain. Hamby Dep. at 57.

9.    The doctor prescribed both medications for 10 days, and advised plaintiff that he should return in 10 days for a re-evaluation and a possible referral if the pain persisted.  Pl. Ex. V at 14.

10.    On October 4, 2001, plaintiff returned to the Medical Unit because he remained in pain.  Pl. Ex. V at 15.

11.    This time, plaintiff saw Dr. Hamby, and reported to him the severe pain he was suffering from the swelling and cramping of his left testicle.  *Id.*; Pl. Ex. IV (Hayes Decl.) at 1-2 ¶¶ 6-7; *see also* Hamby Stat. at 2 ¶¶ 4-6; Hayes Dep. at 15-16.

22

12.     Dr. Hamby prescribed another antibiotic, but only regular Tylenol for the pain.  Pl. Ex. V at 15; *see also* Hamby Stat. at 2 ¶¶ 4-6.

13.     Dr. Hamby never prescribed narcotics (or anything stronger than Tylenol) to inmates because, in his judgment, Tylenol was all they ever really needed.  Hamby Dep. at 51-53.

14.     On October 15, 2001, plaintiff was seen by Dr. Hamby again, and complained again about the severe pain in his left testicle.  Pl. Ex. IV (Hayes Decl.) at 1-2 ¶¶ 6-7  Pl. Ex. V at 15; Hayes Dep. at 15-16.

15.     Dr. Hamby documented this pain in his notes as "discomfort", terminated the Tylenol prescription and prescribed an athletic supporter for the pain.  Pl. Ex. V at 15; *see also* Hamby Stat. ¶¶ 8-12; Hayes Dep. at 40-41 (Dr. Hamby told plaintiff that a jock strap was all he needed).

16.     On October 29, 2001, plaintiff was seen by another doctor within the Medical Unit, Doctor Richard Shute.  Pl. Ex. V at 16.  Plaintiff again reported the swelling and pain in his scrotum.  *Id.*  Dr. Shute's plan was to refer plaintiff for a urology work-up.  *Id; see also* Hamby Dep. at 77-80.

17.     Dr. Hamby's approval was required for such an outside referral. Hamby Dep. at 29-31.

23

18.    Plaintiff did not receive the referral or the urology work-up, and Dr. Shute told plaintiff that Dr. Hamby had declined it.[5]  *See* Hayes Dep. at 29, 31-32.

19.    On January 13, 2002, plaintiff again visited the Medical Unit and reported his testicular pain.  Pl. Ex. V at 17.  He also expressed his concern that he was not being treated because he was "short" — i.e., he had a relatively short time before his release date.  *Id*; *see also* Hamby Dep. at 81.   The following day, Dr. Hamby performed a jacket review of plaintiff's medical file.  Pl. Ex. V at 18.

20.    On January 25, 2002, plaintiff again saw Dr. Shute.  Pl. Ex. V at 18.  Plaintiff now reported increased pain as well as an abnormal, curvature of his penis.  *Id.*

21.    During this visit, Dr. Shute observed that the plaintiff's left testicle was pulled upward and much higher than the right one, and that physically examining it caused even greater pain.  *Id.*  Dr. Shute prescribed an antibiotic, ibuprofen, and ice packs.  *Id.*

22.    A prescription for ice packs was really a "pass" that allowed plaintiff to retrieve ice and take it with him to his cell.  The ice packs were the "only

---

[5]    Although Dr. Shute presumably was employed by the Medical Unit, not by Dr. Hamby personally, his statements to plaintiff about his treatment, and non-treatment, by Dr. Hamby are admissible against Dr. Hamby under Federal Rule of Evidence 801(d)(2)(D) because Dr. Shute worked for and under the authority of Dr. Hamby, the Medical Director.  Hamby Dep. at 26-27; *U.S. v. Rioux*, 97 F.3d 648, 660 (2d Cir. 1996); *see also Nekolny v. Painter*, 653 F.2d 1164, 1171 (7th Cir. 1981) (statements of Township Supervisor's assistant were admissible as non-hearsay in action against Supervisor individually).

thing that helped [plaintiff's] pain." Hayes Dep. at 33, 35. The ice packs provided plaintiff with some temporary relief from the pain, but they did so only for brief periods of time and left him in pain for the remainder of the day. Pl Ex. IV (Hayes Decl.) at 2 ¶ 13.

23.     Dr. Shute explained to plaintiff that he could not prescribe him stronger pain medication because Dr. Hamby would not approve. Hayes Dep. at 26-27.

24.     Dr. Hamby testified that he refused to refer plaintiff to an outside medical provider — whether a urologist or a pain management specialist — because he could not personally document the cause for plaintiff's pain. Hamby Dep. at 104-108.

25.     Apparently even Dr. Shute's witnessing and reporting of the retracting left testicle did not constitute sufficient documentation for Dr. Hamby to refer plaintiff for outside care. Hamby Dep. at 108 (stating that he had "no idea" what he would have had to see in order to make a referral for plaintiff's testicular pain).

26.     Although testicular retraction is an uncommon condition, Dr. Hamby had seen the condition previously and was aware both that it could be caused by a muscle spasm, and that it could be painful. Hamby Dep. at 66-67.

27.     On or about February 6, 2002, Plaintiff saw Dr. Shute again, and reported again his left scrotal pain. Pl. Ex. V at 20.

25

28.     On or about February 14, 2002, plaintiff met with Dr. Shute to review certain x-ray results regarding a bony mass in his arm, and also to request a different pain medicine for his scrotal pain.  Pl. Ex. V at 22.

29.     Dr. Shute continued the prescription of an ice pack and analgesic.  Pl. Ex. V at 22-23.

30.     On March 27, 2002, plaintiff requested a copy of his medical records.  Pl. Ex. V at 25.

31.     On April 16, 2002, plaintiff wrote to Assistant Director Montgomery and described his extreme pain and problems with his testicles — including his retracting and cramping testicle and his bending penis.  DOC Stat. at 7 ¶ 36 and Ex. C (the "Montgomery Letter") at 1-2.

32.     On April 17, 2002, Dr. Shute saw plaintiff again.  Pl. Ex. V at 25.  Plaintiff reported that his scrotum still swelled, but that it responded somewhat to ice packs.  *Id.*  He also reported that he was out of ibuprofen.  *Id.*  Dr. Shute renewed the plaintiff's pass for ice packs and prescribed more ibuprofen.  *Id.*

33.     After receiving plaintiff's April 16 letter, Mr. Montgomery asked Mary Lindley, an administrative assistant,  to investigate plaintiff's complaints.  DOC Stat. at 7 ¶ 37 and Ex D.

34.     On May 9, 2002, Ms. Lindley wrote a memorandum to the Medical Unit to inquire about the complaints.  In the memorandum, Ms. Lindley stated that "[j]ust a brief history/comments will suffice."  *Id.*

26

35.     On and around May 17, 2002, Dr. Hamby, reviewed plaintiff's full medical record and prepared and delivered to the Administrative Assistant's Office a three page Summary of plaintiff's medical condition.  DOC Stat. at 7 ¶ 38 and Ex. E; Hamby Dep. at 44-45 (referring to Exhibit Z, which is the same document at Exhibit E to the DOC Statement).

36.     The letter contained numerous misstatements and inaccuracies — such as stating that plaintiff initially reported pain in his <u>right</u> testicle in September 2001, but then subsequently complained of pain in his <u>left</u> testicle, when in fact plaintiff had reported <u>left</u> testicular pain in September 2001 as well.  DOC Stat. Ex. E; *see also* Pl. Stat. ¶ 6, *supra*.

37.     The letter also was internally inconsistent.  It recited plaintiff's numerous and ongoing complaints of testicular pain but then summarized by stating that plaintiff experienced only "occasional tenderness" in his groin area. DOC Stat. Ex. E.

38.     Finally, the letter did not address plaintiff's cramping and retracting testicle (except to note at one point that the left testicle was higher than the right), and did not explain why plaintiff's extreme pain from this condition was not being treated.  *Id.*

39.     On May 24, 2002, Assistant Warden Bass wrote to plaintiff to respond to the April 16 Montgomery Letter.  Pl. Ex. IV (Hayes Decl.) at 3 ¶ 15 and Ex. DD.  Ms. Bass stated in the letter that she had contacted the Health Care Unit

27

and Health Care Director, and that they had indicated that plaintiff had been seen and was being monitored. *Id.* The letter did not address plaintiff's pain. *Id.*

40.    In or around May 2002, plaintiff learned that Dr. Shute had left his employment at HCC, and that he no longer would have access to the ice packs. Hayes Dep. 33-35, 91.

41.    From this point until plaintiff's departure from HCC, he never again received permission to obtain ice packs for his pain. *Id.* at 33-35.

42.    From late May through July 2002, plaintiff made four sick call requests to see a doctor, each of which was rejected by the Medical Unit. Hayes Dep. at 35, 81-82; Pl. Ex. IV (Hayes Decl.) at 2 ¶¶ 14-15.

43.    Plaintiff kept copies of three of these requests, and noted and dated in his own handwriting "No Response to this Request" at the bottom of each request when he received no response to the request. Hayes Dep. at 96; Pl. Ex. IV (Hayes Decl.) at 2 ¶¶ 10, 16 and Ex. BB.

44.    Upon seeing the three sick call request during his deposition, Dr. Hamby insisted that the handwritten statements "No Response to this Request" on each of the requests were made by his nurses, and that they demonstrated that plaintiff was refusing to seek treatment for his pain. Hamby Dep. at 97-99 and Ex. BB.

45.    Dr. Hamby's testimony in this regarding was demonstrably untrue, for several reasons: (a) as indicated by the Bates numbering at the bottom of the requests, the sick call requests were produced by plaintiff to defendants (*see*

28

Pl. Ex. IV (Hayes Decl.) at 2 ¶ 17), and plaintiff would not have had access to the requests unless he had retained copies of them and written on them; (b) the notes clearly are in plaintiff's handwriting; and (c) since the requests, on their faces, went from plaintiff to the Medical Unit, it would have made no sense for a <u>nurse</u> to write that there was no "response" to the "request". *See* Hamby Dep. at 97-99 and Ex. BB.

46.     On June 10, 2002, plaintiff wrote to Assistant Warden Bass to respond to her letter of May 24, 2002. Pl. Ex. IV (Hayes Decl.) at 3 ¶ 18 and Ex. CC; *see also* Hamby Dep. at 99-100 and Ex. CC.

47.     In the June 10 letter, plaintiff repeated his explanation of the pain he was suffering, and also complained that the Medical Unit now was refusing to give him his "Pain Medication." Pl. Ex. IV (Hayes Decl.) at 3 ¶ 18 and Ex. CC.

48.     On June 17, 2002, Assistant Warden Bass wrote to plaintiff in response to his June 10 letter. DOC Stat. at 6 ¶ 24 and Ex. B.

49.     In her June 17 letter, Ms. Bass acknowledged that plaintiff suffered from swelling and pain in his scrotum, and stated that ice packs and ibuprofen helped the pain, but made no reference to plaintiff's complaints that he no longer was receiving even this minimal treatment. *Id.*

50.     On or about June 20, 2002, plaintiff filed a formal grievance. DOC Stat. at 7 ¶ 39 and Ex. F.

29

51.     In this grievance, plaintiff pleaded for pain medication and the ice packs, and explained how, over the prior year, he had written to numerous people, and "Yelled Screamed, and Cryed" about his pain.  *Id.*  He ended the grievance with the statement, "Please Help Me."  *Id.* at 2.

52.     By Memorandum dated July 1, 2002, Warden Pierson wrote directly to plaintiff and told plaintiff that his "concerns" had been "appropriately addressed" by Ms. Bass and the Medical Unit.  DOC Stat. at 5-6 ¶ 27 and Ex. A.

53.     Finally, on July 13, 2006, plaintiff managed to get in to see a nurse, who apparently without Dr. Hamby's knowledge, prescribed ibuprofen for him.  Pl. Ex. V at 28; Hamby Dep. Ex. AA; *see also* Hamby Dep. at 94-96; Pl. Ex. V at 29 (indicating that he did not believe that plaintiff was seen during July 2002).

54.     On or about July 18, 2002, plaintiff's June 20 grievance was denied.  Defendants' Stat. at 7 ¶ 39 and Ex. F at 3.

55.     On or about August 15, 2002, plaintiff was released from HCC and placed on parole.  Pl. Ex. I at 2014-2015.

56.     Plaintiff proceeded directly to the Veterans' Administration Hospital in  Danville, Illinois, for treatment.  *Id.* at 2014 (top).[6]

57.     A week prior to plaintiff's release, on or about August 8, 2006, Susan Franklin, a placement specialist with the Department of Corrections, had sent a fax to the Chief Social Worker at the Danville Hospital.  *Id.* at 2014-2015.

---

[6]     The Danville Hospital's Progress Notes are printed and appear here in reverse chronological order.

30

58.     In her fax to and subsequent conversation with the Hospital,
Ms. Franklin informed the Hospital staff that, among other things, plaintiff "needs
to see the physician almost daily" and that his "primary problems are psychiatric".
*Id.*

59.     Upon arriving at Danville, plaintiff reported his scrotal pain as
well as his post-traumatic stress disorder from Vietnam.  *Id.* at 2006; Hayes Dep. at
37-38.

60.     As described in Hamby Statement ¶¶ 24-47, and in plaintiff's
responses to various of those paragraphs (*see supra* at Pl. Resp. Hamby Stat. ¶¶ 30,
35-46), plaintiff was seen by Dr. Amin, a Danville urologist, for roughly15 minutes
on August 22, 2002.  *See also* Amin Dep. at 30.

61.     As also discussed above, based on his examination of plaintiff
<u>and</u> on the Danville Hospital medical records (which included the record of Ms.
Franklin's communications to the hospital regarding plaintiff's psychiatric
problems), Dr. Amin determined that plaintiff might be seeking drugs, and that he,
Dr. Amin, "was not going to go for it" at the time.  Pl. Resp. Hamby Stat. ¶ 30.

62.     On or about August 25, 2002, plaintiff was discharged from the
Danville VA.  Pl. Ex. I at 1960.

63.     Despite Dr. Amin's initial concerns that plaintiff might be
seeking drugs improperly, the Danville Hospital discharged plaintiff with

prescriptions for, among other things, Ibuprofen and "Darvocet [a narcotic] one tablet per mouth twice a day as needed <u>for extreme pain</u>."[7]  *Id.* (emphasis added).

64.    On September 12, 2002, plaintiff was seen at the VA Hospital in Lexington KY by a triage nurse to whom he reported his testicular pain and described how his testicle was "drawing up like a muscle cramp".  Pl. Ex. II (Bigham Dep.) at 23 and Ex. B.

65.    That same day, plaintiff was evaluated by a nurse practitioner. Pl. Ex. II (Bigham Dep.) at 24-25 and Ex. C.  The nurse practitioner noted that plaintiff had a history of left testicular retraction with pain, and that the left testicle was very tender.  *Id.*  In response to what she observed, the  nurse scheduled a testicular ultrasound and urology consult.  *Id.*

66.    On September 30, 2002, plaintiff was first seen by Dr. Alacia Bigham, his current primary care physician.  Pl. Ex. II (Bigham Dep.) at 21 and Ex. A.  Dr. Bigham noted that an ultrasound had been scheduled, and also prescribed lortab (a narcotic) for plaintiff's testicular pain.  Pl. Ex. II (Bigham Dep.) at 36-37, 59 and Ex. A.

67.    On October 10, 2002, patient was seen by Dr. William Terence Conner, a urologist at the VA.  Pl. Ex. II (Bigham Dep.) at 46-47 and Ex. D.

---

[7]    We hereby respectfully request that the Court take judicial notice of the fact that Darvocet is the brand name for a drug containing acetaminophen and propoxyphene (information that is readily available during a simple web search). Propoxyphene is a narcotic pain medication.  Pl. Ex. II (Bigham Dep.) at 35-36.

68.     Dr. O'Connor's impression, as indicated in his progress note of October 12, 2002, was "L. epidymimal pain and crematic muscle spasm with chronic pain and peronies disease." *Id.* Peronies disease is an abnormal curvature of the penis. Pl. Ex. II (Bigham Dep.) at 51.

69.     The cremastreric muscle is the muscle that holds the testicles up to the body to protect them. Pl. Ex. II (Bigham Dep.) at 54-55. The cremastreric muscle is normally relaxed, but contracts in response to injury or trauma. *Id.* A muscle spasm of the cremastreric muscle causes the muscle to contract when it should be relaxed. *Id.* A cremastreric muscle spasm causes pain. *Id.*

70.     A urologist is the appropriate type of doctor to diagnose a cremastreric muscle spasm. Pl. Ex. II (Bigham Dep.) at 55.

71.     Dr. Conner treated the patient with an verapamil injection for the curvature of the penis, ordered a CT scan of the pelvis, and referred the plaintiff for a pain management consult. Pl. Ex. II (Bigham Dep.) at 46-47 and Ex. D.

72.     On or about January 27, 2003, the plaintiff was seen again by Dr. Connor and another resident physician in the urology department, Dr. Chad Lagrange. Pl. Ex. II (Bigham Dep.) at 67-69 and Ex. G. Dr. Connor indicated that "the left cremasteric spasm should be managed with medications and protection from trauma." *Id.*

73.     On or about March 24, 2003, the plaintiff was seen by Dr. Joseph Atallah, a board certified pain management specialist at the Kentucky VA Hospital. Pl. Ex. III (Atallah Dep.) at 12-13 and Ex. L.

33

74.     Dr. Atallah prescribed trigger point injections into the plaintiff's cremastreric muscle because plaintiff suffered from a very spastic cremastreric muscle.  Pl. Ex. III (Atallah Dep.) at 13.

75.     The injections, which plaintiff continues to receive, provide the plaintiff with temporary relief.   Pl. Ex. III (Atallah Dep.) at 24.

76.     In addition to the trigger point injections, plaintiff is taking Morphine Sulfate SR (slow release morphine) and Hydrocodone (a narcotic) to manage his severe testicular pain.  Pl. Ex. III (Atallah Dep.) at 30-31; Pl. Ex. II (Bigham Dep.) at 36.

77.     Plaintiff remains under Dr. Atallah's care today.  *Id.*

## C.     <u>ARGUMENT</u>

### I.     <u>Applicable Legal Standards and Plaintiffs' Claims</u>

In Eighth Amendment cases, as in all cases, summary judgment may be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005).  In evaluating the motion, the Court must "constru[e] all facts and draw[] all reasonable inferences in favor of the non-moving party.  *Greeno v. Daley*, 414 F.3d at 652 (citing *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986)).

The Court's role at this stage is <u>not</u> to weigh the evidence, but only to "decide whether a rational jury, viewing the evidence in the light most favorable to the [plaintiff], could come [to a decision in his favor]." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).  If "a reasonable jury could return a verdict for the non-moving party," then "summary judgment will not lie." *Anderson v. Liberty Lobby. Inc.*, 477 U.S. at 248, 106 S.Ct. 2505.

To prevail on his Eighth Amendment, plaintiff must show (i) that he was suffering from a severe medical condition, and (ii) that defendants intentionally or recklessly disregarded it.  Courts sometimes refer to the first element as the "objective" component and the second as the "subjective" one. *Greeno v. Daley*, 414 F.3d at 652.  The Seventh Circuit has made clear, however, that because "subjective, nonverifiable complaints [of pain] are in some cases the only symptoms of a serious medical condition", *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir.1996), a plaintiff "need <u>not</u> produce objective evidence of injury" in order to survive summary judgment. *Walker v. Benjamin, 293 F.3d 1030*, 1040 (7th Cir. 2002); *accord Greeno v. Daley*, 414 F.3d at 655.  On the contrary, where a plaintiff alleges and shows that he experienced severe pain, and the prison officials failed to treat it, the questions of whether he actually suffered from such pain, and whether the prison officials are culpable for ignoring it, are issues for the jury. *Greeno v. Daley*, 414 F.3d at 655; *Walker v. Benjamin*, 293 F.3d at 1040.

Plaintiffs' claims here against Dr. Hamby and the DOC Defendants are quite simple: He was suffering from severe testicular pain, and neither Dr. Hamby

35

nor the DOC Defendants took action to alleviate his suffering.  Indeed, Dr. Hamby withdrew and then refused to re-prescribe even simple pain medication and related relief for plaintiff.  And the prison officials rejected plaintiff's pleas for help without requiring any explanation from plaintiff or the doctor as to the actual cause of plaintiff's pain or the reasons that plaintiff was not receiving adequate treatment for it.  Accordingly, under the legal standards set forth above, plaintiff is entitled to a trial on his claims.

Defendants do not address the foregoing standards, and thus do not explain how the facts at issue here could entitle them to summary judgment under those standards.  Nevertheless, in Sections II and III below, we review defendants' arguments, and demonstrate why they do not suffice for the entry of judgment here.

## II.    Dr. Hamby's Arguments

Dr. Hamby's argument section scarcely amounts to a defense at all.  To be sure, the doctor cites to some generally pertinent Eighth Amendment case law, and recites the standard platitudes about prison doctors having discretion in their methods of diagnosis and treatment.  Nowhere, however, does Dr. Hamby refer to the controlling Seventh Circuit precedent on prisoners suffering from extreme pain.  Nor does he make any effort to explain why he refused to prescribe pain relievers — narcotic or non-narcotic — for plaintiff from and after his October 15, 2001, examination.  Indeed, Dr. Hamby does not even argue (as did the doctor, unsuccessfully, in the *Walker* case) that he refused to provide plaintiff with pain

36

medication and ice packs because he did not believe plaintiff's complaints. *But see Gil v. Reed*, 381 F.3d 649, 662-664 (7th Cir. 2004) (doctor's explanation for failing to provide treatment gave rise to question of fact for jury).

Instead, Dr. Hamby's suggests that, because he only saw plaintiff on two occasions in October 2001, he did not know about the severity of plaintiff's pain and suffering. But this assertion is both untrue <u>and</u> irrelevant. It is untrue because plaintiff specifically advised Dr. Hamby of his severe testicular pain when he saw him twice in October 2001, just as he had complained about the pain to the doctor he saw in September (who prescribed Tylenol with codeine for it), and then continued to complain to the doctor and nurses he saw thereafter. Pl. Stat. ¶¶ 7 and 10-16 and 19 *passim*; Pl. Resp. Hamby Stat. ¶ 6.

Dr. Hamby's argument here also is irrelevant. This is so because, whatever the doctor may or may not have understood when he saw plaintiff in <u>October 2001</u>, he unquestionably knew by <u>January 14, 2002</u>, when he performed a jacket review of plaintiff's medical file, and again in <u>May 2002</u>, when he prepared his Summary of plaintiff's medical records for Administrative Assistant Lindley, that plaintiff had been complaining of severe testicular pain since September 2001. Pl. Stat. ¶ 19; DOC Stat. at 7 ¶ 38 and Ex. E.

Dr. Hamby's effort to escape responsibility here by relying on Dr. Amin's 15 minute examination of plaintiff at Danville Hospital in August 2002 borders on ridiculous. For not only was Dr. Amin's initial determination not to prescribe pain medication clearly tainted by the DOC's warning to Danville that

37

plaintiff's problems were primarily psychiatric, but Dr. Amin (or some other doctor) ultimately decided that plaintiff's pain was real, and thus gave him a narcotic prescription for the pain.  Pl. Resp. Hamby Stat. ¶ 30; Pl Stat. ¶ 63.

Finally, Dr. Hamby's half-hearted assertion that he is immune from suit because there is no clearly established right to see a surgeon or to receive more care and treatment than Dr. Hamby provided misses the point entirely.  It has been the law since well before the events at issue here that a prison official — medical or lay — violates the constitution when he deliberately fails to attend to a plaintiff's severe pain. *See Walker v. Benjamin*, 293 F.3d at 1040 (citing cases establishing this right).  Thus, if plaintiff proves at trial that Dr. Hamby did so — which is precisely what plaintiff alleges and what the evidence shows here — then qualified immunity will not apply.[8]  *Id.* at 1037-1038 (in cases such as this the merits and qualified immunity "effectively collapse into one").

When asked at his deposition why he was suing Dr. Hamby, plaintiff's answer was clear: The doctor "left [him] in a 6 by 9 cell in pain, tremendous pain" and even took away the one thing (ice packs) that provided any relief.  Hayes Dep.

---

[8]    To be clear, we are not claiming here that plaintiff's referral to a urologist would have sufficed.  On the contrary, plaintiff's experience after he left HCC revealed that his condition is incurable, and that it requires intensive pain management as opposed to surgery or other treatment.  *See* Pl. Stat. ¶¶ 64-77.

Yet, as at Danville Hospital and again in Kentucky, a urology referral would have set plaintiff on the road to the treatment he required.  And by refusing to order such referral, and refusing to prescribe the pain medication that plaintiff so desperately needed, Dr. Hamby left plaintiff to suffer unnecessarily for month upon month, and thereby violated his clear Eighth Amendment rights.

38

at 33.  Absolutely nothing in the doctor's motion even remotely refutes these simple facts.  Accordingly, plaintiff is entitled to a trial on his claim against him.

### III.    The DOC Defendants' Arguments

The DOC Defendants all rely on essentially the same two facts: (i) that they were not trained medical personnel; and (ii) that they relied on information provided by the Medical Unit in deciding to take no action to alleviate plaintiff's pain and suffering.

We acknowledge that the Seventh Circuit's opinions in *Greeno* and then *Johnson v. Doughty*, 433 F.3d 1001, 1012 (7th Cir. 2006), raise the bar for plaintiff in his claims against the DOC Defendants.  In those cases, the Court followed the Third Circuit in holding that, where non-medical prison officials refer a prisoner's medical complaints to appropriate medical personnel, they "will generally be justified in believing that the prisoner is in capable hands."  *Greeno v. Daley*, 414 F.3d at 655-656 (emphasis added) (citing *Spruill v. Gillis*, 372 F.3d 218, 236 (3rd Cir. 2004)).

Yet, this case differs significantly from *Johnson*, *Greeno* and *Spruill*, and falls well outside the general rule.  This is so because the rule does not apply where the non-medical personnel have "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner."  *Spruill v. Gillis*, 372 F.3d at 236; *see also Greeno v. Daley*, 414 F.3d at 655-656.

Here, the three remaining non-medical officials (Assistant Director Montgomery, Warden Pierson and Assistant Warden Bass[9]) knew no later than the dates of plaintiff's April 2002 letter to Mr. Montgomery, and his June 10 correspondence to Ms. Bass (entitled "Extreme Pain"), that plaintiff was suffering from severe testicular pain.  Pl. Stat. ¶¶ 31, 46-47.  They also knew, at least as of their receipt of Dr. Hamby's May 17 Summary (and then again from plaintiff's June 10 letter), that Dr. Hamby was minimizing the seriousness of the pain, and was refusing to provide pain medication for it.  Pl. Stat. ¶ 35.

Indeed, Dr. Hamby's own Summary reveals (i) that plaintiff, from and after September 2001, was constantly seeking treatment for his testicular pain, (ii) that plaintiff previously had received Tylenol with codeine for it, and (iii) that plaintiff was receiving no pain medication at all at the time of the Summary.  And of course, plaintiff's June 10 "Extreme Pain" letter expressly advised the DOC Defendants that Dr. Hamby "refused to give [plaintiff] Pain Medication" for his testicular pain.  Yet, they made no effort to determine why it was that Dr. Hamby was refusing to provide, at a minimum, the ice packs and medication that at least had provided plaintiff with some relief in the past.

The DOC Defendants' conduct here thus amounted not to a reliance on medical personnel, but instead to a conscious decision to disregard plaintiff's

---

[9]     *See* footnote 1, supra, on plaintiff's consent to summary judgment for Director Snyder

40

suffering.[10]  Under these circumstances, a jury could find that became  responsible for plaintiff's severe, and unnecessary, suffering.[11]

---

[10]    Notably, Assistant Director Montgomery does <u>not</u> claim that, after he received the April 2002 letter from plaintiff, and delegated it to Ms. Lindley, he believed that the situation had been resolved.  Instead, like the other two DOC Defendants, he predicates his argument on Dr. Hamby's May 17 Summary.  For the reasons stated in the text above, however, that Summary confirmed that plaintiff was <u>not</u> receiving adequate treatment for his pain.  Thus, although we acknowledge that the claim against Mr. Montgomery is slightly weaker than those against Mr. Pierson and Ms. Bass, who also received and reviewed the June 10 "Extreme Pain" letter, we submit that the claims against Mr. Montgomery require a jury to resolve as well.

[11]    As for the DOC Defendants' qualified immunity argument, these defendants miss the point in the same way that Dr. Hamby did.  *See* Section II, *infra*.  While there may not be a clearly established constitutional right to have non-medical officials order outside medical treatment, there long has been such a right to have prison officials — medical or non-medical — take action when a prisoner is suffering from severe pain.  *See Farmer v. Brennan*, 511 U.S. 825, 847, 114 S.Ct. 1970, 1984 (1994) (holding that a medical or non-medical prison official "may be held liable under the Eighth Amendment for denying humane conditions of confinement ... if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it").  Thus, as with Dr. Hamby's qualified immunity argument, the DOC Defendants' argument conflates with their arguments on the merits of plaintiff's claims.

**D.    CONCLUSION**

   WHEREFORE, for all of the reasons set forth above, plaintiff prays that this Court deny defendants' motions for summary judgment, and grant plaintiff such other and further relief as this Court deems just and proper.

Dated: October 16, 2006

         Respectfully submitted,


           /s/ Jonathan A. Backman
           Jonathan A. Backman

Jonathan A. Backman
Law Office of Jonathan A. Backman
117 North Center Street
Bloomington, Illinois 61701-5001
(309) 820-7420
FAX: (309) 820-7430
jbackman@backlawoffice.com

*Attorney for Plaintiff Floyd K. Hayes*

**CERTIFICATE OF SERVICE**

I, Jonathan A. Backman, an Illinois attorney, hereby certify that on October 16, 2006, I electronically filed **Plaintiffs' Consolidated Response to Defendants' Motions for Summary Judgment** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Kelly Choate, Esq.
Illinois Attorney General's Office
Assistant Attorney General
500 South Second St
Springfield, IL 62706
(217) 782-9026
FAX: (217) 782-1090
kchoate@atg.state.il.us, jginter@atg.state.il.us, jedwards@atg.state.il.us, bmyers@atg.state.il.us


Theresa Powell, Esq.
Heyl, Royster, Voulker & Allen
1 N. Old State Capitol Plaza
Suite 575
POB 1687
Springfield, IL 62705
Theresa M Powell
tpowell@hrva.com, sprecf@hrva.com, ejarman@hrva.com


and I hereby certify that I have delivered the document by United States Mail, postage pre-paid, to the following non-CM/ECF participant(s):

No Manual Recipients.


_____/s/ Jonathan A. Backman_____
Jonathan A. Backman

43