Page 1

```
 1                    UNITED STATES DISTRICT COURT
                              for the
 2              CENTRAL DISTRICT OF ILLINOIS
                           PEORIA DIVISION
 3                    Case No. 04-CV-1062

 4
    FLOYD K. HAYES,
 5
                              Plaintiff,
 6
    vs.
 7

 8
    DONALD N. SNYDER, JESSE MONTGOMERY,
 9  MARK A. PIERSON, WANDA L. BASS,
    WILLIAM M. HAMBY, M.D., PhD., each
10  in their individual capacities only,

11                            Defendants,

12
                    A P P E A R A N C E S
13

14          Hon. Jonathan A. Backman
            Attorney at Law
15          117 North Center Street
            Bloomington, Illinois 61701
16
            Hon. Kelly Choate (by speakerphone)
17          Attorney General's Office
            500 S. Second St.
18          Springfield, Illinois  62706

19          Hon. Matthew R. Booker
            Heyl, Royster, Voelker & Allen
20          Attorneys at Law
            1 North Old State Capitol Plaza, Suite 575
21          Springfield, Illinois  62705

22          Jackie Gordon, Paralegal for V.A.

23

24
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 2

1                UNITED STATES DISTRICT COURT

2                          for the

3               CENTRAL DISTRICT OF ILLINOIS

4                      PEORIA DIVISION

5                  Case No. 04-CV-1062

6

7

8  FLOYD K. HAYES,

9

10                          Plaintiff,

11

12  vs.

13

14

15

16  DONALD N. SNYDER, JESSE MONTGOMERY,

17  MARK A. PIERSON, WANDA L. BASS,

18  WILLIAM M. HAMBY, M.D., PhD., each

19  in their individual capacities only,

20

21                          Defendants,

22

23

24

25

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 3

1              Pursuant to notice duly given, the deposition of

2    Dr. Alacia Bigham was taken on October 7, 2005, at 2:00 P.M.

3    at the offices of the Lexington Veterans Hospital, 1100

4

5    Veterans Avenue, Lexington, Kentucky, Room D-206, Cooper

6

7    Drive Division.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 4

```
1                    I N D E X

2                                           Page No.

3  Testimony of Dr. Alacia Bigham

4       Direct Examination by Mr. Backman      5 -  80

5       Cross Examination by Mr. Booker       80 - 114

6       Cross Examination by Ms. Choate      114 - 116

7       Redirect Examination by Mr. Backman  116 - 121

8  Certificate of Reporter                       122

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Dr. Alacia Bigham / October 7, 2005

```
                                                            Page 5
1                   I N D E X   O F   E X H I B I T S

2    BIGHAM

3    Number                                              Page No.

4      A        Progress Note dated 9/30/02                  19

5      B        Progress Note dated 9/12/02                  20

6      C        Progress Note dated 9/12/02                  22

7      D        Progress Note dated 10/10/02                 44

8      E        Progress Note dated 10/29/02                 57

9      F        Summary--Floyd K. Hayes - Dr. William Hamby  62

10     G        Progress Note dated 1/27/03                  65

11     H        Progress Note dated 6/05/03                  67

12     I        Progress Note dated 9/23/04                  69

13     J        Progress Note dated 9/23/04                  73

14     K        Progress Note dated 3/24/04                  76

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 6

```
 1        The witness, DOCTOR ALACIA BIGHAM, after having

 2   been duly sworn, testified as follows:

 3                   DIRECT EXAMINATION

 4   BY MR. BACKMAN:

 5   Q    Good afternoon, Doctor Bigham.

 6   A    Good afternoon.

 7   Q    Would you state your full name and spell it for

 8        the record?

 9   A    Yes.  My name is Alacia, A-L-A-C-I-A, Lynnette,

10        L-Y-N-N-E-T-T-E, Bigham, B-I-G-H-A-M.

11   Q    Thank you.  We're here today--you're been sworn,

12        correct?

13   A    Yes, sir.

14   Q    And, we're here today, I'm going to go through

15        the people who are in this deposition right now

16        and then at the end, I'll ask you if it's

17        correct.  Okay.  There's yourself, Doctor Bigham,

18        the court reporter, the videographer, Mr. Matt

19        Booker who is representing Doctor Hamby in this

20        case, there is Kelly Choate who is representing

21        various state defendants--

22             MR. BACKMAN:  Correct, Kelly?

23             MS. CHOATE:  Yes.  That's great,

24             defendants Snyder, Montgomery, Pierson

25             and Bass.
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 7

```
 1                MR. BACKMAN:  Thank you.

 2    Q   And, there is Aileen Backman, my assistant, the

 3        plaintiff, Floyd Hayes, and Jackie Gordon, a

 4        paralegal with the VA, correct?

 5    A   Correct.

 6    Q   And, nobody else is present.

 7    A   That's also correct.

 8    Q   Have you been deposed before, Doctor Bigham?

 9    A   Yes, sir.

10    Q   So, you know, the general procedures is, I'm

11        going to ask you questions and you're going to

12        answer them to the best of your ability.

13    A   Yes, sir.

14    Q   There's no judge here today, as you can see, but

15        your testimony will be under oath, so answer, of

16        course, honestly and as completely as possible.

17        Okay?

18    A   Okay.

19    Q   Most importantly, I guess, or equally important,

20        just because of the nature, particularly, of

21        having a court reporter, although we do have a

22        videographer here as well, but if you can try to

23        give verbal answers, yes, no or more extended as

24        opposed to nods of the head and--

25    A   Okay.
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 8

1   Q   --that will help.  Everybody, in every deposition

2       I've been in, somebody has forgotten that at some

3       point, either me or somebody else, so, we'll just

4       correct each other, if that happens, but I'll try

5       to follow the rule myself.  Okay?

6   A   All right.

7   Q   Now, if you need a break or anything at any time,

8       if you want to talk to Ms. Gordon, if you just

9       want to take a break, that's fine, just ask me

10      and we'll do that.  Okay?

11  A   All right.

12  Q   And, lastly, if you're confused about any

13      question asked or I haven't been clear enough,

14      just tell me--just ask me to rephrase it or say

15      you don't understand it and I'll do my best to

16      clarify.  Okay?

17  A   Okay.

18  Q   Thank you.  Now, Doctor Bigham, you've given us

19      your full name, where do you live?

20  A   I live here in Lexington.

21  Q   How old are you?

22  A   Forty-three.

23  Q   How long have you lived in Lexington?

24  A   I moved here in '94, so eleven years.

25  Q   Have you ingested in the past twenty-four hours

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 9

```
 1         any drug or alcohol or anything else that might

 2         affect your ability to give clear and complete

 3         answers today?

 4    A    No, sir.

 5    Q    Okay.  What year did you become a doctor?

 6    A    I finished medical school in '98 and then I began

 7         a residency training at that time.

 8    Q    Before I get to that--

 9    A    Uh-huh.  (Yes)

10    Q    --what did you do before--when did you go into

11         medical school, what year?

12    A    1994.

13    Q    What did you do before that?

14    A    I'm a registered nurse.

15    Q    So, you were a registered nurse who became a

16         doctor?

17    A    Yes, sir.

18    Q    How many years were you a nurse?

19    A    From '84 to '94.

20              MR. BACKMAN:  Okay.

21    A    And, then I continued to practice nursing during

22         some of my medical school training.

23    Q    You were an RN?

24    A    Correct.

25    Q    What hospitals or other places--
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

```
 1   A    Uh-huh.  (Yes)

 2   Q    --were you--

 3   A    I, let's see, initially went to Vanderbilt at the

 4        Vanderbilt Hospital, full time there, probably

 5        three years before I was part time there and then

 6        I went as a travel nurse for Star Med Medical

 7        Nursing Corporation for a year and a half, maybe

 8        two years before I went back to Nashville.  When

 9        I was traveling, I was at Maryland General

10        Hospital and then Largo Medical Center in Largo,

11        Florida and then Tampa General Medical Center,

12        then back to Nashville, back to Vanderbilt.  I

13        skipped one.  Actually I did a Park View Medical

14        Center as well in Nashville, we worked twelve

15        hour shifts, so you could actually work more

16        than one place at a time, 'cause you did twelve

17        hour days and so I was at those hospitals

18        simultaneously.  And, then after I went back to

19        Nashville I decided to go back to medical school

20        and then I came to Lexington--

21   Q    When you say back to medical school, had you been

22        to medical school previously?

23   A    Oh, no.  I did a year and a half of pre-med

24        before I decided to go to nursing school.

25             MR. BACKMAN:  I see.
```

DEPOBOOK REPORTING SERVICES (800) 830-8885

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 11

```
 1   A   And, then went back to Murray State partly

 2       because you could go back under the same

 3       catalogue if it had been less than ten years.

 4       So, I went back to my undergrad--to finish my

 5       undergrad before I came to UK to do medical

 6       school.

 7   Q   Okay.  Where is Murray State?

 8   A   In Murray, Kentucky.

 9   Q   And, what degree did you get there?

10   A   I got a BS in nursing.

11   Q   And, then--and you said--when did you--I'm sorry,

12       when did you finish Murray State?

13   A   I was at Murray from 1980 to 1984--

14              MR. BACKMAN:  Right.

15   A   --I got my BS in nursing.

16   Q   That's at that time.  And, then--

17   A   At that time.

18   Q   And, then what happened in 1994 when you decided

19       to go back to medical school?

20   A   In '91 I decided to go back to medical school and

21       I completed the premed requirements at Murray

22       State.

23   Q   Did that lead to an additional degree or just--

24   A   No.  Just to prepare for the MCAT.

25   Q   Understood.  Okay.  Now, did I--I think I may
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 12

```
 1         have interrupted you, but at that point--so in
 2         1991 you started doing Murray State and you were
 3         still a nurse?
 4    A    I was still working as a nurse.  I worked a
 5         weekend option at Vanderbilt.  And, so I would go
 6         back to Nashville on the weekends and continue my
 7         employment and then Monday through Friday, rather
 8         than doing the other jobs that I was doing, I was
 9         a student and I lived in Murray during the week.
10    Q    And, in 1994 you started medical school.
11    A    Medical school.  Full--
12    Q    Now--I'm sorry.
13    A    Full time medical student, University of Kentucky
14         from '94 to '98.
15    Q    Did you get a degree in 1998?
16    A    Yes, I did.
17    Q    An MD?
18    A    Yes.
19    Q    What--does an MD come with any specialties or
20         just a general--
21    A    That's just a general MD.  You complete the third
22         step of the internal medicine boards during your
23         intern year and you must complete those to get
24         your degree to, you know to get it.  And, then
25         you finish that three and then at the university
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 13

```
 1        --you get your degree.  Until you finish that

 2        three, you're finished with the academic

 3        training, but you don't have a degree.

 4   Q    So, you got your degree in 1998.

 5   A    Correct, when I finished the board.

 6   Q    Are you certified at this time?

 7   A    No.  My certification is pending.

 8   Q    What--explain what certification is.

 9   A    You complete your residency program and then you

10        sit for the Internal Medicine Board, if that's

11        your specialty, which is what mine is and I have

12        sat for the boards and I am waiting for scores.

13   Q    Okay.  When do you expect to get them?

14   A    This month.

15   Q    All right.  Okay.  All right.  So, now in 1998,

16        after you've finished your MD, I may have

17        interrupted you, where did you go from there?

18   A    I did my residency at UK.

19   Q    Where is University of Kentucky?  What's the--

20   A    Here in Lexington.

21   Q    It is in Lexington.

22   A    Uh-huh.  (Yes)

23   Q    And, you're affiliated with them--to them,

24        correct?

25   A    Correct.
```

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 14

1   Q   Are you an associate professor there?

2   A   Assistant.

3   Q   Assistant.

4   A   Uh-huh.  (Yes)

5   Q   Okay.  And--okay.  Did I interrupt you?  After

6       you do a residency, do you do your internship

7       before you get your degree and then your

8       residency?

9   A   Your internship is your first year of residency.

10  Q   Okay.  I understand.

11  A   It's the first year of residency.

12  Q   And, that's when they give you a degree.

13  A   After you get your board--pass your boards,

14      correct.

15  Q   Let me make sure, I think I might have lost

16      myself here.  In 1998 you got your MD.

17  A   Correct.  I finished my academic requirements,

18      correct.

19  Q   I thought I heard you say you also had to

20      complete your--a year of internship in order to

21      get the MD or do you get--

22  A   You take your third step of your boards during

23      your internship, whenever that happens to be

24      scheduled.

25              MR. BACKMAN:  Okay.

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 15

```
 1   A   So, you don't have to finish it, they're not--you

 2       take them all at different times, they're

 3       computerized now.  So, you know, some people may

 4       take them in the fall, some people in the spring,

 5       but everybody's got to take them.

 6   Q   Maybe I'm just confusing, those--the tests--those

 7       were tests you took in 1998, the boards or are

 8       those tests?

 9   A   I don't know if I--I probably--yeah.  I guess I

10       did sit for them in '98.  See, I don't know if I

11       sat for them the end of '98 or early '99.

12           MR. BACKMAN:  Okay.

13   A   The university doesn't--you get your--you

14       graduate, but you don't actually get your MD

15       until you've taken the third step of the boards.

16       All right?

17   Q   And, what tests were those that you just took?

18   A   Those were the board certifications in internal

19       medicine.  Not required to be an admitting, just

20       required to be board certified.

21   Q   That's right.  I'm confusing myself.  I'm sorry.

22       Okay.  Now, I understand.  Since 1998, could you

23       just lay out where you've practiced medicine and

24       what your titles have been?

25   A   Uh-huh.  (Yes)  I have practiced at the VA--well,
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

```
 1        since '98, UK, University of Kentucky as a

 2        resident physician and then as an attending

 3        physician here at the VA and that started in

 4        2001.

 5   Q    And, that's where we are today taking this

 6        deposition--

 7   A    Yes.

 8   Q    --the VA?  And, the VA is a part of University of

 9        Kentucky or it's affiliated with--how--what's the

10        relationship?

11   A    No, sir.  The VA is part of the veterans

12        administration--

13              MR. BACKMAN:  Right.

14   A    --period.  And, we have affiliations with the

15        University, but we're not employed by the

16        University.

17   Q    Right.  But, they're affiliated in some way, the

18        professors, some of the doctors and assistant

19        professors?

20   A    Correct.

21   Q    Okay.  Understood.  Why are you laughing?

22   A    Because I think that's the right answer.

23   Q    That's fine.  Okay.  Let me ask you--let me turn

24        to the diagnosis here and the issues regarding

25        this matter.
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

```
 1   A   Okay.

 2   Q   Generally speaking, when you see a patient here

 3       now, how do you--you know--and let me know if

 4       it's different over the past few years.  How do

 5       you keep records of patient visits?  What's the

 6       method for keeping your patient records and

 7       progress notes?

 8   A   Our records are computerized, so we type in as

 9       the patient is sitting there, anything we don't

10       finish typing while they're sitting there, we

11       finish after they leave, but everything is typed

12       in to the computer system.

13   Q   Okay.  And, when you're--are these called

14       progress notes, the things you type in during a

15       visit?

16   A   Yes, sir.

17   Q   When you are seeing a patient, do you have access

18       to the prior progress notes of that patient?

19   A   Yes.

20   Q   And, how is that--how do you view them?  Do you

21       view them on a screen or do you print them out,

22       what's the general way, do you get a file--a hard

23       file or how does it work?

24   A   No, sir.  We view them on a screen.

25   Q   Okay.  And, I think I asked a compound question.
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 18

1        So, let me ask, when you are going to meet with a

2        patient, when you start a patient examination,

3        you, at that point, open up to see the patient on

4        the screen?

5   A    Yes.  I usually pull up at that time my previous

6        notes on the computer.

7   Q    Okay.  And, the way that you take your notes, is

8        that the way that is standard for the doctors and

9        the hospital, doctors and nursing staff?

10  A    In general that's true.  People do various

11       amounts of preparation before they come into a

12       room.  Some people manage to pull the charts up

13       the night before and start, you know, just

14       gathering general information and then some go

15       directly and pull the chart up while the

16       patient's sitting there and open it up at that

17       point.

18  Q    And, when you open up a chart, then you have

19       access to your prior notes as well as other

20       doctors' prior notes?

21  A    Right.  You can look those up.

22            MR. BACKMAN:  Okay.

23  A    Let me add, if those notes are done at our

24       facility, if they're from outside the facility

25       and handwritten those are not in front of us at

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 19

1          the time of the visit.

2    Q    The manner in which--I think you indicted--I

3          think you indicated that when you're seeing a

4          patient, you type in the information

5          concurrently--

6    A    Correct.

7    Q    --at the same time.  Is that the standard in the

8          hospital, is that the way the nurses and other

9          doctors keep the records?

10   A    Yes.

11             MR. BOOKER:  Just as a point of

12             clarification, I don't mean to

13             interject, but when you say hospital,

14             are you referring to the VA--

15             MR. BACKMAN:  Yes, I am.

16             MR. BOOKER:  --facility?

17   Q    Yes.  From hereafter, when I refer to hospital,

18         I'll be referring to the--if I refer to hospital,

19         I'm talking about the VA.

20   A    Okay.

21   Q    Okay.  Thank you.  In your experience, when

22         you've--at the VA, at the hospital, when you've

23         gone to pull up records of your past notes, have

24         you found that they accurately reflect what you

25         previously had typed into them?

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 20

```
 1   A    I would say most of the time, yes.  You know,

 2        there's some typographical, spelling things,

 3        sometimes when you go back, because you're typing

 4        very quickly and you're like, okay, that's not

 5        spelled correctly, but the general information,

 6        I've found to be correct.

 7   Q    What I meant to say was--and thank you for that

 8        answer, but what I meant to say was, when you--

 9        you've typed in your notes and you've closed them

10        out and then the same patient comes back a week

11        later and you open them up to look at what you

12        had done the week before or the month before,

13        have you found that the system is accurate?  That

14        is to say, when you read your notes the next time

15        it reflects whatever it is you had typed in the

16        last time.

17   A    Yes, sir.

18   Q    Okay.  I'm going to start showing you some

19        documents.  Okay.

20   A    Okay.

21   Q    I'm going to show you a document that I'm going

22        to mark as Exhibit A for reference.

23              MR. BOOKER:  Could we go off the record

24              just for a moment?

25              MR. BACKMAN:  Sure.
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

```
 1                    OFF THE RECORD

 2                MR. BACKMAN:  Kelly--

 3                MS. CHOATE:  Yes.

 4                MR. BACKMAN:  --I'm looking at Document

 5                No. 1100, Bates No. 1100.

 6                MS. CHOATE:  Okay.  Thank you.

 7                EXHIBIT NO. A MARKED

 8   A    Okay.

 9   Q    Doctor, do you recognize this document?

10   A    Yes, sir.

11   Q    What do you recognize it to be?

12   A    It's one of my progress notes from September the

13        30th of 2002.

14   Q    And, for which patient is it progress notes of?

15   A    Floyd Kirtley Hayes.

16   Q    To the best of your knowledge, do these notes

17        accurately reflect the notes you actually took at

18        that examination?

19   A    Yes, sir.

20   Q    And, I think you indicated, but let me just ask

21        you, at the time that you took these notes, you

22        would have had available to you any notes that

23        had been taken by anybody else at the VA with

24        respect to Doctor Floyd (sic)--I'm sorry, Mr.

25        Floyd (sic), correct?
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 22

1   A    Correct.

2   Q    Okay.  Do you need another minute to review them?

3   A    I don't think so.

4   Q    Just to be clear, the bottom right hand corner of

5        this document you'll see the number 1100?

6   A    Yes, sir.

7   Q    And, on most of the documents we'll be showing

8        you there will be numbers like that, those are

9        what we call bates numbers, they're for

10       identification among the lawyers.  Okay?

11  A    Okay.

12  Q    So, when I ask you if a document accurately

13       reflects a document you've previously seen or

14       previously taken, I mean accurately, other than

15       those numbers, which have been added since.

16       Okay?

17  A    Correct.  Okay.

18  Q    Okay.  I'm actually going to show you another--

19       before we go through this document--

20  A    Okay.

21  Q    --let me show you another document that I'm going

22       to mark as Exhibit B that starts with Bates No.

23       1093.

24  A    All right.  Okay.

25                    EXHIBIT NO. B MARKED

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 23

1  Q    Do you recognize this document, that is Document

2       Exhibit B?

3  A    Yes, sir.

4  Q    What is that document?

5  A    This is a note from a triage nurse in the Urgent

6       Care Unit.

7  Q    And, to whom does the document refer?

8  A    Patient, Floyd Kirtley Hayes.

9  Q    And, that's the plaintiff in this case who's

10      sitting here today, correct?

11 A    Correct.

12 Q    And, just looking at the chief complaint at the

13      top of the first page of that document, read it

14      to yourself and then will you just describe what

15      that complaint would have meant to you when you

16      were reading it on September 30th, at the time

17      you had the examination referenced in Exhibit A.

18 A    It says to me the patient had what sounds like a

19      testicular mass and an undescended testicle.

20 Q    What is an undescended testicle, can you describe

21      it in terms of what that represents?

22 A    During normal birth and development in utero as

23      the body develops, the testicles are high up in

24      the abdominal cavity and as the--as you grow,

25      they start to descend.  And, usually somewhere

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 24

```
 1        early in life, I mean, as in baby exams, you will
 2        see that the testicles have descended, it's
 3        something that's checked in childhood.  And,
 4        usually if you follow a person their entire life,
 5        their testicles are usually descended and when
 6        they're not descended, then during the pediatric
 7        period, that's addressed by pediatricians,
 8        urologists or whoever to get those testicles
 9        down.  And, so, in an adult male, testicles have
10        generally descended and when they're not, then
11        that requires an investigation.
12   Q    Now, when--an undescended testicle in a situation
13        like that, would that cause--tend to cause pain?
14   A    Only if the testicle, to my--you know, this is my
15        understanding as a general internist, that my
16        thought would be a painful undescended testicle
17        has at some point been descended, you see.  If it
18        never descends, then it's usually not painful, so
19        that testicle at some point had been descended
20        and something--some process was going on.
21   Q    I'm going to show you a document that I'm going
22        to mark as Exhibit C, it's going to be Document
23        1095.
24   A    Okay.
25                  EXHIBIT C MARKED
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 25

1   Q    Please take a look at it and let me know when

2        you're ready.

3   A    Okay.

4   Q    Do you recognize this document?

5   A    Yes, sir.

6   Q    What does it appear to be to you?

7   A    Another note from the Urgent Care Unit, this time

8        by one of the providers, a nurse practitioner on

9        patient Floyd Kirtley Hayes, dated September the

10       12th, 2002.

11  Q    That appears to be a note from the same day as

12       Exhibit B, correct?

13  A    Yes, sir.

14  Q    Would it be standard course that Mr. Hayes could

15       have been referred from triage to the nurse

16       practitioner or the other way around, how would

17       it ordinarily work?

18  A    Ordinarily all patients check in and are seen by

19       the triage nurse who determines the urgency of

20       the patient being seen in the order in which

21       patients are seen by the providers in the UCU--

22       the Urgent Care Unit.  And, in this case Mr.

23       Kirtley (sic) was assigned this practitioner.

24  Q    Okay.  So, this would have been a practitioner

25       actually in the UCU?

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 26

```
 1   A    Correct.

 2   Q    Now, we're just going to review a few parts of

 3        these notes.  What is a PC?  It says Mr. Hayes

 4        presents, in the first line, the first sentence,

 5        Mr. Hayes presents to UCU with request for PC?

 6   A    Primary care provider.  That's a primary--PC is

 7        primary care.

 8   Q    Understood.

 9   A    MHC is the mental health carrier.

10   Q    Now, down near the bottom of that first page--

11   A    Uh-huh.  (Yes)

12   Q    --you'll see an addendum, when are addendums made

13        to these--how is an addendum made to a note

14        generally speaking?

15   A    If you've already signed the note, you can't

16        change the content from your signature up, but

17        you--if there's something you need to add, you

18        just click on make an addendum and it attaches

19        whatever you type into the space to the note that

20        you're amending at the time.

21   Q    Thank you.  What--just read in english the

22        sentence starting with will need u/s.

23   A    Uh-huh.  (Yes)

24             MR. BACKMAN:  Okay.

25   A    Will need ultrasound results before GU and that's
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 27

```
 1        urology, basically, consult can be sent.  I will
 2        follow results.  And, that's Marcy Moynihan,
 3        that's saying she will follow the results.
 4    Q   MSN--according to this document Marcy Moynihan
 5        would be what, what is an MSN?
 6    A   Master of Science and Nursing, Registered Nurse
 7        Practitioner.
 8    Q   So, is it fair to say that from this addendum,
 9        that would indicate that she is referring Floyd
10        to--for an ultrasound?
11    A   Correct.
12    Q   Does the nurse practitioner have the authority to
13        do that?
14    A   Yes.
15    Q   Okay.  So, when she says will need ultrasound
16        results, she's indicating--does that indicate to
17        you that she's--well, let me strike that.  Let me
18        ask this.  If you go above under plan, up the--
19    A   Yes, sir.
20    Q   When you have these notes, I see them in all of
21        them, the plan, are those things that she would
22        order at this time or just is making notes of
23        things that should be done?
24    A   Those are things that--well, both actually.
25                MR. BACKMAN:  Okay.
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 28

1   A   A testicular ultrasound is something that she has

2       to order.  Okay?  The GU which is the urology

3       consult can be sent, but they want the ultrasound

4       results.  So, her plan there it says testicular

5       ultrasound, GU consult to follow, because urology

6       wants the results of the ultrasound in the

7       consult, that's how they know what they need to

8       do for the patient.  So, that's why it says

9       testicular ultrasound with something that you can

10      order right then, but the consult is something

11      you've got to do after you get the ultrasound.

12  Q   Now, you had an opportunity to review these

13      notes--

14  A   Uh-huh.  (Yes)

15  Q   --when you met with Floyd on September 30th,

16      correct?

17  A   Correct.

18  Q   Now, before I turn--back to the 9-30 note, if

19      you would just read the--read this nurse

20      practitioner note and let me know what it is

21      about the nurse practitioner's notes that would

22      indicate to you the need to send Floyd to a--for

23      an ultrasound and whether you agree with the

24      nurse practitioner's decision to do so.

25  A   Sure.  I'd start with a history, history of left

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 29

```
 1          testicular retraction intermittently with pain,

 2          the other thing that would refer for a--we would

 3          refer for an ultrasound is the fact that there's

 4          a nodule.  The fact that there's tenderness that

 5          she mentions there and all of that in the context

 6          of no new sexual partners and discharge, because

 7          those points you in a different direction,

 8          different kind of testing.  So--

 9   Q      Those would be testing for, like, VD?

10   A      Exactly.  Those would point you down the path of

11          sexually transmitted problems.  Without any of

12          those things present, this combination of

13          symptoms points you in the direction of a

14          structural problem with the testicle or some part

15          of the urinary tract.  All right.  And, then the

16          next thing is the exam.  Left testicular

17          retracted and the fact that there is tender.

18          And, I think she said no mass on--I missed the

19          first letter on mass, but that there is a tender

20          retracted testicle.  And, she did not palpate a

21          nodule and patient didn't want a rectal exam at

22          that time.  The assessment, epididimititis,

23          history of testicular nodule, the appropriate

24          thing then with this constellation of symptoms is

25          to get an ultrasound.  And, then the treatment
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 30

```
 1        for epididimititis is the levofloxacin 500 mg for

 2        fourteen days and get a culture before you give

 3        the medicine and she did that.

 4   Q    What is epididimititis?

 5   A    Epididimititis is a series of tubules that

 6        actually wrap behind the testicle and it's part

 7        of the male reproductive system and fluids and so

 8        forth pass through there and the epididymis was

 9        infected.  It was tender to palpation and that

10        usually--that condition and infection or

11        inflammation of the epididymis is called

12        epididimititis, it's treated with fourteen days

13        of antibiotics.  We culture first, even though

14        the organisms are fairly standard, we culture

15        first in case we get something out of the

16        ordinary and then you give this round of

17        antibiotics to cover what you typically find.

18        And, that's why she cultured now and at that time

19        she was saying UA, which is urinalysis now with

20        culture and she gave him levofloxacin which is

21        the appropriate antibiotic and states that she

22        will follow up on the culture.

23   Q    Now, you're indicating that infection could cause

24        pain and sensitivity.

25   A    Yes, sir.
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 31

```
 1   Q    Would that pain and sensitivity or could that

 2        pain and sensitivity have explained the pain in

 3        the left testicle and the other pain that Mr.

 4        Hayes was explaining at this time?

 5   A    Not in and of itself.  No, sir.

 6   Q    So, because I see that--strike that.  Would one

 7        alternative here have been to give the

 8        antibiotics, but not do the testicular ultrasound

 9        for a GU referral at this point?

10             MR. BOOKER:  I'm going to object to the

11             form of the question in that it's a

12             very leading question.  Go ahead.

13   Q    You can answer.

14   A    My interpretation here is, is there something

15        here that would make me not want to do the

16        ultrasound?

17   Q    No.  Let me ask it differently.

18   A    Okay.

19   Q    Is there something about what you're reading in

20        this report that would lead you not to take the

21        route of seeing whether the antibiotic sufficed

22        to remove the pain?

23   A    No, sir.  And, the reason being is the rest of

24        the exam, that the testicle is not descended and

25        painful, is not part of the picture of
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 32

```
 1        epididimititis, it's a picture of something

 2        else--

 3                MR. BACKMAN:  I see.

 4   A    --and you don't know what else, there's something

 5        else.

 6   Q    I see.  Is that conclusion based on your years of

 7        experience as a doctor, as a nurse or both?

 8   A    Both.  Both.

 9   Q    Now, let's--I'm sorry.  If you could just turn

10        very briefly on that same Exhibit C--

11   A    Uh-huh.  (Yes)

12   Q    --to the second page.

13   A    Yes, sir.

14   Q    The--in that line starting U/S scheduled--

15   A    Uh-huh.  (Yes)

16   Q    --what does that tell you?

17   A    It says called and gotten the ultrasound

18        scheduled for September the 18th at 8:00 o'clock

19        in the morning and she's submitted the urology

20        consult at that time.

21   Q    Okay.  When you say submitted a consult, is--what

22        does that mean?

23   A    We have--all our orders are done in the computer

24        as well as our notes and you can go into the

25        computer then and literally request urology to
```

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 33

```
 1        see the patient, give them history and the

 2        ultrasound is required for the consult and in the

 3        consult, if we submit it before we get the

 4        results, we tell them, ultrasound is scheduled

 5        for 9-18.  So, we would give them the information

 6        that was pertinent from our history and physical

 7        and that we've scheduled an ultrasound for

 8        September the 18th.

 9   Q    And, then they, at some point after that, would

10        see the patient?

11   A    Correct.  They schedule the patient based on that

12        information.

13   Q    Okay.  Now, turning back to Exhibit A, and just

14        to clarify, what do the initials HX mean,

15        history?

16   A    Yes, sir.

17   Q    Okay.  Thinking back today, do you recall your

18        initial visit with Mr. Hayes?

19   A    Actually, yes, I do.

20   Q    What was your impression of him and of the

21        information he was giving you at the time?  If

22        that's too unclear, let me rephrase it.

23   A    It's pretty unclear.

24   Q    I'm sorry.  I withdraw that question.  Okay.  Why

25        don't you read the part in the middle of the
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 34

```
 1        first page to yourself at first, HPI, right after

 2        HPI: and after you've read it just describe what

 3        this paragraph is saying.

 4    A   Okay.  So, HPI is the history of the present

 5        illness and HPI is written based on what the

 6        patient tells you.

 7             MR. BACKMAN:  Okay.

 8    A   And, based on--if you've got information that you

 9        can look at, available, that's what goes in this

10        section of the medical records.  And, so, it says

11        patient has bone tumor in the right forearm.

12        States, causes numbness in his fingers and his

13        palm and pain in his right arm.  Patient has had

14        the tumor for over two years, it was not removed

15        because he was in prison.  Patient does not know

16        if the tumor is malignant or benign.  So, this is

17        what he told me.

18    Q   Now, right above that it says CC: bone tumor,

19        what does the CC stand for?

20    A   Chief complaint.  CC is chief complaint.

21    Q   Okay.  And, in No. 2 right below the HPI it says

22        multiple soft tissue tumors.

23    A   Still part of the HPI.  He's told me he's had--

24        he's got soft tissue tumors in his scrotum and

25        that he has an ultrasound scheduled.
```

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 35

1   Q    Okay.  Now, the previous note indicated it was
2        scheduled for September 18th.
3   A    Uh-huh.  (Yes)
4   Q    Would that--and these notes appear to be from
5        September 30th, right?
6   A    Correct.
7   Q    So, it would appear then that the ultrasound was
8        delayed for some reason?
9   A    Correct.
10  Q    Now, can you tell at this time what medications--
11       from your notes, what medications Floyd was on as
12       of your September 30th visit?
13  A    I do not see a medication list in this note, so
14       no, I can't tell from looking at this.
15  Q    Okay.  If you turn back then to Exhibit B, in the
16       middle of the first page it indicates VA
17       medications reviewed.  Now, can you tell from
18       these notes when these were prescribed?
19  A    No, sir.  You cannot.
20  Q    Okay.  Can you just--are any of these medications
21       here for pain?
22  A    No, sir.  They're not.  Well, of course,
23       ibuprofen, which is motrin, that's for
24       inflammation and pain and that's all.
25  Q    What's the propoxyphen?

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 36

```
 1   A   Oh, I'm sorry.  I looked right past that.  That's

 2       also a pain medicine.

 3   Q   What type of pain medicine is that?

 4   A   I'm going to call it a narcotic, but it's not a

 5       highly scheduled narcotic.

 6   Q   Turning to the second page of your notes, Exhibit

 7       A, you have a general, I take it that's, like, a

 8       general impression in the middle of the page, is

 9       that--or near the middle of the page?

10   A   Yes.

11   Q   And, that you indicate a well nourished male in,

12       what's that?

13   A   Moderate distress/pain.

14   Q   Do you recall whether the moderate distress and

15       pain was from his arm or from the testicular

16       pain?

17   A   Judging from my assessment, because I gave him a

18       pain medicine for the testicular pain, I would

19       say testicular pain.

20   Q   What medication did you give him for the

21       testicular pain?

22   A   Loratab.

23   Q   What is that?

24   A   It's hydrocodone and acetaminophen.

25   Q   Hydrocodone is a narcotic?
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 37

```
 1   A    Yes, sir.

 2   Q    Acetaminophen is tylenol?

 3   A    Yes, sir.

 4   Q    Or visa versa, tylenol is acetaminophen?

 5   A    Uh-huh.  (Yes)

 6   Q    Okay.  Near the bottom of that second page of

 7        your notes, you indicate--well, why don't you

 8        read next to the GU.

 9   A    That's supposed to be irregularity.  Patient with

10        irregularities in right testicle, left testicle

11        undescended and very tender.

12   Q    That's what you're describing the type-o's that

13        you make when you're tying fast?

14   A    Really fast.

15   Q    Okay.  What does it mean to describe the testicle

16        area as being tender?

17   A    It means you touch it and the patient tells you

18        it hurts or they give you physical evidence that

19        it hurts, the move, they jump, tenderness is

20        something the patient tells you that they have,

21        you press on it and they tell you that it hurts.

22   Q    Could you tell at this point of your September

23        30th exam what the problem was with Mr. Hayes'

24        testicles?

25   A    No.
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 38

1   Q    Is that part of the reason you were sending him

2        to a GU consult or that he was being sent to a GU

3        consult?

4   A    Yes, sir.

5   Q    Okay.  Let's turn to the third page of that

6        document and it's 1102 at the bottom right hand

7        side.  Why don't you describe your assessment

8        plan for Floyd during that--during this first

9        meeting.

10  A    Yes, sir.  The first thing was the bony

11       abnormality and I decided--I examined it, it

12       wasn't tender, didn't know what it was and so I

13       sent him for x-rays, that's what the films are,

14       films today, of the arm.  And, testicular lesion,

15       palpable lesion--patient with testicular masses,

16       left testicle lesion tender.

17  Q    What's the--what do you mean by lesion?

18  A    They don't know what it is.  It's a mass, it's

19       soft, hard, nodule, just something in the

20       testicle--

21            MR. BACKMAN:  Okay.

22  A    --undefined at this point and tender.  Scheduled

23       for an ultrasound, ibuprofen 600 mg, TID is three

24       times a day on schedule.  Loratab, two tabs twice

25       a day for severe pain.

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 39

1   Q    We don't need to go through the rest of it at

2        this point.

3   A    Okay.

4   Q    Now, the last page of this indicates a /es/, is

5        that a way of electronically signing a document?

6   A    Correct.

7   Q    Is that what you actually type into the computer

8        /es/?

9   A    No.  I type in a code, that is my signature code

10       and this is what the computer spits out as the

11       document signed.

12  Q    So, nobody else can sign your document.

13  A    Correct.

14  Q    Do nurse practitioners have those codes as well?

15  A    Yes, they have--all have their own code.

16  Q    During--just picking up that Exhibit A again, is

17       there any reference in that document to a problem

18       with a curved--a penal curvature?

19  A    No, sir.  Not in my document.

20  Q    Is it fair to say at this point that with respect

21       to the testicles you're describing two potential

22       issues, one, the cysts or growths and the other

23       being the undescended aspect, the pain or is

24       that--they seem to be two separate issues, is

25       that fair to say?

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 40

```
 1   A    Yes, sir.

 2   Q    And, then there's, of course, the arm issue,

 3        which you're sending him for x-rays.

 4   A    Correct.

 5   Q    All right.  At this point in time on September

 6        30th, 2002, that is, could you make any

 7        conclusion about the connection or relationship,

 8        if any, between testicular cysts and the pain?

 9   A    No, sir.

10   Q    Would it have been appropriate for you at this

11        point to have treated Floyd without sending him

12        for a GU consult?

13             MR. BOOKER:  Hold on.  I'm going to

14             object to the form of the question in

15             that it calls for speculation and I

16             think she's already answered the

17             question in terms of her consults.  I

18             don't think it's an appropriate

19             question.

20             MR. BACKMAN:  Let me rephrase it and

21             then you'll probably want to object

22             again anyway.

23   Q    But, based on your experience with internal

24        medicine, both as a nurse and a doctor, in your

25        view, in your opinion, would it have been
```

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 41

```
 1        appropriate for you to continue treating Floyd's
 2        testicular conditions without referring him for a
 3        consult with a urologist?
 4               MR. BACKMAN:  Same objection?
 5               MR. BOOKER:  No.
 6     A  The question is, would I think it would be
 7        appropriate?
 8               MR. BACKMAN:  Right.
 9     A  No, sir.  I don't.
10     Q  Why not?
11     A  I think the first reason is, you know, the
12        patient has already been seen in exam so I have
13        the benefit of that.  Okay.  And, the patient had
14        epididimititis and it had been treated.  So, now
15        what?  It's kind of one of those things, now what
16        is the cause of the pain.  So, No. 1, the--
17        everything to treat from internal medicine
18        standpoint that we had any evidence to treat was
19        treated.  The other is, tender testicles can lead
20        to permanent problems, typically if they're--if
21        there's an infection there and that doesn't mean
22        there's not infection there, you know, that can
23        cause the tenderness, but you have to worry about
24        things like abscesses that you can't diagnose on
25        clinical exams.  You need an ultrasound to know
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 42

1          if masses or nodules are solid or cystic, you

2          know, are they solid, do they have fluid in them,

3          you know, and the differential then goes from

4          there.  Either way, masses in the testicles, when

5          you find them, you need a picture to know what

6          kind of mass it is and then the specialist will

7          go from there as to what to do about it.  But, as

8          far as general internal medicine, once we

9          determine in a testicle that there's a mass and

10         it hurts, you know, it's pretty much, we're done,

11         we've got to see what that is to decide who does

12         what next.

13    Q    Let me ask you, with respect to Floyd, was it the

14         mass that was causing the pain?

15              MR. BOOKER:  Objection, asked and

16              answered.  She said she didn't know.

17    A    I don't know for sure.  I don't know.  I know

18         that clinically the patient said he was in pain

19         and when I examined him he behaved like a person

20         that was in pain.

21    Q    No.  I'm sorry, I wasn't clear.  As you sit here

22         today now--

23    A    Uh-huh.  (Yes)

24    Q    --do you know what it was that was causing

25         Floyd's pain, the principal cause for Floyd's

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 43

```
 1        pain?
 2                 MR. BOOKER:  Same objection.  Asked and
 3                 answered.  Go ahead.
 4   A    Okay.  I know that there are cremaster muscle
 5        spasms that will pull the testicle up and are
 6        very painful.  I know that because I've seen the
 7        chart.  You know, but not because that's what I
 8        do, you know, as a--
 9   Q    That's what I meant to ask.  I just wanted to--
10        you were--strike that.
11   A    But, no, at that time, I didn't know that.
12        Right.  And, I understand that.
13   A    Okay.
14   Q    But, as you sit here today, the pain--is it true
15        that the pain that it turns out Floyd was
16        experiencing, was not related to the cysts or the
17        growth?
18                 MR. BOOKER:  Well, I'm going to object
19                 to the form of the question.  When you
20                 say, as you sit here today, you're not
21                 being clear as to what the foundation
22                 for that question is.
23                 MR. BACKMAN:  Okay.  Fair enough.  I'll
24                 move on.
25   Q    Without knowing exactly what was causing the
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 44

```
 1      pain--

 2   A  Yes.

 3   Q  --at that time, back on September 30th, 2002, you

 4      nevertheless, did diagnose (sic) a narcotic for

 5      Floyd's pain, correct?

 6   A  Correct.

 7   Q  You did indicate just a moment ago that you do

 8      know today from--well, you do--you indicated that

 9      you know today what causes--what was causing pain

10      for Floyd, right, it was the spasms you referred

11      to?

12   A  Yes, sir.

13   Q  And, how have you come to be aware of that?

14   A  By reviewing the chart.

15   Q  And, would that be the notes from the urologist?

16   A  Yes, sir.

17   Q  Generally speaking without respect to Floyd on

18      September 30th, I see several doctors' references

19      to a pain rating or pain scale--

20   A  Yes.

21   Q  --can you describe what that is generally?

22   A  Yes, sir.  Yes, sir.  We try to have, because

23      pain is subjective, you know, it is what the

24      patient says it is, we have to have a way to

25      measure, that we can track and follow to know--to
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 45

```
 1        rate kind of what the patient--how the patient
 2        feels about the pain as well as the effectiveness
 3        of our treatment.  And, so, we ask people to rate
 4        their pain on a scale of zero to ten, zero being
 5        no pain, ten being the worse pain that that
 6        person has ever had, obviously, five is moderate
 7        and so forth.  Here at the VA our goal is to have
 8        pain control at a level where the patient says
 9        that pain is three or less, you know, that's some
10        arbitrary number that somebody picked that said,
11        this is acceptable, you know, the best we can do.
12        And, we have to then judge our treatment based on
13        those ratings as well as the side effects of the
14        medication.  And, so, we shoot for a goal of
15        three or less, sometimes we don't get there
16        because they're bothered by side effects and so
17        forth.  And, then it helps us determine when need
18        to intervene.  So, in general pain scores of four
19        or more need some kind of intervention at our
20        institution.
21   Q    Let me ask you, just in terms of--well, let me
22        ask this.  Can you compare pain scores from one
23        patient to another?
24   A    No, sir.  No, sir.  That's the other beauty of
25        this score.  This patient's pain score is this
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 46

```
 1        patient's pain score.  And, where someone may

 2        have a root canal, for instance, just to use

 3        something that people are familiar with, and the

 4        pain is a ten out of ten for that patient, the

 5        next guy who had the same root canal and say, oh,

 6        it's a four, give me some ibuprofen.

 7    Q   Now, based on your experience of--as a doctor

 8        dealing with these pain ratings and based on that

 9        comparison you just made, would somebody who--did

10        you have any knowledge of whether people who have

11        been experiencing pain for a longer period of

12        time, that is a chronic pain, how they rate pain

13        relative to people who are experiencing the same

14        pain, but for the first time?  Is there anything

15        you've detected over your experience?

16    A   That would be purely speculation, I think.

17    Q   Okay.  Withdraw.  I'm going to show you a new

18        document.  Exhibit D.

19                MR. BACKMAN:  It's document 1108 on the

20                front, Kelly.

21                MS. CHOATE:  Thank you.

22                    EXHIBIT D MARKED

23                     OFF THE RECORD

24    Q   Have you had a chance to review Exhibit D?

25    A   Yes, sir.
```

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 47

1  Q    Do you recognize anything in this document?

2  A    Yes, sir.

3  Q    What is it?

4  A    It's a urology consult response where the patient

5       saw urology on October the 10th, 2002.

6  Q    Okay.  Looking at the bottom of the first page

7       there's a /es/ Matthew Lawson, correct?

8  A    Correct.

9  Q    And, that--do you know who Mr. Lawson--Doctor

10      Lawson is, or Mr. Lawson?

11  A   Yes, sir.  He's a physician assistant in the

12      urology clinic.

13  Q   So, he's not a doctor?

14  A   No, sir.

15  Q   Do you know who William Terrence is?

16  A   Yes, sir.  He is the urologist in that division,

17      that saw the patient with Mr. Lawson, according

18      to this note.

19  Q   Would you just, in english, read the history

20      paragraph?

21  A   Yes, sir.  Fifty-six year old white male in for

22      consult on penile curvature, testicular pain and

23      retracted left testicle.  The patient states a

24      two to three year history of left testicle pain

25      and aching.  Outside ultrasound report reviewed

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 48

```
 1        from 2000, he was noted to have bilateral
 2        epididymal cysts and normal testicles.  He has
 3        aching, throbbing type pain in the left testicle
 4        and inguinal area that is worsened by standing.
 5        Also complains of a two year history of
 6        progressively worsening pain with erection and
 7        dorsal greater than ninety degrees.  He denies
 8        any known trauma, no voiding complaints and no
 9        hematuria.
10   Q    Where it says he denies any, no trauma, that's a
11        double negative.
12   A    Yes.
13   Q    So, he denies any trauma.
14   A    Yes, sir.
15   Q    The--just--that was--that makes sense now.  But,
16        could you describe the worsening pain with
17        erection and dorsal greater than ninety degrees,
18        what that means?
19   A    Yes, sir.  Okay.  When the penis is flaccid, that
20        would be zero degrees, ninety degrees, the penis
21        is at erect, so anything with erection, of
22        course, the erection--speaking of erection that's
23        a physiological elevation of the penis to--
24               MR. BACKMAN:  Right.
25   A    --and dorsal greater, they're here talking about
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 49

```
 1        my interpretation of this anyway, is a passive,

 2        when you move the penis above--

 3              MR. BACKMAN:  Oh, I see.

 4   A    Okay.

 5   Q    It's not entirely clear to you whether that means

 6        during--obtaining an erection or just moving it?

 7   A    With an erection.

 8              MR. BACKMAN:  Oh, okay.

 9   A    And, this is and dorsal greater than ninety

10        degrees, two different--they're talking about two

11        different things at this point.

12              MR. BACKMAN:  Okay.

13   A    With an erection being a natural physiologic

14        state.

15   Q    Now, PE, that's the--what does PE stand for?

16   A    Physical exam.

17   Q    Okay.  So, the first paragraph, the history is

18        what basically Floyd describes to the urologist.

19   A    What Floyd describes to the urologist and

20        anything that we have available to read prior to,

21        you know, that visit.  So, all of that is history

22        of the present illness as well.  So, there was

23        something they had from the UCU, I don't--

24        wouldn't necessarily be something that--had to be

25        something that Floyd said, that's all considered
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 50

1        prior history.

2    Q   Thank you.  Okay.  And, the PE is something that

3        happens basically at the time of the exam?

4    A   Correct.  That's the exam, this is what they see.

5    Q   Okay.  To the best of your ability, would you

6        read the PE on this report?

7    A   Uh-huh.  (Yes)  Genital urinary uncircumcised

8        phallus, no lesions, one by three centimeter firm

9        dorsal plaque, no gross curvature of flaccid

10       penis, testes twenty ccs bilaterally, no nodules,

11       left testicle retract palpable and left upper

12       scrotum, tenderness on epididymis and left

13       inguinal canal, no palpable hernias, left

14       testicle fully descends with patient in supine

15       position, right testicle one centimeter palpable

16       cyst in the head of the epididymis.  Digital

17       rectal exam, normal sphincter tone, four by four

18       centimeter, smooth, symmetrical prostate no

19       nodules, scrotal ultrasound report, impression,

20       right varicoceles--

21   Q   So, that--is that the end of the PE for the

22       impression that's considered part of the PE?

23   A   Impression--the scrotal ultrasound report is part

24       of the test or lab or ultrasounds and so forth it

25       comes right after the physical exam and the

Deposition of Dr. Alacia Bigham  /  October 7, 2005

1          extended physician note.

2    Q     Okay.  And, so, then this is the impression of

3          the report he's giving here?

4    A     Correct.

5    Q     Okay.  And, what is this saying?

6    A     Right varicoceles and small hydrocele.

7    Q     What is that?

8    A     Fluid collections, basically.  Left epididymal

9          head cyst as well as epididymitis, probably

10         chronic.  And, No. 3, normal testicles.

11   Q     Now, there's--then there's a procedure--

12   A     Yes.

13   Q     Do you know--of a penile injection, do you know

14         what that--reading that, do you know what that

15         injection would be given for?

16   A     Yes, sir.  That's given for peronies disease that

17         causes a curvature in the penis.

18   Q     Okay.  The curvature of the penis, that's a

19         separate issue from the descended--from the

20         undescended or the retracting testicle?

21   A     Yes, sir.

22   Q     Now, based on this report is it fair to say that

23         this--the doctor is indicating that this is not

24         an undescended testicle from birth type of

25         problem, correct?

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 52

```
 1    A    Correct.
 2    Q    The doctor's indicating that when he's supine the
 3         testicle moves into the scrotum and that there is
 4         some problem that causes it at time to move
 5         upward.
 6              MR. BOOKER:  I'm going to object to
 7              that.  I'm trying to be decent about
 8              the leading aspects of the questions,
 9              but that's clearly leading.
10    Q    Okay.  Go ahead.
11    A    I forgot what the question was.  One more time.
12    Q    That's fine.  I'll move on.  The--under the
13         procedure that's described with the injection--
14    A    Yes.
15    Q    --do--I tell you what, the injection, what would
16         be the goal of this injection?
17    A    To try to relieve the curvature of the penis.
18    Q    What's causing the curvature, do you know, can
19         you tell from these notes?
20    A    It's a classic diagnosis of peronies disease.
21    Q    And, can you describe peronies disease?
22    A    I knew you were going to ask me that.  No.  I
23         better not try that.
24    Q    Okay.  Now, under--below the procedure there's
25         IMP, is that a separate impression, what is--can
```

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 53

1       you tell from the standard way of taking these

2       notes what that refers to?

3    A  Impression, usually--and in this case, looking at

4       the way this was written, we group our

5       impressions and we group our plan, we don't just

6       say, most people don't.  Most people do group

7       their impressions, I think I break mine up, yes,

8       I do.  But, this says left epididymal pain and

9       cremasteric spasm with chronic pain and then it

10      says peronies disease and those are separate

11      entities.

12   Q  Okay.  So, the peronies disease--the indication

13      of peronies disease here based on your

14      understanding of the writing of these reports is

15      not the left epididymal pain.

16   A  No, sir.  Peronies disease is its own entity.

17   Q  Okay.  This report is indicating that the pain is

18      caused by--the pain--strike that.  From the first

19      sentence--

20   A  Yes, sir.

21   Q  --of that impression, what does this tell you

22      about a cause of Mr. Hayes' pain?

23   A  This says cremasteric spasm with chronic pain.

24   Q  And, can you describe what a cremasteric spasm

25      is?

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 54

```
 1   A    Yes, sir.  The cremaster muscle is a muscle that
 2        pulls the testicles up near the body and that's--
 3        its whole purpose is to pull the testicles up and
 4        protect them.  All right.  So, for example, if
 5        you get dumped in a bucket of cold water, the
 6        cremaster muscle pulls the testicles up to keep
 7        them warm, it has to do with reproduction and
 8        keeping sperm warm and healthy and making
 9        everybody warmer.  So, cremaster muscles pull the
10        testicles up in cold, if you get hit or
11        something, they normally contract and pull the
12        testicles up, it's a safety mechanism, defense.
13        Normally, that muscle is relaxed.  All right.  It
14        relaxes especially when the testicles are
15        extremely warm, it draws up when the testicles
16        are extremely cold.  You injure the testicles,
17        you hurt the patient in that area, it contracts,
18        that's a normal thing.  When the muscle is in
19        spasm, it's contracted and it should be relaxed
20        and that's it.
21   Q    Does the spasming of the cremasteric muscle cause
22        pain?
23   A    You can probably answer that better than I could.
24             MR. BOOKER:  I was going to object as
25             to speculation.
```

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 55

```
 1   A    That's what I was going to say.  I'm like, you
 2        could probably answer that better than I could.
 3        But, textbooks say yes.
 4   Q    Do you have experience with people other than Mr.
 5        Hayes who had cremasteric spasms?
 6   A    I can honestly say no.
 7   Q    Okay.  What type of doctor is appropriate for
 8        diagnosing cremasteric spasm?
 9   A    I send to the urologist.  I mean, theoretically,
10        an internist could probably diagnose this, but we
11        don't.  I mean, it's just not seen commonly
12        enough that that would be something that we'd be
13        expected to do.
14   Q    Okay.  Now, the bottom of that Exhibit D there's
15        some medications and it appears--I'm sorry, the
16        bottom of the first page--  I apologize.
17   A    Oh, yes, sir.
18   Q    --there appears to be a--these--let me ask this.
19        Are these medications listed near the bottom, are
20        those additional medications that Doctor Lawson--
21        or Mr. Lawson and Doctor Conner are prescribing?
22   A    Yes, sir.
23   Q    And, by--
24   A    Excuse me, vicodin is actually the same medicine
25        that he was on.
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 56

1    Q    That's the same as the hydrocodone?

2    A    Yes, sir.

3    Q    Okay.  One is the generic of the other.

4    A    Yes, sir.

5    Q    Okay.  Hydrocodone being the generic?

6    A    Yes, sir.

7    Q    Okay.  Now, the pain--what is that reference to

8         pain management consult tell you?

9    A    That basically he's referring him to this pain

10        specialist to help manage his pain from this

11        condition.

12   Q    And, by him, you mean referring Floyd?

13   A    Yes, sir.

14   Q    On the--just on next page of that exhibit, Page

15        1109, there is an addendum and you've explained

16        how those are generally kept, correct?

17   A    Yes, sir.

18   Q    And, it looks--is it fair to say that this

19        addendum is made by Doctor Conner himself?

20   A    Yes, sir.

21   Q    Where he states--where the doctor states, it is

22        unusual for this to be a chronic problem, do you

23        know what he means by that?

24   A    Yes, sir.  I mean, it's very straightforward to

25        me.  It's just unusual for the cremasteric muscle

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 57

1        to stay in spasm, which is all it says.

2    Q    Which appears to be what's going on with--

3    A    Yes.  He says problem suggests cremasteric spasm,

4         it is unusual for this to be a chronic problem.

5                   MR. BACKMAN:  Let's take, like, a five

6                   minute break.  I want to go over the

7                   last part of my questions and--

8    A    Okay.

9                   MR. BACKMAN:  --we should be able to be

10                  finished by 4:00.

11                          RECESS

12   Q    Doctor, before we took that short break you had

13        described a little bit the types of things that

14        cause a spasm, of the--is it the cremasteric

15        muscle.

16   A    Yes, sir.

17   Q    You indicated that cold water could do it or ice

18        cold water--

19   A    Uh-huh.  (Yes)

20   Q    --and also an injury, is that correct?

21                       OFF THE RECORD

22   A    Cremasteric muscle.  Yes.  Anything, like I said,

23        that the body would sense as injury to the

24        testicles will cause that muscle to contract and

25        pull the testicles into the body.

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 58

1    Q    Now, is the pain similar regardless of the cause

2         of the spasm?

3                   MR. BOOKER:  I'm going to object to the

4                   form of the question, when you say

5                   pain.  I think it's unclear as to what

6                   type of pain you're referring to.

7    Q    Okay.  Go ahead and answer to the best you can.

8    A    Okay.  When the cremasteric muscle contracts,

9         there is discomfort.  Okay.  The degree of the

10        contracture, that being a muscle just like any

11        other muscle in spasm, would give you more pain.

12        So, we have muscle spasms in other parts of the

13        body that sometimes the pain's mild, other times

14        it's moderate, other times it's severe.  This is

15        a muscle just like any other muscle, its function

16        is to pull the testicles into the body.

17   Q    So, just from knowing that there's a cremasteric

18        spasm doesn't tell you what level of pain--

19   A    Correct.

20   Q    --the person is experiencing?

21   A    Correct.  And, like any other muscle in spasm, if

22        you can't get the muscle to relax, the pain

23        continues.

24   Q    What does the--you indicated, I think, you had

25        prescribed lorazepam for this pain, is that

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 59

1         correct?

2    A    No.  I prescribed loratab.

3    Q    Oh, loratab.  I'm sorry.  I'm sorry.  I stated

4         that wrong.  You're right that is what you said.

5    A    Uh-huh.  (Yes)

6    Q    The--what would the loratab do for this pain?

7    A    Loratab is a narcotic pain killer.  It is purely

8         a pain killer.  It doesn't treat a problem, it

9         treats pain.

10   Q    So, it wouldn't undo the spasming, but it would

11        moderate the experience of that pain by the

12        patient?

13   A    Correct.  And, when I saw the patient, I hadn't

14        determined that the muscle was in spasm.  I just

15        determined that the patient was having testicular

16        pain.

17   Q    Understood.  That's correct.  The diagnosis of

18        the cremasteric spasm came later.

19   A    Yes, sir.

20   Q    Thank you.  I'm going to show you a document I'm

21        going to mark as Exhibit E.

22             MR. BACKMAN:  Kelly, this is Document

23             1116.

24             MS. CHOATE:  Yes.

25                  EXHIBIT E MARKED

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 60

1   Q   Take a look through it and let me know if you
2       recognize it.
3   A   Yes, sir.
4   Q   What is this document?
5   A   This is a call-in visit from October 29th of 2002
6       on patient, Floyd Kirtley Hayes.
7   Q   What is a call-in visit?
8   A   When the patient has called with a problem and
9       the nurse or some scheduling personnel has put
10      the patient into my clinic to be seen.
11  Q   Here it indicates in this report--in this
12      progress note that the chief complaint is
13      numbness in the right forearm, correct?
14  A   Correct.
15  Q   Then turning to Page 1118 at the bottom--
16  A   Uh-huh.  (Yes)
17  Q   --can you read the number--what's next to the No.
18      1?
19  A   Yes, sir.  It says bony lesion/ulnar nerve signs:
20      Vet with bony lesion that per ortho is not
21      surgical, however vet with no history of fracture
22      to the area in question.  Discussed with Doctor
23      Woodring, who is a radiologist, if lesion is
24      cartilaginous it will unlikely show up on a bone
25      scan.

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 61

```
1   Q    What does that mean, if lesion is cartilaginous?

2   A    If it's cartilage and not bone, bone in nature,

3        it won't show up on this particular modality of

4        imaging, which was--I was asking him about, from

5        the looks of this, whether or not a bone scan

6        would be helpful.

7   Q    In trying to determine what's causing--

8   A    What causing--yeah.  What kind of lesion it is

9        and what can be done about it.

10  Q    Can you describe--do you recall, can you describe

11       what the lesion looked like--

12  A    No, sir.

13  Q    Too long ago.  Okay.  That's fine.  Going down it

14       says, unable to do an MRI due to shrapnel.

15  A    Yes.

16  Q    And, that's because--

17  A    Because it's metal.  I mean, you can't put metal

18       into the scanner--

19  Q    Right.  It--

20  A    --it heats up.

21  Q    When you say--and when you say it is metal, the

22       shrapnel is metal.

23  A    The shrapnel is metal.

24  Q    And, it was your understanding that Mr. Hayes had

25       shrapnel in his body from--
```

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 62

```
 1   A   Yes, sir.
 2   Q   And, was that from his military service, do you
 3       know?
 4   A   Yes.  Yes, sir.  I think he stepped on a land
 5       mine.
 6   Q   I wanted to ask you something else about this
 7       document.  Oh, yes.  You read it, but what is
 8       ulnar nerve signs mean?
 9   A   The ulnar nerve is a nerve that supplies the--
10       when you place the arm eventually the inner
11       aspects of the palm as well as the last two
12       digits, pinky finger and ring finger commonly
13       known as, that's the area that ulnar nerve
14       services.  And, so, ulnar nerve signs can be
15       weakness in that distribution, numbness,
16       tingling, pain, burning, those are symptoms that
17       are neurologic in nature as opposed to soft
18       tissue problems.  So, the nature of the pain
19       makes it neurologic and its distribution then is
20       what makes it the ulnar.
21   Q   Are you trying to determine whether the bony
22       lesion was creating these ulnar nerve signs, is
23       that the point you're making here?
24   A   Exactly.
25   Q   Can you tell from these notes, in the area we
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 63

```
 1        were just reading from, what was planned as

 2        follow-up for the evaluation of the bony lesion?

 3   A    Yes, sir.  By the plain film x-rays the lesion in

 4        question was not surgical orthopedic doctors or

 5        surgeon.  So, if it's not surgical, a lot of

 6        times there's nothing that they can do or they

 7        will decline to proceed because if there's not a

 8        surgery to be done, then they don't have much to

 9        do.  So, then the question if it's not a surgical

10        lesion, what is it and what can we do to relieve

11        this discomfort and the symptoms that the patient

12        was having.  The ideal modality to do that would

13        have been an MRI, you can look at soft tissues

14        that area--you know, we already know how to look

15        at the bone with the x-ray, we can see the soft

16        tissues best with an MRI, but that wasn't an

17        option--that was not an option.  So, the next

18        best test after discussion with the radiologist

19        was the CT, do a CAT scan, in other words, of

20        that area and let's see what it looks like there.

21        So, we added the CAT scan, apparently to be done

22        on 10-31, the day that we were going to do the

23        pelvic scan anyway for his other medical

24        problems.

25   Q    And, what's a pelvic scan?
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 64

1    A    It was just another CAT scan looking at the

2         pelvic, the lower part of the abdomen and the

3         pelvis going down towards the scrotum.

4    Q    Do you know what the purpose of the pelvic exam

5         was going to be at this point?

6    A    I think to complete the evaluation and--that

7         urology had already started at this point.

8    Q    Thank you.  Doctor, I'm going to show you a

9         document marked as Exhibit F.

10             MR. BACKMAN:  Kelly, it's 1047.

11             MS. CHOATE:  Yes.

12                EXHIBIT F MARKED

13   Q    Have you seen this document before?

14   A    No, sir.  I don't think so.

15   Q    Let me--what I'm going to ask you to assume is

16        that this is a summary written by Doctor William

17        Hamby of his experiences with Mr. Hayes.  Okay?

18   A    Okay.

19   Q    I take it, as you look at the last page, you

20        don't recognize Doctor Hamby's signature?

21   A    No, sir.

22   Q    Now, would you read that entire first paragraph,

23        to yourself, and then I'll--I'm going to ask you

24        a couple of questions.

25             MR. BOOKER:  Well, before you even do

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 65

```
 1                    that, I'm going to object to you asking
 2                    this witness questions as it pertains
 3                    to the summary that was drafted by
 4                    Doctor Hayes insomuch as it clearly,
 5                    even within the first paragraph,
 6                    references medical records and
 7                    institutional records, which presumably
 8                    this witness has never seen and which
 9                    are not going to be made available to
10                    her.  So, to that extent, I think it's
11                    an improper line of questioning to have
12                    her simply read it and then comment.
13                    Secondly, I would object in that these
14                    opinions or any opinions that you're
15                    going to elicit about statements made
16                    in the summary on Deposition Exhibit F
17                    have not been previously disclosed.
18                    And, to that extent it's an improper
19                    line of questioning.
20                    MR. BACKMAN:  I'm sorry.  What
21                    questions haven't been previously
22                    disclosed?
23                    MR. BOOKER:  Any opinions as that this
24                    witness may have regarding her
25                    impression or interpretation of what's
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 66

1                    written on the Deposition Exhibit F

2                    have not been previously disclosed.

3                    MR. BACKMAN:  Okay.  Fair enough.

4                    You've preserved those objections.

5                    MR. BOOKER:  Well, if you're going to

6                    continue the line of questioning, I can

7                    continue objecting or else we can show

8                    a renewed, continued objection

9                    throughout this whole line.

10                   MR. BACKMAN:  Let's show renewed,

11                   continued objection to the entire--

12                   there's not going to be that many

13                   questions to the letter.

14                   MR. BOOKER:  If there's something else,

15                   I may object, but--

16                   MR. BACKMAN:  Sure.

17  Q   Okay.  Doctor, go ahead, now that the lawyers

18      have spoken.  Doctor, I hate to interrupt you,

19      but based on the objection that was raised, I

20      think we'll withdraw the questions about this

21      document and just turn to documents you have

22      seen.  Okay?

23  A   Okay.  I'm all for that.

24  Q   Okay.  That will knock off some questions.

25      Doctor, do you know offhand what the medication

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 67

1        doxycycline, D-O-X-Y cycline is?

2    A   Doxycycline?

3              MR. BACKMAN:  Yes.

4    A   Yes, sir.

5    Q   What is that?

6    A   It's an antibiotic.

7    Q   Okay.  We'll mark the next document--you

8        actually--you gave it back to me, correct?

9    A   Yes, sir.

10   Q   Let's keep it in the pile, because--since it's

11       been marked to avoid confusion down the road

12       we'll keep it in the pile.  At the end you'll be

13       giving those to the court reporter, but I'm just

14       not going to ask any questions about it.  Okay?

15   A   Okay.

16   Q   Thank you, doctor.  Now, we're going to mark the

17       next one as G.

18              EXHIBIT G MARKED

19   Q   Do you recognize this document?

20   A   Yes, sir.

21   Q   What would this document be?

22   A   It is a urology clinic follow-up note dated

23       1-27-2003 on patient, Floyd Kirtley Hayes.

24              MS. CHOATE:  John, excuse me just a

25              moment, what number are we on for that?

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 68

```
 1                    MR. BACKMAN:  I'm sorry, Kelly.  I was
 2                    keeping you up to date until then.
 3                    It's 11--
 4                    MS. CHOATE:  We were okay up until
 5                    then.
 6                    MR. BACKMAN:  It's 1152.
 7                    MS. CHOATE:  1152.  Great.  Thanks.
 8    Q   I'm sorry.  And, you were indicating it's a--go
 9        ahead.
10    A   Yes.  Urology clinic physician note dated
11        1-27-2003 written by a resident physician and
12        co-signed by Doctor Conner, attending urology
13        physician.
14    Q   And, then again, Doctor Conner's indicating an
15        addendum to this.
16    A   Yes, sir.
17    Q   That appears to be just a signature.
18    A   Yes, sir.
19    Q   Now, at this point, which is January 27th, '03,
20        it indicates under plan, No. 3, referral to pain
21        clinic for left scrotal pain, cremasteric spasm.
22        Can you tell from this note whether they've
23        diagnosed it as a cremasteric spasm or whether
24        they are sending to the pain clinic to determine
25        that?
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 69

1   A    They've diagnosed it, they're sending him for

2        treatment.

3   Q    What is the pain clinic?

4   A    The pain clinic is run by anesthesiology and they

5        do procedures that we don't do in primary care or

6        the other specialties related to controlling pain

7        of various origins in patients or they also

8        follow patients whose pain regimen is beyond what

9        we prefer to prescribe as the--in the other

10       specialties.

11  Q    Do you know whether Mr. Hayes subsequently

12       obtained treatment from the pain clinic?

13  A    Yes, sir.  He did.

14  Q    You can set that one aside.  I'm going to show

15       you a document I'm going to mark as Exhibit H.

16            MR. BACKMAN:  Kelly, it's going to be

17            document 1182.

18            MS. CHOATE:  Thank you.

19            EXHIBIT H MARKED

20  Q    When you've reviewed it, you can just let me know

21       if you recognize this document.

22  A    Yes, sir.

23  Q    What does it appear to be?

24  A    This is a progress note that I wrote June the

25       5th, 2003 on patient, Floyd Kirtley Hayes.

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 70

1  Q    Doctor, just to be clear, with respect to all the
2       progress notes I've shown you, when I ask you
3       whether you recognize the document, is it true
4       that--have you actually seen the documents before
5       or some of them you've only seen on the screen?
6  A    I've only seen on the screen.
7  Q    Okay.  So, when I--when you're answering whether
8       you recognize the document, is it more fair to
9       say that you're indicating that you've seen the
10      information on the screen that's now in this
11      document?
12 A    Correct.
13 Q    Now, the middle of the first page, there's an
14      indication, has chronic pain in testicle, he
15      follows with urology and does well on current
16      dose of pain medication.  Do you recall what you
17      mean by does well on current dose?
18 A    No.  I usually ask people whether their pain
19      medicine is working and how they're doing and
20      then as the nurses check the patients in, there's
21      always a pain score and the nurses actually put
22      this in with their vital signs.
23           MR. BACKMAN:  Okay.
24 A    And--
25 Q    Thank you.  Okay.  Okay.  Doctor, I'm going to

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 71

1      show you a document we're going to mark as

2      Exhibit I.

3              MR. BACKMAN:  Kelly, it's bates 1565.

4              MS. CHOATE:  Yes.

5              EXHIBIT I MARKED

6   Q   Doctor, in particular, I'm asking you to look at

7      the bottom of the first page, over to the next

8      page through the electronic signature that

9      appears on the third page for--purporting to be

10     from a Herbert Villaflores.

11  A   Yes, sir.

12  Q   Is that one progress note that is starting on the

13     first page at the bottom where it's titled PM&RS

14     through to the electronic signature on the third

15     page?

16  A   Yes, sir.

17  Q   And, what is that--what do you recognize that to

18     be?

19  A   This is a consult response to a request for an

20     EMG nerve conduction study, that's a muscle and

21     nerve study done by the preventative medicine and

22     rehab service on November the 4th, 2003 on

23     patient, Floyd Hayes.

24  Q   What were the results of that?

25  A   Electrodiagnostic evidence of focal ulnar nerve

Deposition of Dr. Alacia Bigham  /  October 7, 2005

```
 1          neuropathy, sensory greater than motor, distal to

 2          the elbow consistent with tumor of the right

 3          ulna.  No electrodiagnostic evidence of cervical

 4          radiculopathy.

 5    Q     Okay.  Can you describe what that means?

 6    A     Sure.  That means that the nerve conduction study

 7          supported the clinical diagnosis of an ulnar--a

 8          neuropathy or a nerve problem.  And, the ulnar

 9          distribution on the same arm that we examined

10          before and that the sensory component, meaning

11          that the numbness and tingling in that kind of

12          component was greater than the motor in the sense

13          that he had full motor strength, movement and so

14          forth.

15    Q     What was the treatment for this diagnosis?  Not

16          necessarily this time.  What have you all

17          determined it to be?

18    A     Okay.  A couple ways to approach it.  There's the

19          medical approach and then if there's any surgical

20          approach to be done, then that's referred.  From

21          the medical standpoint, we treat the symptoms.

22          We're not equipped and it's not a medical issue

23          to treat the cause, I mean, if there's a bony

24          lesion, then the surgeon's got to treat the

25          lesion, you know, and so we treat the cause--we
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 73

```
 1        treat the symptoms and not the cause.  So, we do

 2        that with medications, control the pain, control

 3        the numbness and tingling, there's two or three

 4        classes of drugs you can do that with.  I don't

 5        know which one we used on Floyd, until I looked--

 6              MR. BACKMAN:  Okay.

 7   A    --but you do that just drugs basically, control

 8        the symptoms and when you can't get the--you

 9        can't control the symptoms with the drugs, then

10        you try to get a surgeon to do something about

11        the lesion.

12   Q    Is there a reference in the note, not necessarily

13        one of the ones before--in front of you, to a

14        gabapentin?

15   A    Gabapentin is one of the drugs that we do use to

16        treat neuropathic pain and symptoms.  It's very

17        commonly used, pretty easily tolerated and it

18        mixes well when you have to take several other

19        medicines, unlike some of the other drugs.

20   Q    How does--how, if at all, would you compare

21        gabapentin type of pain medication to the

22        hydrocodone or narcotic type you described

23        earlier.

24   A    Sure.  They treat different types of pain.  Any

25        time you've going to treat pain, you ask very
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 74

```
 1         specific questions about its nature.  Soft tissue
 2         pain can be treated with narcotics.  Neuropathic
 3         pain usually doesn't respond real well to
 4         narcotics, they help some, but you really have
 5         to work at the nerve from a different angle than
 6         the narcotics were.  Neuropathic pain is
 7         typically treated with drugs like gabapentin or
 8         tricyclic antidepressants.  Many of the seizure
 9         medications, because of the mechanisms of the way
10         they work in the brain and the receptors are very
11         useful for treating neuropathic pain, more or
12         less.
13    Q    Like they--
14    A    Lamictal, latrilitose, (phonetic) neurontin,
15         carbamazepine, lamotrigine, tricyclic
16         antidepressants, that whole group of drugs, by
17         their very nature does a very good job with those
18         kinds of pain.  Gabapentin has a lesser side
19         effect profile than some of the others.
20    Q    So, generally, the gabapentin--let me ask you
21         this.  Will the gabapentin have had any
22         beneficial impact on the cremasteric muscle
23         spasms?
24              MR. BOOKER:  I'm going to object to the
25              form of the question.  I guess on the
```

DEPOBOOK REPORTING SERVICES (800) 830-8885

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 75

```
 1                   foundational level that it's
 2                   speculative at this point.  I think you
 3                   haven't identified in any medical
 4                   record nor has the witness testified
 5                   that that medication had ever been
 6                   prescribed.  So, to the extent that
 7                   you're asking it in the abstract, I
 8                   would object.
 9                   MR. BACKMAN:  Fair enough.
10   Q   Doctor, let me show you a document I'm going to
11       mark as Exhibit J.  It's--
12                   MR. BACKMAN:  Kelly, it's 1558.
13                   MS. CHOATE:  Okay.  Thank you.
14                   EXHIBIT J MARKED
15   Q   Do you recognize this document?
16   A   Yes, sir.
17   Q   What does it appear to be?
18   A   Progress note dated December the 5th, 2003 from
19       my clinic on patient, Floyd Hayes.
20   Q   And, it actually starts right below the
21       electronic signature of Matt Lawson on the first
22       page.
23   A   Uh-huh.  (Yes)  Yes, sir.
24   Q   Now, looking over--looking--starting at the
25       bottom of the first page, it would appear that
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 76

```
 1          Floyd is on significantly fewer medications at

 2          this point than at earlier times.  Is that just

 3          because fewer ones were noted or was he actually

 4          being prescribed fewer meds?

 5     A    I can't answer that right this minute, because if

 6          there were medicines that had expired, this note,

 7          for instance he's on them, but he has not

 8          reordered them timely, because he hadn't run out

 9          of them for whatever reason, they don't appear on

10          the list.

11     Q    I understand.  Thank you.  Do you recall whether

12          you ever prescribed gabapentin for Floyd?

13     A    I don't recall if I prescribed it.  It looks like

14          I requested to get it approved, according to this

15          note.  It's a controlled substance here at the

16          VA, it has to be approved for its use and it

17          looks like an assessment on this plan, I will

18          request neurontin, that is a poor candidate for

19          the trycyclics because of his other medicines.

20     Q    Would gabapentin generally speaking, have a

21          beneficial effect on the pain--testicular pain or

22          would it be more focused on the arm?

23     A    It would be more likely to improve the arm pain.

24     Q    Can you describe the connection between the bony

25          lesion and the neuropathy?
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

```
 1   A    Yes, sir.  It looked like the area of the lesion
 2        was--it looked like the ulnar nerve would run
 3        along side that lesion and that the ulnar nerve
 4        would be irritated by that lesion.  In the sense
 5        that it was believed and then confirmed that the
 6        nerve conduction study, the level at which the
 7        neuropathy started and that's what we were after
 8        with the nerve conduction study, had a bone
 9        lesion, then we could take the nerve conduction
10        study and find out exactly where the abnormality
11        started.  And, it started at the level of the
12        lesion.  The lesion itself was deemed not
13        surgical because typically you don't fix that
14        lesion, I mean, you don't have to.  But, in this
15        case, a nerve was running beside it and the nerve
16        was being irritated causing symptoms.  And, so,
17        now we're trying to fix the symptom, you know,
18        make the patient feel better because it's not a
19        surgical lesion like a cancer or a break or
20        something you need to remove just by the mere
21        fact that it's there, it was just causing him
22        problems.
23   Q    Why was it not a good candidate for a removal, do
24        you know?
25   A    It would not necessarily solve the problem, if
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 78

```
 1          the nerve is damaged and you do the surgery, the

 2          nerve is still damaged.

 3    Q     Okay.  Finally, Doctor, I'm going to ask you to

 4          take a look at Exhibit K.

 5                    MR. BACKMAN:  1859, Kelly.

 6                    MS. CHOATE:  All right.  Thank you.

 7                    EXHIBIT K MARKED

 8    Q     Do you recognize this document?

 9    A     I recognize this document well.

10    Q     Okay.  And, what is this document?

11    A     This is a standard VA narcotic contract.

12    Q     Okay.  And, who is the contract between?

13    A     This is between Doctor Alacia Bigham and

14          patient, Floyd Kirtley Hayes.

15    Q     Do you recognize your signature on the second

16          page of this document?

17    A     That's me.

18    Q     And, what is this contract for?

19    A     Sure.  This is a contract that is generated

20          between the VA provider and any patient that

21          we're going to be giving chronic pain medicine

22          to.  So, the people that we're going to have on

23          recurring pain medicine for a long period of time

24          agree to get pain medicine only from one

25          provider, one institution, not to take medicines
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 79

```
 1        --controlled substances that are from outside the

 2        VA or provided by another provider.  Every

 3        patient eventually gets on a narcotic contract as

 4        we're renewing their medicines.  So--and that is

 5        actually flagged in the chart so that if the

 6        patient presents to the emergency department

 7        requesting pain medicine, their chart is already

 8        flagged that they're already on something from

 9        another provider.  In the agreement you're

10        agreeing to get the medications from us and only

11        us.  You're agreeing to drug testing, you're

12        agreeing to monitor your pain and report it

13        appropriately and we tell you how to do that.  We

14        also tell you in this all the side effects of the

15        medications, all the possible side effects and

16        everyone doesn't have them all, but so that

17        people are aware of the nature of them we tell

18        you about the potential of developing

19        psychological and physical dependence and the

20        fact that they can impair your ability to drive

21        and operate heavy machinery and therefore we

22        don't recommend you do that.  Then we tell you

23        the symptoms of withdrawal and what happens if

24        you take your medicine ahead of time and run out

25        at the end of the month, the kind of symptoms
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 80

```
 1        that you have and that that can be dangerous.
 2        And, finally we tell you that if we find any
 3        elicit drugs or drugs that are controlled from
 4        other providers that we have the right to
 5        discontinue the medicines from us and we flag the
 6        chart as such.  And, last but not least, we tell
 7        you not to do anything with the drugs that we
 8        didn't tell you to do with the drugs.  Don't sell
 9        them, don't use them, don't share them, don't
10        give them away, don't lose them.
11   Q    Thank you, Doctor.  Now, do you recall with
12        respect to this contract, was this done in
13        connection with the pain--the referral to the
14        pain clinic or was this just something that you
15        had because of the medication and you were
16        prescribing it?
17   A    It's something I have because of the medication I
18        was prescribing, but it's become VA policy, I
19        mean, it's not just, you know, it wasn't anything
20        in particular directed at Mr. Hayes.  It is our
21        policy, if you're going to be on chronic pain
22        medicine, you sign the narcotic contract.
23   Q    And, which medicine was Floyd on that would have
24        mandated this policy?
25   A    Floyd was on Loratab at the time.  I'd have to
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 81

```
 1        see my next note to see--or another note to see

 2        when we went to a long acting pain medicine.

 3        Somewhere during the course of when I was

 4        treating Floyd, we went through a policy where we

 5        were not going to issue more than 100 tablets of

 6        short acting narcotics.  And, if the person

 7        needed more than 100 tablets a month, then they

 8        needed to go on a long acting pain medicine.

 9   Q    And, what would be a long acting pain medicine?

10   A    Examples of that are long acting morphine

11        sulfate, methadone, those are really the two that

12        we use without prior approval from the pain

13        clinic.  So, those are really the two that we

14        use.

15   Q    So, you personally can without the pain clinic

16        diagnose either of those two?

17   A    Prescribe.  Yes, sir.

18   Q    Prescribe.

19   A    Absolutely.

20   Q    Do you know, as you sit here today, which of the

21        long acting medications Floyd is on?

22   A    Morphine.

23   Q    He's not supposed to signal to you.

24   A    No.  I--it's morphine, I'm certain.

25   Q    Okay.  Thank you.  Roughly, how often do you see
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 82

1          Floyd today?

2    A    We were just talking about that.  I don't know

3          when I saw Floyd last actually.  I try to see

4          Floyd every three or four months, no more than

5          every six months between visits.  Occasionally

6          it goes a little more, a little less than six.

7          So, I would say the six months is the most I can

8          space it that far because Floyd has other follow-

9          ups.  So--for things that I'm not treating.  So--

10         for his other medical conditions, I really ought

11         to see him at least every six months.

12                  MR. BACKMAN:  Thank you.  I have

13                  nothing further at this moment.

14                  MR. BOOKER:  Kelly, I've got questions,

15                  do you want to go or do you want me to

16                  go?

17                  MS. CHOATE:  Go ahead, Matt.

18                  MR. BOOKER:  All right.

19

20                  CROSS EXAMINATION

21   BY MR. BOOKER:

22   Q    Doctor my name is Matt Booker, I'm an attorney

23         and I represent Doctor Hamby in this case and I

24         have some more questions for you.  I know you've

25         spent about two hours now answering questions, we

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 83

```
 1        appreciate your patience, but I do have some
 2        follow-up questions.
 3   A    Okay.
 4   Q    You, by training, are not a neurologist--
 5        urologist, is that right?
 6   A    Correct.
 7   Q    You haven't received any specialized training,
 8        other than the training you received in medical
 9        school in regards to the field of urology, is
10        that right?
11   A    In residency, yes.
12   Q    Okay.  Same type of question, you're also not an
13        orthopedic surgeon, is that right?
14   A    Correct.
15   Q    Nor are you a neurologist.
16   A    No, sir.
17   Q    Your focus, if I understood your testimony
18        correctly, is internal medicine, is that
19        basically correct?
20   A    General internal medicine.  Yes, sir.
21   Q    Just so I'm clear and I'm understanding your
22        testimony, you were, at least, handed an exhibit
23        F which was a summary of statements and care
24        rendered by Doctor Hamby.  Just so I'm clear and
25        the jury is clear, you're not today offering any
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 84

1       opinions that are critical of Doctor Hamby, are

2       you?

3    A   No, sir.

4    Q   Do you even know who Doctor Hamby is?

5    A   No, sir.

6    Q   Have you ever met him?

7    A   No, sir.

8    Q   Have you ever reviewed any of the medical records

9       that indicate Doctor Hamby has provided medical

10      care?

11   A   No, sir.

12   Q   You've never even been shown those, have you?

13   A   No, sir.

14   Q   All right.  Likewise, have you seen any other

15      medical records prior to the initiation of

16      veteran's records, some time back in 2002?  What

17      I'm getting at, did you ever see any of his

18      medical records from when he was incarcerated?

19   A   No, sir.

20   Q   All right.  Do you know his dates of

21      incarceration, when he was released?

22   A   No, sir.

23   Q   Do you know what medical care, if any, he

24      received from when he was released from

25      incarceration to when he began medical treatment

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 85

```
 1        at the Veterans Administration?

 2   A    I've not seen any documentation.

 3   Q    I'm going to ask you some--a little bit general

 4        questions about the Veterans Administration

 5        Hospital that you work at and the facilities.

 6        This may seem like an obvious question and I

 7        apologize, if it is, but that's facilities

 8        provided for veterans, is that right?

 9   A    Correct.

10   Q    Somebody off the street can't walk in and get

11        treatment at a veteran's facility, true?

12   A    True.

13   Q    To your knowledge, is there any billing that's

14        done for patients?

15   A    Yes, sir.  If there is a third party payer the VA

16        started billing in the last two or three years, I

17        don't know exactly when, they will bill, if you

18        have insurance that's billable.

19   Q    But, otherwise, are patients directly billed for

20        services provided by the Veterans Administration

21        facilities?

22   A    There's a co-pay system based on income and

23        degree of service connection and who qualifies

24        for free service versus co-pay.  It's determined

25        in the benefits office, so we don't know in the
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 86

```
 1          clinic who pays for anything or who doesn't.
 2    Q    So, to your knowledge, as you sit here today, you
 3          don't know the status of Floyd Hayes and what, if
 4          any, co-pay he has?
 5    A    No, sir.
 6    Q    Okay.  You mentioned this a few times and it's
 7          come up in your deposition, a concept of pain.
 8          And, you may have even mentioned the word
 9          subjective, do you recall that?
10    A    Yes, sir.
11    Q    It's subjective and objective are the types of
12          findings that a physician such as yourself can
13          have, is that right?
14    A    Correct.
15    Q    Can you explain what the difference is?
16    A    Yes, sir.  Subjective is what the patient tells
17          you, objective is what I can see, feel, you know,
18          touch, that kind of thing.
19    Q    All right.  So, let me see if I understand.  An
20          objective finding would be something that's kind
21          of concrete, I can actually feel it, you can see
22          it on an x-ray, you can see it in a laboratory
23          result, those kinds of things, is that what I'm
24          understanding you to mean objective?
25    A    Yes, sir.  Or I can see your reaction to
```

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 87

```
 1          something that I do.  If I push on this and it
 2          hurts and you yell and you pull back, you know,
 3          I've got then determine in my mind if I believe
 4          you or not, you know.  And, so, pain is what the
 5          patients say it is.
 6     Q    Okay.  And, that's ultimately what it comes down
 7          to, isn't it is that pain that a patient reports
 8          to you, you have to rely on their honesty and
 9          their sincerity, is that true?
10     A    And, my clinical findings--
11                    MR. BOOKER:  Sure.
12     A    --to support a cause for that pain.
13     Q    And, you have to correlate those two.
14     A    Yes, sir.
15     Q    All right.  Based on your education, training and
16          experience--strike that.  You work with other
17          physicians, don't you?
18     A    Yes, sir.
19     Q    Based on your education, training and experience
20          here at the Veterans Administration facility in
21          Lexington, Kentucky, would you agree that
22          physicians with the same background and training
23          might come to different conclusions about a
24          patient's report of pain?
25     A    Yes, sir.
```

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 88

1    Q    All right.  Doctors can have different opinions

2         on a level of pain that a patient reports, true?

3    A    Level of pain is what the patient says the level

4         of pain is.  Now, we can have different opinions

5         and--as to whether that is congruent with the

6         diagnosis in question, whether that level of pain

7         is commonly felt with that particular problem.

8         You know, those things we can have different

9         opinions of, but the general position is pain is

10        what the patient says it is, it has to be because

11        it's subjective.

12                VIDEOGRAPHER:  I hate to interrupt, but

13                I need to change tapes.

14                MR. BOOKER:  Sure.

15                    OFF THE RECORD

16   Q    Okay.  Back on the record, ma'am.  I want to

17        follow up on another portion of your testimony.

18        You mentioned something that the Veterans

19        Administration, the physicians it seems, have

20        collectively come to an opinion or a goal of

21        trying to keep a pain level--a reported pain

22        level to three or below, is that right?

23   A    Yes, sir.

24   Q    So, is it then fair to say that the collective

25        goal of physicians here at the veterans facility

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 89

```
 1        is not to totally eliminate every ounce of pain

 2        that every plaintiff or every patient, I'm sorry,

 3        presents with, is that a fair way to put that?

 4   A    Yes, sir.

 5   Q    Would you agree that not every testicular

 6        complaint or report of pain in the testes

 7        deserves a--or needs a referral to a urologist?

 8   A    Yes.  I would agree that every testicular pain

 9        doesn't have to be referred to a urologist.

10   Q    That's part of your training in internal medicine

11        is examination and assessment of those types of

12        complaints, true?

13   A    Correct.

14   Q    I'm going to be asking you some questions from

15        some of the exhibits that the plaintiff's counsel

16        has presented to you and I have them in order and

17        I'm going to ask you a few questions about each

18        one of them.

19   A    Okay.

20   Q    I'll do my best in telling everyone exactly where

21        I'm at.  If you could look at Deposition Exhibit

22        A--

23   A    Okay.

24   Q    Deposition Exhibit A is a medical record that I

25        believe was generated by you back on September
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 90

```
 1          30th of 2002, is that right?
 2     A    Yes, sir.
 3     Q    And, that was for an initial visit, true?
 4     A    Yes, sir.
 5     Q    And, that means, if I'm not mistaken, that prior
 6          to September 30th of 2002, you hadn't seen this
 7          patient before.
 8     A    Correct.
 9     Q    This was a kind of get acquainted session.
10     A    Yes, sir.
11     Q    All right.  The chief complaint at that time was
12          designated by you, is that right?
13     A    Correct.
14     Q    And, the chief complaint that was reported to
15          you, was that for what's called a bone tumor, is
16          that right?
17     A    Correct.
18     Q    All right.  What does the concept of chief
19          complaint mean and where does that come from, is
20          that a patient reporting that?
21     A    Yes.  Typically, you--a patient comes in and
22          you'll ask them what brings you in today, is
23          there anything bothering you today?  Sometimes
24          that gives you a list of six things, sometimes it
25          just gives you one.  It's a lot easier to write
```

Deposition of Dr. Alacia Bigham / October 7, 2005

```
 1        just one, if there's just one, but a lot of times
 2        there's more than one and I--whether, you know,
 3        chief complaint in this section turns out to be
 4        what I consider the most important thing and the
 5        assessment and plan in my number one on this
 6        list, it doesn't matter.  The other numbers are
 7        just random, when you get to assessment of pain,
 8        it's not necessarily in order like the most
 9        important, next important, it's just, you've got
10        to have something--somewhere to start.  And, when
11        they're new, they're all important, but they all
12        can't be a number one, you've just got to start
13        somewhere.  So, the bony tumor--the bone tumor,
14        in my mind was the most pressing thing to him at
15        that time because it really wasn't being worked
16        up, the other stuff had already been started in
17        the UCU, the scrotal stuff and all that had been
18        started, you know, the tests ordered, we were
19        waiting for them, there was nothing I could do at
20        that point until I got them.
21   Q    Okay.  I understand that.  I just want to make
22        sure I'm clear, cause you mentioned this just a
23        few moments ago.  If this patient had reported to
24        you and had arrived at that initial visit and
25        said, Doctor, I have two main problems, I have a
```

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 92

 1         problem with my testicles and a problem with what

 2         I'm calling a bone tumor.

 3    A    Uh-huh.  (Yes)

 4    Q    Would it have been your pattern and practice to

 5         list both of those things in the chief complaint

 6         section of your report?

 7    A    Sometimes, maybe not.  You know, that chief

 8         complaint really serves more--is really more of

 9         interest to the billing people than it is to me.

10         Everything that he tells me is important to me.

11              MR. BOOKER:  Okay.

12    A    And, so it's just a--it's really for billing.  I

13         mean, from my standpoint, they want a chief

14         complaint.  To me, all three of these things or

15         all of those things are important, but it has--

16         you know, could it be four times, sometimes it

17         is, it's follow-up for diabetes, coronary artery

18         disease, heart problems, you know, it may be a

19         list of four things that I follow a person for

20         routinely, if they don't come in complaining of

21         something.  If they come in complaining of

22         something, then that's what goes in this file in

23         particular.

24    Q    As part of your initial intake, you do a physical

25         exam, is that right?

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 93

```
 1    A    Yes, sir.

 2    Q    One of the things that that encompasses is either

 3         yourself or someone else taking things called

 4         vital signs, is that right?

 5    A    Correct.

 6    Q    And, those are things like blood pressure, pulse,

 7         temperature, respirations--

 8    A    Uh-huh.  (Yes)

 9    Q    --correct?

10    A    Correct.

11    Q    Those can all be indicators of the amount of

12         distress that a patient is in, is that true?

13    A    They can be.

14    Q    What were the vital signs of this plaintiff or

15         this patient, I'm sorry, on September 30th of

16         2002, were they normal?

17    A    They look pretty normal.  Yes, sir.

18    Q    What does that tell you?

19    A    It tells me at that point in time he had normal

20         vital signs.

21    Q    Let's look at your assessment and plan on the

22         third page, for the record it's bates number

23         1102.

24    A    Okay.

25    Q    Do you see where it says assessment plan?
```

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 94

```
 1   A   Yes, sir.

 2   Q   No. 1, you have listed as bony abnormality, is

 3       that right?

 4   A   Correct.

 5   Q   And, I think you mentioned a few moments ago,

 6       and once again, I just want to make sure I'm

 7       clear, the numerical values listed under the

 8       assessment plan are not necessarily indicative of

 9       the significance or the seriousness of those

10       conditions, is that true?

11   A   That is true.  Let me qualify that.  Only in the

12       sense that when all--when you come to active

13       problems, active problems are usually up high and

14       things that are, you know, my chronic sinuses

15       might be listed here, you know, at the very

16       bottom of the list, 'cause I'm not going to do

17       anything else with that.  So, all these things in

18       a new patient, they're all equally relevant, you

19       know, because you don't know yet.

20   Q   Fair enough.  No. 1 was bony abnormality and your

21       plan for that issue was to do some plain films of

22       that extremity, true?

23   A   True.

24   Q   Would you consider that bony abnormality that you

25       determined for this patient to be life
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 95

1         threatening?

2    A    No, sir.

3    Q    Was it a serious medical condition that had to

4         get immediate treatment or resolution?

5    A    I was not sure at that time.  The patient was

6         calling it a tumor, certainly if it were a tumor,

7         it changes the flavor of the diagnosis.  And, so,

8         when he called it a tumor, that made it very

9         important to him, you know, because tumors to lay

10        people, in particular, are cancers.  So, that

11        would--had that been a cancer it could have been

12        life threatening.  So, when I'm picking an order,

13        even though it is somewhat random, that was

14        something I had to know, you know, for his sake.

15   Q    Let's just make sure we clear that up.  Based on

16        your treatment of this patient, there was never a

17        cancerous tumor identified in that extremity--

18   A    Exactly.

19   Q    --is that right?

20   A    Exactly.

21   Q    So, the thing that we're talking about, if I'm

22        not mistaken, it's almost a build-up of bone or

23        some type of lesion on the bone itself, it's not

24        the type of cancerous tumor that some people

25        might think.

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 96

```
 1   A    Exactly.  But, when I wrote the note, I didn't

 2        know what it was.  He was saying it was a tumor,

 3        and so he said it's a tumor, I wrote a bony--and

 4        I wrote my assessment bony abnormality, why,

 5        because bone tumors are uncommon in adults,

 6        they're common in children.  You know, as a

 7        physician, I'm supposed to know that, he's not

 8        supposed to know that.  So, he calls it a tumor,

 9        in my mind I say I doubt it's a tumor, but a

10        tumor would be a dangerous thing, so let's rule

11        that out.

12        Okay.  No. 2, you have testicular lesion, is that

13        right?

14   A    Correct.

15   Q    And, then you had some recommendations for that,

16        some of which have already been covered by

17        plaintiff's counsel.  But, the top two ones, at

18        least, the first two that are listed--

19   A    Uh-huh.  (Yes)

20   Q    --as far as the plan for that issue are schedule

21        for an ultrasound, true?

22   A    Yes, sir.

23   Q    And, that's a medically appropriate thing to do,

24        is--with the type of issue that this patient

25        presented with, is to get an ultrasound.
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 97

```
 1   A    Yes, sir.

 2   Q    Okay.  And, you also prescribed what looks like

 3        600 milligrams of ibuprofen--

 4   A    Uh-huh.  (Yes)

 5   Q    --is that right?

 6   A    Yes, sir.

 7   Q    And, that's the same thing as motrin?

 8   A    Yes, sir.

 9   Q    And, what's that for?

10   A    It's an anti inflammatory.  And, anti

11        inflammatories, they decrease pain and it's a

12        secondary measure by decreasing inflammation.

13        And, so a lot of times you can treat soft tissue

14        pain and bony pain with ibuprofen very well and

15        it's a reasonable first step, but also something,

16        I think, that he'd already had before, but should

17        be continued.

18   Q    Okay.  Let's move on to Deposition Exhibit B.

19   A    Okay.

20   Q    Do you have that there?

21   A    Yes, sir.

22   Q    And, if I'm not mistaken, Deposition Exhibit B,

23        and for the record it begins with bates number

24        1093, was from an urgent care unit note from

25        September 12th, 2002, is that right?
```

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 98

```
 1   A   Yes, sir.

 2   Q   And, the chief complaint at that time was what?

 3   A   Chief complaint, lump in the right scrotum.

 4   Q   There's also what looks like a note from a

 5       patient report that the lump, as it was defined

 6       in the chief complaint, has grown quite a bit, is

 7       that right?

 8   A   Yes.

 9   Q   Is there any further information that you can

10       garner from that record which gives us any more

11       detail on the amount of time or over what period

12       of time that that's grown?

13   A   No, sir.

14   Q   All right.  There's also a continuation of that

15       chief complaint or rather the patient's

16       subjective reports that--

17           MR. BACKMAN:  I object to the

18           characterization.  Go ahead.

19   Q   Well, is this a subjective report of what the

20       patient is telling?

21   A   Yes.  The chief complaint and HPI is what the

22       patient tells you.

23   Q   All right.  So, the patient is telling the author

24       of this note that by the end of the day there was

25       more pain on the left side than right and I'm
```

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 99

```
 1        assuming that that's the testicles, is that the
 2        way you read that?
 3   A    Yes, sir.
 4   Q    All right.  About halfway down that first page of
 5        Deposition Exhibit B, there's a section called VA
 6        medications reviewed.
 7   A    Uh-huh.  (Yes)
 8   Q    Is that a yes?
 9   A    Yes, sir.  I'm sorry.
10   Q    That's okay.  The next line says active
11        outpatient prescriptions, none found--
12   A    Yes, sir.
13   Q    --do you see that?  What does that mean?
14   A    That means that we hadn't prescribed for him yet.
15        Those medicines aren't in our pharmacy log.
16   Q    All right.  If you could turn to the second page
17        of Deposition Exhibit No. B, bates number 1094,
18        do you see the pain level up about the top third
19        of the page?
20   A    Yes.
21   Q    And, there's a severity scale listing, is that
22        right?
23   A    Yes, sir.
24   Q    And, what's the listing that's made there?
25   A    They listed five.  Severity scale of five.
```

DEPOBOOK REPORTING SERVICES (800) 830-8885

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 100

1    Q    Does it give any onset or duration information?

2    A    No, sir.

3              MR. BOOKER:  All right.

4    A    They say acute, constant pressure and burning.

5    Q    All right.  If you go about halfway down the

6         page, there's a triage patient acuity

7         classification, do you see that?

8    A    Yes, sir.

9    Q    What does that mean?

10   A    They are trying to decide whether the patient has

11        to be seen immediately or whether he can sit and

12        wait his turn among patients that are not urgent

13        or emergent or to be seen in the ER and it's

14        saying non-urgent.

15   Q    So, just so I'm clear, at that time of this

16        assessment, that problem was considered to be

17        non-urgent.

18   A    Yes, sir.

19   Q    Is that the same thing as non-life threatening?

20   A    Yes, sir.

21   Q    Could you turn to Deposition Exhibit C?

22   A    Yes, sir.

23   Q    This is a note from September 12th of 2002 again,

24        is that right?

25   A    Yes, sir.

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 101

1   Q    And, this is kind of the full note of the

2        document that we just went over in Exhibit B, is

3        that the right way to look at that?

4   A    This is the provider.  This one--the first one is

5        the nurse, this is the doctor or a nurse

6        practitioner that saw the patient at the

7        clinician.

8   Q    Okay.  Is there a chief complaint or reason that

9        he presented to the urgent care facility that's

10       documented?

11  A    They say presents to the urgent care unit with a

12       request for primary care mental health clinic and

13       follow-up on testicular nodules.

14  Q    Right.  So, by that, at least, some of the issues

15       that the plaintiff or the patient presented at

16       that time are--they walk up to the desk and say,

17       I need someone to address primary care, some

18       other issues, as well as the testicular issue, is

19       that a fair way to look at that?

20  A    Yes, sir.

21  Q    All right.  In the history portion a few lines

22       down from that entry, still on Deposition Exhibit

23       B, it states, has history of left testicular

24       retraction intermittently with pain, has chronic

25       nodule right testicle, last ultrasound two years

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 102

1        ago.  Did I read that right?

2   A    Yes, sir.

3   Q    And, then the next line says left testicle more

4        tender lately, is that right?

5   A    Yes, sir.

6   Q    What does that mean, do you know?  And, what I

7        mean by that, does it sound like it's getting

8        worse over time or that it's stable from the last

9        two years?

10  A    The interpretation here is that it's worse

11       lately.

12  Q    All right.  If you follow down to the--still on

13       the first page of Deposition Exhibit C, the plan

14       that was implemented by the nurse practitioner.

15  A    Uh-huh.  (Yes)

16  Q    In addition to the ultrasound, which we've

17       already discussed, the nurse did a UA and that's

18       a urinalysis, is that right?

19  A    Yes, sir.

20  Q    That's where the patient voids or urinates into a

21       cup and they do some laboratory testing of that.

22  A    Yes, sir.

23  Q    And, also to do a culture of that to see if

24       there's any organisms that grow.

25  A    Yes, sir.

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 103

1    Q    And, in addition, it looks like she prescribes

2         what's called levofloxacin, is that right?

3    A    Yes, sir.

4    Q    And, that's an antibiotic.

5    A    Yes, sir.

6    Q    What's that for?

7    A    She diagnosed him with epididimititis, it's just

8         an antibiotic to cover an infection believed in

9         the epididymis.

10   Q    And, you may have answered this question before

11        and if you did, I apologize.  But, the steps

12        taken by the nurse practitioner in terms of

13        getting a sonogram or an ultrasound of the

14        testicles, doing a urinalysis and prescribing

15        antibiotics, those were all appropriate steps,

16        weren't they?

17   A    Yes, sir.

18   Q    Okay.  If you could move on to Deposition Exhibit

19        B (sic).  It appears--and you may want to take a

20        moment just to familiarize yourself with this,

21        you were asked questions about this exhibit

22        earlier.  But, it appears that--

23             MR. BACKMAN:  Matt, are you referring

24             to B or D?

25   Q    I'm sorry D, as in dog, bates number 1108.

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 104

```
 1                MR. BACKMAN:  Okay.

 2   A    Okay.

 3   Q    And, that's a note from October 10th, of 2002.

 4   A    Uh-huh.  (Yes)

 5   Q    Do you see that?

 6   A    Yes, sir.

 7   Q    It appears that at some point there was an

 8        ultrasound that was done sometime in the year

 9        2000, is that right?

10   A    Yes, sir.

11   Q    And, it looks like whoever the author of this

12        note was, had some way of getting the results of

13        that, because in the third line of the history,

14        it says outside ultrasound report reviewed 2000,

15        he was noted to have bilateral epididymal cysts

16        and normal testicles--

17   A    Uh-huh.  (Yes)

18   Q    --did I interpret that right?

19   A    Yes.

20   Q    Now, there was an additional ultrasound that was

21        done in October of 2002, is that right?

22   A    Yes, sir.

23   Q    Are you able to tell if there's any difference

24        from the year 2000 ultrasound and the one that

25        was done in October of '02?
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 105

1   A   If they actually sent for the actual imaging,
2       they would be able to do that.  But, it looks
3       like he refers to a report as opposed to actually
4       seeing the images.
5   Q   Well, based on just what's reported, does it look
6       like there's any differences?
7   A   Not that I can tell.
8   Q   All right.  And, the section of the physical exam
9       from that same page, Deposition Exhibit D, bates
10      No. 1108, about the fourth line down on the
11      physical exam it says left testicle fully
12      descends with patient in supine position, did I
13      read that right?
14  A   Yes, sir.
15  Q   And, what is supine position?
16  A   That's laying flat on your back.
17  Q   All right.  So, is it fair to say then that this
18      phenomenon where the left testicle retracts
19      that's not something that's present twenty-four
20      hours a day, is that a fair way to read that
21      record?
22  A   Yes.
23  Q   Assuming that the patient assumes a supine
24      position at some point during the day, is that
25      right?

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 106

1    A    Yes.

2    Q    All right.  And, of the ultrasound that was done

3         in October of 2002, the third impression was that

4         the testicles were normal.

5    A    Yes, sir.

6    Q    Now, the curvature of the penis issue, would you

7         consider that a life threatening medical problem?

8    A    No, sir.

9    Q    And, is it also fair to say based on your review

10        of the records and your recollection of this

11        patient, that the curvature or the peronies

12        disease, that's not what was causing this

13        discomfort and pain that the patient reported, is

14        that true?

15   A    Yes, sir.

16   Q    That's a different issue.

17   A    That's a different issue.

18   Q    But, nonetheless, one that the patient wanted

19        addressed.

20   A    Yes, sir.

21   Q    And, it also appears that there's a pain

22        management consult for the first time on October

23        10th of 2002.  Is that what your recollection is

24        as well, and just for the record, Deposition

25        Exhibit D, the first page, second to the last

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 107

1        item on the plan section.

2    A   Yes, sir.

3    Q   Is--could you have referred to the pain

4        management department or the anesthesiology

5        department earlier, if you had thought that was

6        appropriate?

7    A   Yes.  But, like I say, we refer to them for pain

8        either that we are having difficulty managing or

9        if we need a drug that's controlled by them.  So,

10       urology doesn't treat pain, they refer pain.  So,

11       it's either back to me or pain management.  So--

12       but they don't treat chronic pain, they will

13       refer that to either pain management or primary

14       care.

15   Q   Okay.  Also on Deposition Exhibit D, Page 1108

16       for the bates number, under the impression

17       section--

18   A   Yes, sir.

19   Q   --there's two sources of discomfort or pain that

20       have been kind of diagnosed or found for this

21       patient, is that right?

22   A   Yes, sir.

23   Q   And, that's left epididymal pain and then this

24       cremasteric spasm with chronic pain.

25   A   Yes, sir.

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 108

1   Q   Now, are we to assume then that the

2       epididimititis or the possible chronic

3       epididimititis, that's a source of pain and

4       discomfort, is that right?

5   A   It can be.  Yes, sir.

6   Q   And, that doesn't have anything to do with this

7       muscle spasm that intermittently draws the

8       testicle up, those are two different things, is

9       that right?

10  A   Yes, sir.

11  Q   If you could turn to Deposition Exhibit E, bates

12      No. 1116.

13  A   Yes, sir.

14  Q   This is, again, a note from you.

15  A   Yes, sir.

16  Q   And, the chief complaint at that time was

17      numbness in the right forearm.

18  A   Yes, sir.

19  Q   And, if you go down to the history section of

20      your notes, specifically the fourth line down--

21  A   Yes.

22  Q   --it says--one of your entries says, films

23      reviewed by, I assume that means orthopedic--

24  A   That's ortho there.

25  Q   Films reviewed by ortho and states secondary to

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 109

1        trauma and no need to see patient--

2   A    Yes.

3   Q    --did I read that right?

4   A    Yes, sir.

5   Q    All right.  So, is it fair to say then that you

6        had initially referred this to orthopedics for a

7        consult, they looked at the data that had been

8        generated and said or concluded that they don't

9        need to see this patient.

10  A    Correct.

11  Q    It also appears that this 10-29-02 progress note

12       or examination record doesn't show that you

13       prescribed anything new on this visit, am I

14       interpreting your record correctly in that

15       regard?

16  A    Yes.

17  Q    So, you did not prescribe any additional pain

18       medications, true?

19  A    Not at that time.

20  Q    Or you did not prescribe any additional anti

21       inflammatories.

22  A    Correct.

23  Q    If you could turn to Deposition Exhibit G, and

24       this was a note that you were asked some

25       questions about and as I interpret this note this

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 110

```
 1        was made by the urology department, is that
 2        right?
 3   A    Correct.
 4   Q    On the first portion of that note, kind of the
 5        history section, there's a notation that I wanted
 6        to ask you some questions about, or at least what
 7        your interpretation of that notation is, and that
 8        is claims his testicle, quote, jumps up, close
 9        quote, when he gets angry or emotional and causes
10        pain, kind of like a cramp.  Did I read that
11        right?
12   A    Yes, sir.
13   Q    Does that suggest to you that this, once again,
14        is a phenomenon or a complaint that's twenty-four
15        hours in duration, that it's all the time or is
16        it more intermittent.
17   A    Intermittent.
18   Q    Okay.  And, it also appears that there's some
19        precipitating factors that he has found that
20        caused this cramp to develop, is that true?
21   A    Aggravating factors, I would call them more so.
22        Yes.
23   Q    Okay.  And, it also--I don't think this was
24        covered earlier, but he--when plaintiff's counsel
25        was asking you questions, at one point there was
```

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 111

1        a mention of getting a CT of the abdomen and

2        pelvis, do you recall that?

3  A    Yes, sir.

4  Q    And, it looks like on this note that there's some

5        suggestion that that CT was done.

6  A    Yes, sir.

7  Q    And, what were the results of that CT based on

8        this urology note?

9  A    He had a negative CT of the abdomen and pelvis.

10  Q    So, what does that mean, negative CT, is that

11        good or bad?

12  A    That's good.  Didn't find any abnormality.

13  Q    There's also a note, if you go down to the

14        physical exam portion of, once again, Deposition

15        Exhibit G, bates No. 1152, that the left

16        hemiscrotum reveals a high riding testicle with

17        no masses, did I read that right?

18  A    Yes, sir.

19  Q    Now, what does that mean, a high riding testicle?

20  A    The testicle is not descended into its normal

21        position.

22  Q    Is that necessarily an abnormal finding?

23  A    Yes.  It is, if the other one's not up there too.

24        I mean, they should both be up or both be down.

25  Q    So, based on your training and experience, it

Deposition of Dr. Alacia Bigham  /  October 7, 2005

1         would be abnormal to have what's called a high

2         riding testicle.

3    A    Yes, sir.

4    Q    On the plan of this note--this urology note,

5         still Deposition Exhibit G, the No. 2 plan was no

6         intervention for right varicocele since

7         asymptomatic, did I read that right?

8    A    Yes, sir.

9    Q    What does that mean?

10   A    It means the fluid collections are not causing

11        any problem.

12   Q    If you could turn to Deposition Exhibit I, bates

13        No. 1565.

14   A    Yes, sir.

15   Q    This was a note that was authored by--I think, a

16        neurologist, is that right?

17   A    No, sir.

18   Q    At least the person who did the--

19   A    No, sir.  These are preventative medicine and

20        rehab doctors.

21   Q    Okay.  They did the nerve conduction velocity

22        studies.

23   A    Yes, sir.

24   Q    The physical exam on the second page of that

25        exhibit 1566 bates number, has the initials NAD,

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 113

1       what does that mean?

2   A   No apparent distress.

3   Q   And, then based on your education, training and

4       experience, the results of this nerve conduction

5       study, does it show a degree or severity of

6       neuropathy?

7   A   No, sir.

8   Q   And, is the type of neuropathy that's documented

9       as the first finding under the electrodiagnostic

10       impression, is that a life threatening finding?

11   A   No, sir.

12   Q   Is that an unusual finding in the normal

13       population to have some degree of neuropathy?

14   A   Neuropathys are not uncommon and we usually look

15       for a cause.

16   Q   Now--

17   A   --okay, but--

18   Q   I'm sorry, I didn't mean to interrupt.

19   A   I'm done.

20   Q   When we see neuropathy, that means that there's

21       some interruption or there's some disturbance in

22       the innervation of that extremity, is that right?

23   A   Correct.  There's a problem with the nerve of

24       some etiology.

25   Q   Is it comparable to or similar to in nature

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 114

```
 1        what's called carpal tunnel syndrome?
 2   A    Carpal tunnel can cause a neuropathy of the
 3        median nerve.  Yes, sir.
 4   Q    Okay.  And, to differentiate, this was the ulnar
 5        nerve, which is not the same thing that's
 6        involved in carpal tunnel, true?
 7   A    True.
 8   Q    The last deposition exhibit which is K, bates No.
 9        1859 is the narcotic contract you were asked some
10        questions about.
11   A    Yes, sir.
12   Q    It appears from my looking at this document on
13        the second page, there's a note that it was
14        revised on March 14th of 2002, do you see that?
15   A    Yes, sir.
16   Q    Now, you had these narcotic contracts available
17        at the Veterans Administration for use, at least
18        as far back as March 14th of 2002, is that right?
19   A    Yes, sir.
20   Q    This wasn't something new that came about during
21        your care of this patient, is that right?
22   A    No, sir.
23   Q    It appears that it took approximately, about
24        eighteen months or so--
25   A    Yes, sir.
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 115

1   Q   --for this contract to be made part of the

2       patient's medical record--

3   A   Yes, sir.

4   Q   --from when the first time that you saw him, is

5       that about right?

6   A   Yes, sir.

7   Q   Why does it take--why did it take eighteen months

8       or so, whatever the exact breakdown was, in this

9       case?

10  A   Initially, they were available and not commonly

11      in use.  And, so everybody was not put on

12      narcotic contracts when they first came into the

13      system.  And, then at some point as people were

14      coming in to the system and being put on the pain

15      medicines, we started and then at some point we

16      had to go back and get those people that we

17      didn't put on initially.  Occasionally, if I--

18      even if I'm writing recurring pain medicine, if I

19      think I'm going to get you off of them, this

20      problem's going to go away, it's not going to be

21      a long acting thing, I won't start it

22      immediately.  Or if we stay under the 100 tablets

23      a month type thing, and things are getting

24      better, I won't initiate it.  When we get to the

25      point where they're not going to issue more than

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 116

1        100 tablets a month for a short acting pain

2        medicine and I'm going to have to put you on

3        something chronically, then I will institute it,

4        which was the case here.

5   Q    And, you may have explained this before and if

6        you did, I apologize, I just want to make sure

7        I'm clear.  One of the reasons why you have

8        patients sign these narcotic contracts are

9        because there's real dangers with long term

10       narcotic use.

11  A    Absolutely.  We don't like to use them, if we can

12       help it.

13  Q    All right.  And, one of those things is the risk

14       of dependency--

15  A    Yes, sir.

16  Q    --or abuse of the narcotics, is that right?

17  A    Yes, sir.

18              MR. BOOKER:  Doctor, I thank you very

19              much for your time.  That's all the

20              questions I have right now.

21              MR. BACKMAN:  Kelly?

22

23                  CROSS EXAMINATION

24  BY MS. CHOATE:

25  Q    Yes.  Hi, Doctor.  I'm Kelly Choate and I

Deposition of Dr. Alacia Bigham  /  October 7, 2005

```
 1         represent the administrators from the Illinois

 2         Department of Corrections.  I will get you out of

 3         here really quick, I just have a couple of

 4         questions for you.

 5    A    Uh-huh.  (Yes)

 6    Q    Would you agree with me that there are some

 7         medical problems that even a lay person could

 8         determine needs a certain type of medical care?

 9    A    Yes, sir (sic)--ma'am.

10    Q    For example, like a fracture where the bone is

11         sticking out of the leg, would that be something

12         that you think a lay person could look at and say

13         gees, this person needs to go to the hospital?

14    A    Yes.

15    Q    Now, regards the type of problems that Mr. Hayes

16         presented with, would those be the types of

17         medical problems that a lay person would be able

18         to diagnose?

19    A    No, ma'am.

20    Q    Would those be the types of medical problems that

21         a lay person would be able to determine what sort

22         of treatment was appropriate?

23    A    No, ma'am.

24    Q    In your--and I realize you testified earlier that

25         you had not seen any of the documentation from
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 118

```
 1        the Illinois Department of Corrections, is that

 2        correct--

 3   A    Yes.

 4   Q    --at the time you saw Mr. Hayes?

 5   A    Yes, that's correct.

 6   Q    So, you never saw any documentation where the

 7        administrators of the Department of Corrections

 8        were told that the treatment Mr. Hayes was

 9        receiving was inappropriate, is that correct?

10   A    No, ma'am.  I don't believe I did.

11             MS. CHOATE:  I have nothing further.

12             MR. BACKMAN:  I have a few follow-up.

13

14                 REDIRECT EXAMINATION

15   BY MR. BACKMAN:

16   Q    Matt made the point that pain, and you agree,

17        that pain is subjective as opposed to medical

18        findings that are objective, can be objective,

19        correct?

20   A    Yes.

21   Q    Now, when you say that pain is subjective, is it

22        fair to say, nonetheless, that there are certain

23        medical conditions that you know to a high degree

24        of medical certainty are going to cause pain.

25   A    Yes, sir.
```

Deposition of Dr. Alacia Bigham / October 7, 2005

Page 119

1    Q    So, the example Kelly gave, if--Ms. Choate, if

2         somebody comes in with the--with a bone sticking

3         out of their leg, you expect that person will

4         state that they have pain.

5    A    Yes.

6    Q    Okay.  And, but that's still, in your view,

7         considered subjective, what their level of pain

8         is, right?

9    A    Correct.

10   Q    Now, you indicated that pain--and your

11        determination of whether you view it as being--at

12        what level it's at has to do in part with your

13        view of the person's honesty and sincerity,

14        correct?

15   A    Correct.

16   Q    So, you would not view a particular person's

17        medical condition and attending pain--strike

18        that.  Let me ask you this, Doctor.  When you--

19        after examining Doctor Hayes (sic) on September

20        30th, that was the Exhibit A exam.

21   A    Okay.

22             MR. BOOKER:  Mr. Hayes.

23             MR. BACKMAN:  What did I say, Doctor

24             Hayes?  Sorry.

25   A    Yes, Your Honor.

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 120

1    Q    Thanks.

2    A    No problem.

3    Q    After examining Mr. Hayes on September 30th, can

4         you as you sit here today, think of any reason

5         not to have referred him to a urologist?

6    A    No, sir.

7    Q    Now, it turns out that Mr. Hayes did not have

8         cancer in his testicles, correct?

9    A    Correct.

10   Q    And, the curvature problem was not a severe long

11        term problem, correct?

12   A    Correct.

13   Q    So, if, on September 30th, you were confident

14        that the cysts and swelling were not cancerous or

15        malign--

16   A    Uh-huh.  (Yes)

17   Q    --if you believe that--

18   A    Uh-huh.  (Yes)

19   Q    --and if you likewise--well, and I don't even

20        think in the September 30th notes you had

21        anything about a curvature, right?

22   A    No.  I didn't.  It was in--mentioned in the UCU

23        note, but it wasn't anything that I mentioned in

24        my note, correct.

25   Q    Okay.  So, based on those two things, if you

Deposition of Dr. Alacia Bigham  /  October 7, 2005

```
1        believe at that point that the cysts were not a

2        problem--

3   A    Uh-huh.  (Yes)

4   Q    And, if you didn't have any idea about a

5        curvature problem--

6   A    Uh-huh.  (Yes)

7   Q    --is it fair to say the only reason for not

8        sending Floyd to a urologist at that point would

9        have been if you just were disregarding his pain?

10               MR. BOOKER:  I object to the form of

11               the question.  It's un--

12  A    I can't answer that.

13               MR. BOOKER:  Hold on, let me finish my

14               objection.

15               MR. BACKMAN:  Okay.

16  A    I can't answer that.

17               MR. BOOKER:  I think it misstates the

18               evidence and I think it's just an

19               improper form of the question and it

20               calls for speculation.  Subject to

21               that, if you can answer, Doctor, go

22               ahead.

23  A    I don't think I can.  I mean, I really don't.  I

24       don't--

25  Q    If you can't answer it--
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 122

```
 1   A    I can't--

 2        --don't guess.

 3   A    --answer it that way.  I can't answer that.

 4   Q    Okay.  The--Matt made the point that it is

 5        indicated in the notes that when--that is in the

 6        medical records--

 7   A    Uh-huh.  (Yes)

 8   Q    --that when Floyd was supine, lying down, that

 9        his testicle appeared to descend, correct?

10   A    Correct.

11   Q    Would the distension of the testicle when he's

12        lying down remove the--all of the pain that was

13        being experienced from the cramping when it was

14        up?  Would it be immediate relief?

15   A    You'll have to ask the urologist that, I don't

16        know that.  I don't know that.

17              MR. BACKMAN:  That's all I have.

18              MR. BOOKER:  I don't have any further

19              questions.  Kelly?

20              MS. CHOATE:  I have nothing further.

21           FURTHER THIS WITNESS SAITH NOT

22

23              MR. BOOKER:  You have an opportunity to

24              review a copy of the transcript--

25   A    Okay.
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 123

```
 1              MR. BOOKER:  --that's going to be
 2              generated.  You can check it for
 3              typographical accuracy, you can't say,
 4              oh, I remember some more stuff and put
 5              it--you can trust that she did a good
 6              job and just say you reserve it or you
 7              waive that right or you reserve it.  It
 8              makes no difference to anyone in this
 9              room.  So, if you just trust that she
10              did a good job, then you can waive it.
11              MR. BACKMAN:  You have no particular
12              reason to--
13    A    I don't have any reason to do that.  No.
14              MR. BOOKER:  We have to tell you
15              though.
16    A    Okay.  That's fine.
17              MR. BOOKER:  Thank you very much for
18              your time.
19    A    You're welcome.
20              MR. BACKMAN:  Yes.  Thank you.
21              MS. CHOATE:  Thank you.
22
23
24
25
```

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 124

1

2

3    STATE OF KENTUCKY )

4                     )

5    COUNTY OF FRANKLIN)

6

7

8        I, Melody Curtis, a Notary Public in and for the state

9

10   and county aforesaid, do hereby certify that the foregoing

11

12   testimony was taken by me at the time and place and for the

13

14   purpose stated in the caption;  that the witness was duly

15

16   sworn by me before giving her testimony;  that said

17

18   testimony was taken down in shorthand writing by me and

19

20   later reduced to typewriting under my direction;  and the

21

22   foregoing is a true record of the testimony given by said

23

24   witness.

25

Deposition of Dr. Alacia Bigham  /  October 7, 2005

Page 125

1

2        I further certify that no written request has been

3

4   made before the officer by any party to the action

5

6   requesting that the foregoing transcript of testimony be

7

8   submitted to the witness and, therefore, such proceeding is

9

10  not signed by the witness.

11

12

13       Witness my hand and notarial seal this 14th day of

14

15  October, 2005.

16

17

18                          _____

19                          Notary Public

20                          State of Kentucky at Large

21

22

23  My commission expires:  6/13/2008

24