**E-FILED**
Tuesday, 20 March, 2007  10:17:05 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| FLOYD K. HAYES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-1062 |
| | ) | |
| DONALD N. SNYDER, JESSE | ) | |
| MONTGOMERY, MARK A. PIERSON, | ) | |
| WANDA L. BASS, and WILLIAM M. | ) | |
| HAMBY, M.D., Ph.D., each in their | ) | |
| individual capacities only, | ) | |
| | ) | |
| Defendants. | ) | |

# O R D E R

This matter is now before the Court on Defendants' Motions for Summary Judgment. For the reasons set forth below, Defendant Hamby's Motion for Summary Judgment [#32] is GRANTED, and the Motion for Summary Judgment by Defendants Snyder, Montgomery, Pierson, and Bass [#33] is also GRANTED.

## BACKGROUND

Plaintiff, Floyd Hayes ("Hayes"), is a 60-year-old former inmate in the Illinois Department of Corrections. In 1997, he was sentenced to 10 years' imprisonment and was ultimately incarcerated at the Hill Correctional Center ("HCC") in Knox County, Illinois.

Hayes claims that he began experiencing problems with his left testicle in September 2000. He was examined by Dr. Chaudry, the medical director at HCC at that time. At that time, the doctor's notes reflect a statement by Hayes that the cysts were causing him discomfort but no pain. On October 9, 2000, Hayes received an ultrasound, which revealed a cyst on his right testicle and a smaller cyst on his left testicle. Blood work was analyzed,

with a complete blood count coming back normal.  Urinalysis was normal, and tests came back negative for HIV, tumor markers for PSA, Alpha Feto Protein and Beta HcGon.   Dr. Chaudry educated him about epidydimal cysts and after discussing Hayes' case with a consulting urologist on December 16, 2000, concluded that neither the removal of the cysts nor a referral for a urology consult/biopsy was indicated.

In March 2001, Hayes filed a grievance complaining that he should be seen by a board certified urologist and receive a biopsy on his cyst.  He also requested to be transferred to a federal prison so that his medical benefits could provide appropriate treatment.  The grievance officer denied the grievance after noting that Hayes had received appropriate screening related to his physical complaints, including special lab tests and an ultrasound.  Warden Pierson concurred with this ruling on April 4, 2001, as did the Administrative Review Board Office of Inmate Issues on behalf of Donald Snyder, Director of the Illinois Department of Corrections.

On September 23, 2001, he visited HCC's medical unit for the pain.  The next day, he was examined by a doctor in the medical unit, and the doctor prescribed an antibiotic for possible infection and Tylenol 3 for the pain.

On October 4, 2001, Hayes returned to the medical unit and was personally seen by Defendant Dr. William Hamby, the Medical Director of the unit.  Hayes claims that he was experiencing swelling and cramping in his left testicle.  However, Dr. Hamby's notes from that day reflect complaints of frequency and urgency in urination and observed suprapublic tenderness.  After diagnosing high cholesterol, a possible urinary tract infection, and gastritis, Dr. Hamby prescribed Keflex, Tylenol, and Tagamet and advised Hayes to return in 10 days.

- 2 -

Hayes returned to the medical unit on October 15, 2001, as directed.  He asserts that he again complained of severe pain in his left testicle, but Dr. Hamby's treatment notes indicate only continued discomfort in his left testicle.  An examination revealed tenderness but no identified abnormality.  Dr. Hamby prescribed an athletic supporter and advised Hayes to return in two weeks.

On October 29, 2001, Hayes was seen in the medical unit by Dr. Richard Shute. Hayes reported continued pain and swelling in his scrotum.  Dr. Shute's notes indicate that his plan was to refer Hayes for a urology work up, but there is no evidence that he ever completed any of the forms required to refer an inmate out for an outside consultation or treatment, and Dr. Hamby testified that no request for a referral to an outside physician was ever presented to him by Dr. Shute.  Hayes never received the referral for a urology work up.

On January 13, 2002, Hayes returned to the medical unit complaining, "My cyst is bigger.  I feel and I'm in pain they don't want to check it out any further because I'm short."[1] The following day, Dr. Hamby performed a review of Hayes' medical file and recommended that Hayes be seen by a doctor.

On January 25, 2002, Hayes saw Dr. Shute again and reported increased pain while urinating and an upward curvature in his penis.  Dr. Shute noted that Hayes' left testicle was pulled upward and was much higher than his right testicle, but he observed no penile curvature.  Dr. Shute further observed that the ultrasound results were non-conclusive but suggestive of epdidymal cysts and that the patient had improved in the past with a course

---

[1] This is apparently a reference to the fact that he had a relatively short time before his release date.

of antibiotics. He prescribed an antibiotic, ibuprofen, and ice packs, as well as recommended a repeat ultrasound. There is no reference in Dr. Shute's notes to any need for an outside referral or consultation.

Hayes saw Dr. Shute again on February 6, 2002. Although Hayes complained of continued left scrotal pain, his primary complaints appear to have been with respect to a lump in his forearm. Dr. Shute's recommended treatment was to continue taking ibuprofen.

On February 14, 2002, Hayes returned to Dr. Shute to review x-ray results of his forearm. At that time, he also requested a change in pain medication for his testicular pain. Dr. Shute recommended that he continue to take ibuprofen and use an ice pack.

On April 17, 2002, Hayes complained that his scrotum still swelled but that it responded somewhat to ice packs. Dr. Shute renewed his prescription for ibuprofen and ice packs.

Hayes wrote a letter to IDOC Assistant Deputy Director Montgomery in which he complained about the medical treatment that he was receiving for his scrotum and forearm and requested an early release so that he could seek additional medical treatment. On May 24, 2002, HCC Assistant Warden Bass responded to this letter. In her response, Assistant Warden Bass stated that she had contacted the medical unit and Health Care Director and that they had indicated that Hayes had been seen and was being monitored.

 In May 2002, Dr. Shute stopped providing medical services to HCC. From this point on, Hayes did not receive permission to obtain ice packs for his pain. From late May 2002 through July 2002, Hayes made four sick call requests to see a doctor, each of which he claims was rejected. However, Hayes admits that he was seen by a nurse in July 2002, who prescribed Ibuprofen for him. Defendants respond that none of these requests were

- 4 -

ever actually presented to the medical unit, as they have no stamp on them indicating that they were received in the medical unit.

On June 10, 2002, Hayes wrote to Assistant Warden Bass seeking reconsideration of her prior letter.  He challenged her previous conclusions, reiterated that he was suffering from pain and was being denied pain medication, and speculated that his cysts could be cancerous.  Assistant Warden Bass responded on June 17, 2002, indicating that she had again contacted the medical unit administrator and had his chart reviewed.  She stated that based upon her review, he had a history of scrotal cysts that occasionally swelled and caused him pain but responded to ice packs and Ibuprofen.  She further noted that both the urologist that Hayes saw in December 2000 and the current medical director "indicate that you do not require further intervention.  However, if you feel you need further education regarding cysts, please sign up for nurse sick call."

On or about June 20, 2002, Hayes filed a formal grievance in which he reports that he has repeatedly complained about his "extreme pain, cancer, and swollen testicals [sic], and lack of medical care to all concerned parties."  On July 1, 2002, Warden Pierson responded to the grievance, stating that his review of Hayes' concerns and prior correspondence revealed that Hayes' concerns had been appropriately addressed.  On July 12, 2002, the Grievance Officer prepared a report summarizing the medical treatment of Hayes' condition and findings by medical personnel and concluding that there was no evidence to substantiate any misconduct by HCC staff.  Warden Pierson concurred with this assessment on July 18, 2002.

Hayes was released from HCC and placed on parole on August 15, 2002.  He proceeded directly to the VA Hospital in Danville, Illinois, for treatment complaining of his

scrotal pain and post-traumatic stress disorder.  Hayes was seen by Dr. Amin, a urologist, who determined that Hayes might be seeking drugs and that he "was not going to go for it" at that time.  On August 25, 2002, he was discharged from the VA Hospital with prescriptions for Ibuprofen and Darvocet for his pain.

On September 12, 2002, Hayes was seen at the VA Hospital in Lexington, Kentucky, where he reported his testicular pain and cramping to a nurse.  On September 30, 2002, he was seen by Dr. Alicia Bigham, who noted that an ultrasound had been scheduled and prescribed Lortab for his pain.  On October 10, 2002, he was seen by Dr. William Terence Conner, a urologist at the VA, who indicated that Hayes had "L. Epidymimal pain and crematic muscle spasm with chronic pain and peronies disease."  He subsequently received further treatment for his condition from various physicians.

On March 3, 2004, Hayes filed this Complaint, alleging that Defendants Snyder, Montgomery, Pierson, Bass, and Hamby had been deliberately indifferent to his serious medical needs.  Defendants have now moved for summary judgment, and this Order follows.

## STANDARD OF REVIEW

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that

there is an absence of evidence to support the non-moving party's case." Id. at 325.  Any

doubt as to the existence of a genuine issue for trial is resolved against the moving party.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139,

1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of

presenting specific facts to show that there is a genuine issue of material fact.  Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  Federal Rule of Civil

Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce

evidence of a genuine issue for trial.  Celotex, 477 U.S. at 324.  Nevertheless, this Court

must "view the record and all inferences drawn from it in the light most favorable to the

[non-moving party]."  Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir.

1989).  Summary judgment will be denied where a reasonable jury could return a verdict

for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

## ANALYSIS

States have a duty to provide adequate medical care to incarcerated persons.

Boyce v. Moore, 314 F.3d 884, 888-89 (7th Cir. 2002).  In connection with this duty, prison

officials' deliberate indifference to a serious injury or medical need violates a prisoner's right

under the Eighth Amendment to be free from cruel and unusual punishment.  Greeno v.

Daley, 414 F.3d 645, 652-53 (7th Cir. 2005); Chapman v. Keltner, 241 F.3d 842, 845 (7th

Cir. 2001); Wynn v. Southward, 251 F.3d 588, 593 (7th Cir. 2001), citing Estelle v. Gamble,

429 U.S. 153, 182-83 (1976).  The injury or need must be objectively serious, and the

official must personally know of the risk and consciously disregard it.  See Henderson v.

- 7 -

Sheahan, 196 F.3d 839, 845 (7th Cir. 1999); Mathis v. Fairman, 120 F.3d 88. 91 (7th Cir. 1997); Wynn, 251 F.3d at 593.

An objectively serious injury or medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Chapman, 241 F.3d at 845, *quoting* Zentmyer v. Kendall County, 220 F.3d 805, 810 (7th Cir. 2000)(*quoting* Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997)).  An objectively serious condition also presents itself if "'failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain.'" Reed v. McBride, 178 F.3d 849, 852 (7th Cir. 1999), *quoting* Gutierrez, 111 F.3d at 1373.

The subjective component (deliberate indifference) does not encompass negligence or even gross negligence.  Id., *citing* Salazar v. City of Chicago, 940 F.2d 233, 238 (7th Cir. 1991); Farmer v. Brennan, 511 U.S. 825, 836 (1994).  The prisoner must "show that the prison official was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed to the prisoner's health or safety." Wynn, 251 F.3d at 593, *citing* Farmer v. Brennan, 511 U.S. at 837; Zentmyer, 220 F.3d at 811.  A prisoner is not required to show that he or she was "literally ignored." Sherrod v. Lingle, 223 F.3d 605, 611 (7th Cir. 2000)(jury could find deliberate indifference, "[i]f knowing that a patient faces a serious risk of appendicitis, the prison official gives the patient an aspirin and an enema and sends him back to his cell.") Deliberate indifference may also be inferred "when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate the person responsible did not base the decision on such a judgment." Estate of Cole v.

- 8 -

Pardue, 94 F.3d 254, 261-62 (7th Cir. 1996); *see also,* Collingnon v. Milwaukee County, 163 F.3d 982, 989 (7th Cir. 1998)(deliberate indifference may be established if "response so inadequate that it demonstrated an absence of professional judgment, that is, that nominally competent professional would not have so responded under the circumstances.") However, malpractice or disagreement with a doctor's treatment decisions cannot be the basis for an Eighth Amendment challenge.  Steele v. Choi, 82 F.3d 175, 178-79 (7th Cir. 1996); Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996).

      I.     Claim Against Defendant Hamby

      The record reveals that Hayes was seen by Dr. Hamby on two occasions in Ocotber 2001.  On October 4, 2001, Dr. Hamby's notes reflect that Hayes complained of frequency and urgency in urination and observed suprapubic tenderness.  After examination, Dr. Hamby diagnosed high cholesterol, a possible urinary tract infection, and gastritis. He prescribed Keflex, Tylenol, and Tagamet for these conditions and advised Hayes to return in 10 days.

      On October 15, 2001, Hayes returned to the medical unit.  Dr. Hamby's notes indicate that Hayes was still experiencing discomfort in his left testicle.  After examination, Dr. Hamby noted that the testicle was tender but that he identified no abnormality and that the epidydimitis was resolving.  He prescribed the use of an athletic supporter and advised Hayes to return in two weeks.  That was the last time that Hayes was personally seen by Dr. Hamby; after that, treatment was provided by other physicians in the medical unit.

      From these notes, it would appear that Dr. Hamby examined Hayes, evaluated his condition, and treated him pursuant to his diagnosis.  Medical treatment notes further indicate that his cysts remained stable during his time at HCC.  The record is devoid of

evidence indicating that Dr. Hamby personally knew that there was an objectively serious medical need and consciously disregarded it.  The fact that Hayes requested but did not receive a referral to an outside physician, a biopsy of his cyst, or a specific type of pain medication does not satisfy this showing, as it is well-settled that inmates are not entitled to a specific type of treatment, or even the best care, only reasonable measures to prevent a substantial risk of serious harm. Forbes v. Edgar, 112 F.3d, 262, 267 (7th Cir. 1997).

Both prior to and following Dr. Hamby's examinations, Hayes was seen regularly by other physicians who reached similar conclusions and recommended similar treatment. Despite Hayes' speculation to the contrary, there is no admissible evidence suggesting that Dr. Hamby influenced or interfered with the findings or treatment recommended by any of the examining physicians who treated him while at HCC.  Moreover, shortly after his release from HCC, Hayes was examined by Dr. Amin, a urologist at the VA hospital.  Dr. Amin made findings and treatment decisions that were very similar to those reached by Dr. Hamby and indicated that he thought that Hayes might have been "drug seeking."  The fact that another physician ultimately made a different diagnosis and recommended different treatment almost a year after Dr. Hamby conducted his examinations does not in and of itself establish deliberate indifference.  Youngber v. Romeo, 457 U.S. 307, 322-23 (1982).

There is nothing in the record indicating that Hayes had been diagnosed by a physician with a medical need that mandated treatment, nor is there any indication that Dr. Hamby's treatment was such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that he did not base his decision on such judgment.  Furthermore, Hayes concedes that the medical problems with which he presented were not the sort that a layperson could diagnose or determine what treatment

was appropriate.  In summary, the record demonstrates nothing more than the exercise by Dr. Hamby of his professional judgment.

Even assuming arguendo that Hayes has demonstrated that Dr. Hamby should have been aware of the fact that Hayes' cysts continued to be problematic and could support the inference that his condition posed a substantial risk of serious harm, that is only half of Hayes' burden.  He must also show that Dr. Hamby actually drew that inference and either intended to harm Hayes or knew that the risk of harm was so significant that an intent to harm could be inferred from the course of treatment prescribed.  Higgins v. Correctional Medical Services, 178 F.3d 508, 511 (7th Cir. 1999); Smith-Bey v. Hospital Administrator, 841 F.2d 751, 759 (7th Cir. 1988).  No reasonable jury could find that this showing has been made on the record before the Court.

The Court finds that the record does not support any inference of deliberate indifference.  At best, Hayes has shown that Dr. Hamby was negligent in diagnosing or treating his testicular condition, which is insufficient to support a valid Eighth Amendment claim.  Steele, 82 F.3d at 178-179; Sanville v. McCaughtry, 266 F.3d 724, 734 (7th Cir. 2001) (holding that a complaint that a physician committed malpractice or was negligent in diagnosing or treating an inmate's medical condition does not rise to the level of an actionable claim under the Eight Amendment.)  Dr. Hamby is therefore entitled to summary judgment on Hayes' Eighth Amendment claim against him.[2]

---

[2] Dr. Hamby also raises a defense of qualified immunity under Harlow v. Fitzgerald, 457 U.S. 800, 818 (1992), which requires a showing of a violation of a federal right and that the constitutional standards implicated were clearly established at the time in question.  As the Court has found that Hayes did not make an adequate showing that his Eighth Amendment rights were violated, Dr. Hamby would also be entitled to qualified immunity.

II.    <u>Claim Against IDOC Defendants</u>

Hayes concedes that IDOC Director Snyder had no personal involvement in this case and consents to the entry of summary judgment in his favor.  However, he continues to allege that Montgomery, Pierson, and Bass were deliberately indifferent to his serious medical needs during his incarceration at HCC.  "Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals."  <u>Johnson v. Doughty</u>, 433 F.3d 1001, 1011 (7th Cir. 2006).

Here, there is no dispute that Hayes was seen for his testicular cysts and forearm on a continued basis by the medical providers in HCC's medical unit.  It is also undisputed that he never spoke directly with Montgomery, Pierson, or Bass about his medical concerns, but believes that they checked into his medical care.

Hayes filed his first grievance on March 27, 2001.  The grievance officer consulted with the medical unit administrator and reported that Hayes had received an appropriate screening related to his complaints, including special lab tests, an ultrasound, and education.  The grievance officer recommended that the grievance be denied, and Warden Pierson concurred with the recommendation on April 4, 2001.  After review of the grievance officer's report and subsequent recommendation, the Administrative Review Board Office of Inmate Issues responded on behalf of IDOC Director Snyder and concluded that the issue was appropriately addressed by the institutional administration.

Hayes directed an April 16, 2002, letter to Assistant Deputy Director Montgomery.  Montgomery's designee contacted HCC and asked that the allegations made in the letter be investigated.   Mary Lindley, an administrative assistant at HCC, then requested

- 12 -

information from the medical unit regarding Hayes' medical condition.  Dr. Hamby then reviewed Hayes' medical file and prepared a written response detailing the course of Hayes' treatment in the medical unit from September 18, 2000, through April 17, 2002, including the results of tests that were performed, examination observations, and prescribed treatments/medications.  Dr. Hamby concluded that "telephone consultation and length of follow-up indicate that the epididymal cysts are simply cysts.  Biopsy and/or surgical excision are not indicated at this time."

On May 24, 2002, Assistant Warden Bass responded that upon investigation, his medical concerns have been reviewed by the appropriate medical staff.  Following additional correspondence, Bass had a specific discussion with the medical unit administrator, and Hayes' medical file was reviewed again.  On June 17, 2002, she acknowledged his history of scrotal cysts that responded to ice packs and Ibuprofen.  Although Bass mistakenly indicated that Hayes had been examined by a urologist in December 2000 when there had in fact been a telephone consultation between Dr. Chaudry and the consulting urologist, she noted that this consultation and the current opinion of the medical director indicated that his condition did not require further intervention.  She concluded that if he felt that he needed further education, he should sign up for sick call.  After reviewing Bass' responses and the information from the medical director, Warden Pierson also wrote to Hayes stating that after reviewing his complaints and the responses that were provided, it appeared that his concerns had been appropriately addressed.

Hayes filed a grievance on June 21, 2002.  On July 12, 2002, the grievance officer recommended that Hayes' grievance be denied based on Dr. Hamby's detailed response

- 13 -

indicating that Hayes had been treated and tested according to the symptoms presented, prescribed analgesics and ice for his discomfort, and that his cysts had remained stable except for self-reported swelling and occasional tenderness.  The grievance officer noted that Hayes had received antibiotics where associated urinary tract symptoms were present with no evidence of an acute problem documented.  Warden Pierson concurred in this recommendation on July 18, 2002.

The record reveals that at each step of the process, the appropriate officials or their designees made appropriate inquiries of the medical staff and reviewed the available medical information regarding Hayes' condition and treatment.  The IDOC defendants are not trained medical personnel, and it is apparent that they relied on the information provided by the medical unit.  As such, they were presumptively justified in believing that Hayes was in capable hands.  Greeno, 414 F.3d at 655-56.

Hayes argues that the presumption does not apply where prison officials have "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner."  Id.  In support of this assertion, he contends that Montgomery, Pierson, and Bass knew from his April 2002 letter and June 2002 correspondence that he was suffering from severe pain and that Dr. Hamby's May 2002 medical summary evidenced that he was minimizing the seriousness of his pain and refusing to provide appropriate treatment.  Thus, Hayes maintains that their conduct was not reasonable reliance on medical personnel, but rather a conscious decision to disregard his suffering.

With all due respect, the fact that Hayes continued to experience pain does not negate the fact that the IDOC Defendants knew that he had continued to be examined by

- 14 -

medical personnel and had received diagnostic testing, antibiotics, pain medication, and other treatment for his condition. If this were the case, then every inmate who continued to self-report pain from a condition for which he was receiving treatment would have an Eighth Amendment claim for deliberate indifference. This is not the law in this circuit.

These Defendants were aware of Hayes' complaints of pain. However, he has not established that they disregarded his complaints or had a sufficiently culpable state of mind. The record indicates that they (or their designees) investigated the complaints, referred them to the medical providers for response, found that the medical staff was monitoring the situation and providing treatment, and reasonably deferred to the medical professionals' opinions. This is all that the Constitution requires of non-medical prison officials, particularly where Hayes' own treating physician has opined that the medical problems with which he presented were not the sort that a layperson could diagnose or determine what treatment was appropriate. Johnson, 433 F.3d at 1010-11, citing Greeno, 414 F.3d at 656, and Bond v. Aguinaldo, 228 F.Supp.2d 918, 920 (N.D.Ill. 2002). On the record before the Court, Defendants Montgomery, Pierson, and Bass did not act with deliberate indifference to Hayes' rights under the Eighth Amendment and are therefore insulated from liability.[3]

## CONCLUSION

For the reasons set forth herein, the Motion for Summary Judgment [#32] by Defendant Hamby is GRANTED, and the Motion for Summary Judgment [#33] by

---

[3] As with Dr. Hamby, the Court has concluded that Hayes has failed to establish the violation of a federal right. The IDOC Defendants would therefore be entitled to qualified immunity.

Defendants Snyder, Montgomery, Pierson, and Bass is also GRANTED.  This matter is now terminated.

ENTERED this 19th day of March, 2007.

s/ Michael M. Mihm
Michael M. Mihm
United States District Judge